## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------------x
                                          :
                                          :
In re:                                    : Chapter 11
                                          :
WINDSOR PETROLEUM TRANSPORT               : Case No. 14–11708 (____)
CORPORATION, et al.,¹                     :
                                          : (Joint Administration Requested)
                    Debtors.              :
                                          :
-----------------------------------------------------------------x
```

## DECLARATION OF PAUL M. LEAND, JR. IN SUPPORT OF VOLUNTARY PETITIONS, FIRST DAY MOTIONS AND APPLICATIONS

I, Paul M. Leand, Jr., hereby declare:

1.     I am the Managing Director and Chief Executive Officer of AMA Capital Partners LLC ("**AMA**").  AMA has served as restructuring advisor to the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") since September of 2013.  As of July 11, 2014, each of the Debtors has appointed me Chief Restructuring Officer ("**CRO**") as provided in the engagement letter between AMA and the Debtors.

2.     AMA and its professionals have provided strategic and M&A advisory services to parties in the transportation sector for two decades.  I joined AMA in 1998 and was appointed CEO of AMA in 2004. I lead AMA's restructuring practice, helping AMA earn its position as the pre-eminent maritime restructuring advisor for both creditors and companies alike. I have been involved in the restructuring of numerous high yield issues including Golden

---

¹     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, are:  Windsor Petroleum Transport Corporation (1381) ("**Windsor Petroleum**"),Windsor Holdings Limited, Buckingham Petro Limited, Buckingham Shipping Pl, Caernarfon Petro Limited, Caernarfon Shipping Plc, Sandringham Petro Limited, Sandringham Shipping Plc, Holyrood Petro Limited, and Holyrood Shipping Plc.  The mailing address for Windsor Petroleum is c/o Frontline Ltd., PO Box HM 1593, Par-la-Ville Place, 14 Par-la-Ville Road, Hamilton HM 08, Bermuda.  The mailing address for each of the other Debtors is Fort Anne, Douglas, Isle of Man, IM1 5PD, British Isles.

Ocean, ACL, Pegasus Enterprises, and Horizon Lines. On the offshore side, I have led AMA's

efforts in the restructurings of, among others, PetroMENA ASA, Sevan Marine ASA, Remedial

Offshore and Equinox Offshore. I serve as a Director of Golar LNG Partners LP (Nasdaq), Lloyd

Fonds AG ( Frankfurt Stock Exchange), North Atlantic Drilling (Oslo Stock Exchange), SeaDrill

Ltd. (NYSE), Ship Finance International Ltd. (NYSE) as well as privately held Helm

International. I hold a BS/BA from Boston University's School of Management.

   3.  On the date hereof (the "**Petition Date**"), Windsor Holdings Limited

("**WHL**") and 9 of its subsidiaries each filed a voluntary petition for relief under chapter 11 of

title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors continue to operate

their businesses and manage their properties as debtors in possession pursuant to §§ 1107(a) and

1108 of the Bankruptcy Code.  Concurrently herewith, the Debtors filed a motion seeking joint

administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**").

   4.  On the date hereof (the "**Petition Date**"), each of the Debtors filed a

voluntary petition with the Court for relief under chapter 11 of title 11 of the United States Code,

11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").

   5.  I submit this declaration (this "**Declaration**") in support of the Debtors'

petitions and motions requesting various types of "first day" relief (collectively, the "**First Day**

**Motions**") necessary to maintain the Debtors' operations, fulfill the Debtors' duties as debtors in

possession, and achieve a successful reorganization of the Debtors.  Except as otherwise

indicated herein, all facts set forth in this First Day Declaration are based upon my personal

knowledge of the Debtors' operations and finances, information learned from my review of

relevant documents, information supplied to me by other members of the Debtors' management

01:15716990.4

and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.                              .

A.      **General Background.**

    *Debtors' Business and Overview.*

    6.  The Debtors' business operations center around the ownership of four very large crude oil carriers named Pioneer, Progress, British Pride and British Purpose (each, a "**Vessel**" and collectively, the "**Vessels**").  As is fairly typical in the shipping industry, the Debtors have no employees.  Instead, the Debtors rely exclusively upon third-party managers to provide for the actual day-to-day operations of the Vessels, including on their commercial manager, Frontline, Ltd ("**Frontline**"), and with respect to certain of the Vessels, operational managers who handle day-to-day operations.

    7.  Windsor Petroleum Transport Corporation ("**Windsor Petroleum**"), a company organized under the laws of the State of Delaware, is a special purpose vehicle that was established in the United States to issue secured notes as agent on behalf of Debtors Buckingham Shipping Plc, Caernarfon Shipping Plc, Sandringham Shipping Plc, Holyrood Shipping Plc (collectively, the "**Shipping Companies**").  The four Shipping Companies are sister companies of four separate ship owning companies, also SPVs established in the Isle of Man−Debtors Buckingham Petro Limited, Caernarfon Petro Limited, Sandringham Petro Limited, and Holyrood Petro Limited (collectively, the "**Owner Companies**" and together with the Shipping Companies, the "**Operating Companies**").[2]  The Operating Companies and Windsor Petroleum

---

[2]   A corporate organizational chart is attached as **Exhibit A**.

are indirect wholly-owned subsidiaries of WHL, an Isle of Man holding company, which is a

wholly-owned subsidiary of Cambridge Oil Transport Corporation ("**COTC**"), a closely held

Cayman Islands corporation.

        8.     The Vessels were built and delivered between December 1999 and

November 2000.  At that time, the Shipping Companies each entered into a head lease with

subsidiaries of Abbey National Treasury Services for the Vessels and concurrently bareboat

chartered the Vessels to BP Shipping Limited ("**BP Shipping**"), a subsidiary of The British

Petroleum Company p.l.c. Once the four head leases were cancelled, ownership of the Vessels

was transferred to the Owner Companies.  The Vessels are leased from the Owner Companies by

the Shipping Companies under four separate leases.

        9.     The obligations of the initial charterer under each initial charter were

guaranteed by The British Petroleum Company p.l.c. ("**British Petroleum**") pursuant to a

guarantee (each, a "**BP Guarantee**").  The initial charterer was an indirect, wholly-owned

subsidiary of British Petroleum.  Pursuant to each initial charter, the initial charterer had the right

to terminate such initial charter at any time upon irrevocable written notice twelve months in

advance no earlier than the expiration of the period commencing on the delivery date for such

Vessel and terminating after approximately 9.0 years for Pioneer, 9.5 years for Progress, 10.0

years for British Pride and 10.5 years for British Purpose (each, a "**Fixed Period**").

        10.    During the Fixed Period, charter payments are unconditionally guaranteed

by British Petroleum and take place regardless of Vessel usage, except in the case of total loss,

which would be covered by BP's guarantee of BP Shipping's obligations under the bareboat

charters. The bareboat charters give BP Shipping responsibility for every aspect of vessel

operation, including possession of the Vessels; crews, maintenance, insurance, and operating

funds; and controls to ensure operation in accordance with all U.S. and international maritime and environmental laws.

11.    At the end of the Fixed Period, BP Shipping has the option to cancel each charter or, on a rolling 12-month basis, to renew it at then-current market rates.  Cancellation requires twelve months of advance notice and is irrevocable.  BP Shipping exercised its option to cancel its charters for Pioneer, Progress, and British Pride.  The bareboat charter with BP Shipping Limited for Pioneer terminated on January 10, 2011 at which time the Vessel was re-delivered to the Debtors and a majority-owned subsidiary of Frontline commenced technical management of the Vessel.  The bareboat charter with BP Shipping for Progress terminated on March 12, 2014 at which time the Vessel was re-delivered to the Company and a majority-owned subsidiary of Frontline commenced technical management of the Vessel.  The bareboat charter with BP Shipping for British Pride is scheduled to be terminated on or around August 27, 2014.  BP Shipping delivered a notice of termination of the bareboat charter with British Purpose, indicating that such termination shall be effective as of July 14, 2015.

12.    As a result, Pioneer and Progress currently trade on the spot market, British Pride will trade on the spot market when its charter termination becomes effective, and unless a replacement bareboat charter or purchaser for British Purpose can be found, it will also trade on the spot market when its charter termination becomes effective.[3]

13.    Frontline serves as manager for each of the Vessels pursuant to four separate management agreements.  Under the management agreements, the Manager manages all of the administrative and corporate obligations of the Operating Companies, which includes

---

[3]    Unlike a bareboat charter, under which the party contracting with the ship owner acquires use of a ship for a specified period of time, the party contracting with the ship owner under a spot charter contracts for the ship owner to carry cargo for a fixed fee from a loading port to a discharging port.

maintaining the books and records of each Operating Company, preparing and filing annual financial statements and tax returns, providing office staff and accommodation for each Operating Company, interacting with the trustee for the bonds with respect to any payments necessary for the operating, chartering and maintenance of the Vessels (which includes providing accounting of expenses and requesting from the trustee and maintaining funds for the ongoing operations of the vessels), obtaining and maintaining insurances, and making necessary payments.  Frontline also serves as administrative manager for each of the Vessels.  This includes monitoring and enforcing the terms of the bareboat charters with British Petroleum, reviewing and if necessary obtaining insurance policies for the Vessels, reviewing all necessary consents requested by, and assignments and subcharters of the Vessel by, the bareboat charterer, keeping books and records, and providing office accommodation to the extent necessary.  Frontline also serves as remarketing agent, which involves seeking buyers for vessels that come off bareboat charters in accordance with the requirements of the Secured Notes Indenture (as defined below) and, if no adequate bids can be obtained, chartering the Vessels on the spot market.  In connection with the Vessels trading on the spot market, Frontline contracts on the Debtors' behalf with "technical managers" and "post-fixture managers" who provide the Vessels' day-to-day technical and logistics management, including the staffing and payment of seaborne crew and obtaining supplies, services, and local permits necessary to operate the Vessels, which is far more economical and beneficial than building and operating an international infrastructure directly.  Frontline's reputation is an important factor in its ability to obtain spot charters for the Vessels, as companies seeking to charter a vessel generally prefer vessels that are managed by managers with well-established reputations.

*The Secured Notes*

14.     As of the date hereof, the substantial majority of the Debtors' liabilities – in excess of $188 million in the aggregate principal amount outstanding – consisted of funded debt (*i.e.*, not trade debt, derivative liability or warrants) comprised of the Secured Notes.

15.     On November 1, 1997, Windsor Petroleum, as agent for the Shipping Companies, issued $239,100,000.00 in the aggregate principal amount of secured notes (the "**Secured Notes**") under that certain Indenture (as amended, modified or supplemented from time to time, the "**Secured Notes Indenture**") between Windsor Petroleum as agent for the Shipping Companies, the Shipping Companies and the Bank of New York Mellon as successor indenture trustee to The Chase Manhattan Bank (the "Indenture Trustee") for the benefit of secured noteholders thereunder (the "**Secured Noteholders**" and together with the Indenture Trustee, the "**Secured Parties**").  Only the term notes under the Secured Notes Indenture remain outstanding and unpaid, which accrue interest at a rate of 7.84%.  As of the date hereof, $188.59 million remains outstanding under the Secured Notes. The Secured Notes mature on January 15, 2021, with the interest on the Secured Notes payable semi-annually on January 15 and July 15 of each year.  The proceeds of the Secured Notes issuance were used along with equity contributions (from Cambridge Oil Transport Corporation, an affiliate of WHL) and funds generated by certain UK finance leases to construct the four Vessels.

16.     The Secured Notes are secured by substantially all assets of the Shipping Companies (the "**Collateral**"), including, without limitation, (a) mortgages for each Vessel, (b) management agreements, (c) charters, (d) all rights of each Shipping Company to receive payments of any kind, all charterhire, tolls, rents, issues, profits, products, revenues and other income (including insurance, warranty and sales proceeds) from the Collateral, all of the estate,

right title and interest of such Shipping Company in and to the same and every part of said

property, (e) all moneys and securities including the trust accounts and any permitted

investments under the Secured Notes Indenture, and (f) all income, payment and proceeds of the

foregoing.  The Secured Notes are also secured by a pledge of the Operating Companies' stock

by WHL pursuant to a Stock Pledge Agreement, dated as of November 1, 1997 (as amended,

modified or supplemented from time to time, the "**Stock Pledge Agreement**"). The obligations

under the Secured Notes Indenture are not guaranteed by any of the Debtors.

**B.     Events Leading to These Chapter 11 Cases.**

17.     In the years preceding the commencement of these Chapter 11 Cases, the

Debtors' business operated in a uniquely challenging economic environment.  During this time

period, the growth in the supply of international crude oil and product tankers significantly

exceeded growth in demand, leading to a sharp fall in rates.

18.     Growth in demand for international crude oil and petroleum product

transportation services was depressed in the years prior to the Petition Date due to structural

changes in global oil supply and consumption. First, the global recession, which began in 2008,

depressed demand for crude oil and refined petroleum products. Global consumption of crude oil

went from 87.1 million barrels of oil per day in 2007 to 85.5 million barrels of oil per day in

2009, reversing a trend of increasing oil consumption that lasted more than 25 years. While

consumption rebounded somewhat in 2010 and 2011, the benefit was somewhat offset by

reduced growth in demand for seaborne transportation, particularly in North America.

19.     Additionally, a larger portion of global crude oil consumption was and is

being supplied from increased domestic production or crude oil inventory stock rather than from

foreign suppliers. From 2007 to 2011, consumption by members of the Organization for

Economic Co-operation and Development ("**OECD**"), which predominantly includes net

01:15716990.4

8

importers of crude oil, decreased by 3.7 million barrels per day, or 7.4%, while OECD

production for the same period increased. Thus, fewer international tankers were needed to

transport crude oil from oil-producing countries to OECD countries.

20.    Moreover, a growing percentage of oil produced by members of the

Organization of the Petroleum Exporting Countries ("**OPEC**") was and is being used internally

by the members of OPEC or to supply China and the Far East, while U.S. consumption of oil

produced by members of OPEC has dropped. For example, oil consumed by the United States

from members of OPEC decreased by 21% from 2008 to 2011, from 5.4 million barrels per day

to 4.2 million barrels per day. Conversely, Chinese consumption of oil produced by members of

OPEC increased from 2.6 million barrels per day in 2008 to 3.4 million barrels per day in 2011

(an increase of 31%). This shift led to a decrease in international tanker usage, as the voyage to

the U.S. from the Middle East is one of the longest possible voyages for seaborne crude oil

(approximately 44 days one-way from Saudi Arabia to Louisiana via the Cape of Good Hope),

while the voyage to China from the Middle East is generally less than half that length (18 days).

Overall, demand for international oil tankers decreased because growth of non-OECD demand

was not sufficient to offset declining oil demand in OECD areas and increased production in

non-OPEC areas.

21.    Against this backdrop of decreased demand for international oil tankers,

the global supply of oil and refined product tanker capacity increased steadily from 2002.

Improved market conditions during the years 2000 to 2007 resulted in shipping companies

ordering a substantial number of new vessels from 2006 to 2008. As new tankers are typically

delivered eighteen to thirty-six months after they are ordered, a substantial number of new

tankers entered the market between 2008 and 2011. The size of the global tanker fleet grew from

291 million deadweight tonnage ("**DWT**") in 2002 to 475 million DWT in 2011.  Further, the

international order book for new vessels (for tankers greater than 10,000 DWT) that were on

order as of November 14, 2012 represented 15 percent of the then-existing supply of new

vessels.  Thus, deliveries of tankers ordered before the 2008 recession have extended capacity

beyond what demand has absorbed.

22.    The increased supply of international crude and product tankers currently

in the market, together with decreased demand for international oil tanker services over the four

years prior to the Petition Date, caused charter rates for international crude and product vessels to

plummet, which has more of a stark impact on the Debtors as more of the Debtors' Vessels trade

on the spot market.  The effects of these market pressures have been felt across the industry,

resulting in the chapter 11 filing of a number of industry participants.

*Negotiations with Supporting Noteholders and the Restructuring Support Agreement*

23.    For many months prior to the filing of these chapter 11 cases, the Debtors

explored various restructuring alternatives with holders of the Secured Notes, including at least

70%, measured by claim size, of the holders of Secured Notes who are represented by Paul,

Weiss, Rifkind, Wharton & Garrison LLP (the "**Supporting Noteholders**"), in order to create a

consensual framework that would reduce the Debtors' debt burden and restructure their balance

sheet.  On July 14, 2014, after months of intensive negotiations, the Company and the

Supporting Noteholders entered into the restructuring support agreement attached hereto as

**Exhibit B** (the "**Restructuring Support Agreement**").  The Restructuring Support Agreement

binds the Supporting Noteholders to support a restructuring that would substantially reduce the

Debtors' debt burden, enhance their liquidity, and solidify the Debtors' long-term growth and

operating performance.  Specifically, the parties agreed to support a chapter 11 plan of

reorganization (the "**Plan**") that embodied the terms set forth in a term sheet annexed to the

01:15716990.4

Restructuring Support Agreement.  These terms, which the Debtors believe will allow for the

Debtors' chapter 11 reorganization process to be a brief one, provide for the following:

- Conversion of 100% of the debt outstanding under the Secured Notes Indentures into new common stock of the reorganized Debtors.

- Unimpairment of all General Unsecured Claims under section 1124 of the Bankruptcy Code.

- Equity Interests in WHL will be cancelled as of the Effective Date and holders of such Equity Interests in WHL will receive no distribution under the Plan.

24.    After good faith negotiations, the parties to the Restructuring Support

Agreement agreed that these terms will be embodied in definitive documentation, including the

plan, a disclosure statement in support of such plan, and solicitation procedures to be approved

by the Court.  Each party agreed to certain consent and consultation rights with respect to some

or all of the definitive documents.  Subject to the satisfaction of those consent rights, and other

conditions, the Supporting Noteholders are obligated to support the Plan and other elements of

the Debtors' chapter 11 cases.

**C.    The Debtors' First Day Motions.**

25.    Concurrently with the filing of these chapter 11 cases, the Debtors filed

the First Day Motions seeking relief related to the administration of the chapter 11 cases, their

operations, and their cash and financing needs.  A list of the First Day Motions is set forth below.

<u>Administrative and Operational First Day Motions</u>

i.    *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases*

ii.    *Debtors' Motion for an Order Confirming (I) the Enforcement and Applicability of Section 362 of the Bankruptcy Code and (II) the Debtors' Authority with Respect to Postpetition Operations*

iii.    *Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(b), 503(b), 1107(a) and 1108 of the Bankruptcy Code, (I) Authorizing the*

> *Debtors to Pay Certain Prepetition Obligations of Certain Critical and Foreign Vendors and Service Providers and (II) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers*

Cash and Financing First Day Motions

iv.    *Debtors' Motion for an Order, Pursuant to Sections 105(a) and 345(a) of the Bankruptcy Code, Bankruptcy Rule 2015 and Local Rule 2015-2, (I) Authorizing and Approving Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Waiving the Requirements of Section 345(b) on an Interim Basis and (IV) Granting Certain Related Relief*

v.    *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Secured Parties, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (D) Granting Related Relief*

26.    The Debtors have narrowly tailored the First Day Motions to meet their goals of:  (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible until such time as the restructuring is complete; (b) maintaining the confidence and support of their key customer constituencies during the reorganization process; and (c) establishing procedures for the efficient administration of these chapter 11 cases.

27.    I have reviewed and discussed with counsel each of the First Day Motions (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on Frontline and the Debtors' advisors.  I incorporate by reference the factual statements set forth in each of the First Day Motions as though set forth herein.

28.    It is my belief that the relief sought in each of the First Day Motions is necessary to the successful implementation of the Debtors' efforts to maximize creditor recoveries through a reorganization.  It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims, the relief requested is

01:15716990.4

essential to the Debtors' reorganization and necessary to avoid immediate and irreparable harm to the Debtors' estates.

29.     The success of the Debtors' chapter 11 cases depends upon their ability to maintain their operations to the extent necessary to effectuate the reorganization.  The relief requested in the First Day Motions is a critical component of maintaining the confidence of key constituencies necessary to implement an orderly restructuring.

30.     I respectfully request that all of the relief requested in the First Day Motions, and such other and further relief as may be just and proper, be granted.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
          July 14, 2014

                                              /s/ Paul M. Leand, Jr.
                                        Name:  Paul M. Leand, Jr.
                                        Title:   Chief Restructuring Officer

## **EXHIBIT A**

### **Corporate Organizational Chart**

***WINDSOR PETROLEUM - CURRENT STRUCTURE***



**Windsor Holdings Limited,**
an Isle of Man holding company
(HoldCo)

**100%**

**Windsor Petroleum Transport Corporation ("Windsor Petroleum"),**
a Delaware corporation
Issuer of $239,100,000 of 7.84% Term Secured Notes Due 2021 (the "**Notes**") and Agent for Buckingham Shipping Plc, Caernarfon Shipping Plc, Sandringham Shipping Plc and Holyrood Shipping Plc (collectively, the "**Companies**")

**Buckingham Petro Limited,** Isle of Man private company (Replacement Owner/Lessor)

**Caernarfon Petro Limited,** Isle of Man private company (Replacement Owner/Lessor)

**Sandringham Petro Limited,** Isle of Man private company (Replacement Owner/Lessor)

**Holyrood Petro Limited,** Isle of Man private company (Replacement Owner/Lessor)

**Buckingham Shipping Plc,** Isle of Man public limited company**

**Caernarfon Shipping Plc,** Isle of Man public limited company**

**Sandringham Shipping Plc,** Isle of Man public limited company**

**Holyrood Shipping Plc,** Isle of Man public limited company**

The Notes have NO guarantees.  The Notes are secured by substantially all assets of the Companies (collectively, "**Collateral**"), including:
- HoldCo's pledge of all outstanding stock of the Companies and Replacement Owners/Lessors;
- Mortgage and Promissory Note for each Vessel held by the Trustee for the benefit of the Noteholders;
- Lease Agreements between applicable Replacement Owner/Lessor and each Company;
- Management Agreements between the Manager and each Company;
- Each Acceptable Replacement Charter (as defined in the Indenture);
- All rights of each Company to receive payments of any kind;
- All the charterhire, tolls, rents, issues, profits, products, revenues and other income from the Collateral;
- All moneys and securities, including the Trust Accounts and any Permitted Investments, required to be paid or deposited with the Indenture Trustee; and
- All income, payments and proceeds of the foregoing.

\* Frontline Ltd. provides administrative and advisory services to the Companies and coordinates ship management under four management agreements (the "**Management Agreements**").

\*\* The Companies lease the Vessels from the applicable Replacement Owner/Lessor pursuant to four separate lease agreements (the "**Lease Agreements**").

**EXHIBIT B**

**Plan Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, supplemented or otherwise modified as provided herein, the "RSA"), dated as of July 11, 2014, is by and among Windsor Holdings Limited (the "Holdings"), an Isle of Man holding company, Windsor Petroleum Transport Corporation ("Windsor Petroleum" or the "Company"), a corporation duly organized and existing under the laws of the State of Delaware, Buckingham Petro Limited, an Isle of Man private company, Caernarfon Petro Limited, an Isle of Man private company, Sandringham Petro Limited, an Isle of Man private company, Holyrood Petro Limited, an Isle of Man private company, Buckingham Shipping Plc, an Isle of Man public limited company, Caernarfon Shipping Plc, an Isle of Man public limited company, Sandringham Shipping Plc, an Isle of Man public limited company, and Holyrood Shipping Plc, an Isle of Man public limited company, and each of their respective subsidiaries and any successors thereto (collectively with Holdings and Windsor Petroleum, the "Company Parties") and the holders set forth on the signature pages hereto of the 7.84% secured notes due 2021 (the "Secured Notes") issued under the Indenture, dated as of November 1, 1997 (as amended, supplemented, or modified from time to time, the "Indenture"), by and between Windsor Petroleum, as issuer and The Bank of New York Mellon, as successor indenture trustee to The Chase Manhattan Bank (the "Indenture Trustee"), in the aggregate principal amount of $239,100,000.00 (collectively, the "Initial Participating Holders" and each holder of the Secured Notes generally referred to as a "Noteholder" and collectively, as the "Noteholders"). The Company Parties, the Initial Participating Holders, and each other Noteholder that becomes a party hereto in accordance with the terms hereof (collectively with the Initial Participating Holders, the "Participating Holders") shall be referred to herein individually as a "Party" and, collectively, as the "Parties."

## RECITALS

**WHEREAS**, prior to the date hereof, representatives of the Company Parties and certain Participating Holders have discussed consummating a financial restructuring (the "Restructuring") of the Company Parties' consolidated indebtedness and other obligations on principal terms consistent with those set forth in this RSA and the Restructuring Term Sheet attached hereto as **Exhibit A** (the "Restructuring Term Sheet");

**WHEREAS**, the Company is considering commencing voluntary Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court to effect the Restructuring by means of the Plan (each as defined below);

**WHEREAS**, the Parties have engaged in good faith negotiations with the objective of reaching an agreement with respect to the Restructuring. Each Party has reviewed or has had the opportunity to review this RSA and the Restructuring Term Sheet with the assistance of professional legal advisors of its own choosing;

**WHEREAS**, the following sets forth the agreement among the Parties concerning their support, subject to the terms and conditions hereof and thereof to implement the

1

Restructuring.  In the event the terms and conditions as set forth in the Restructuring Term Sheet and this RSA are inconsistent, the terms and conditions contained in the Restructuring Term Sheet shall control.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1.  Definitions.  The following terms shall have the following definitions:

    "Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership, limited liability company or other ownership interests, by contract or otherwise) of such Person.

    "Affiliated Transferee" means with respect to the Participating Holder, any entity that, as of the date a Participating Holder becomes a Party to this RSA, is an Affiliate of such Participating Holder and, as of the date of any transfer of such Participating Holder's notes to such Affiliate, continues to be an Affiliate of that Participating Holder.

    "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

    "Ballot" means the ballot distributed with the Disclosure Statement for voting on the Plan.

    "Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which the New York Stock Exchange and banking institutions in New York, New York are authorized by law or other governmental action to close.

    "Chapter 11 Cases" means the voluntary chapter 11 cases to be commenced by the Company.

    "Company" has the meaning set forth in the preamble hereof.

    "Company Parties" has the meaning set forth in the preamble hereof.

2

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and which shall be in form and substance reasonably acceptable to the Requisite Participating Holders.

"Controlled Affiliate" means, with respect to any Noteholder, any other person that is controlled by such Noteholder or that serves as investment adviser for such Noteholder.

"Critical Dates" has the meaning set forth in Section 5.6 hereof.

"Disclosure Statement" means the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"Effective Date" means such day that is the business day as soon as reasonably practicable after all conditions to the occurrence of the effective date set forth in the Plan have been satisfied or waived.

"Filing Date" means the day that the Plan and Disclosure Statement are filed with the Bankruptcy Court.

"Frontline" means Frontline Ltd., a corporation organized under the laws of Bermuda.

"Indenture" has the meaning set forth in the preamble herein.

"Indenture Trustee" has the meaning set forth in the preamble hereof.

"Initial Participating Holders" has the meaning set forth in the preamble hereof.

"Management Agreements" means the amended management agreements by and between Frontline, as successor manager to Cambridge Fund Management L.L.C. and each of Buckingham Shipping Plc, Caernarfon Shipping Plc, Sandringham Shipping Plc, and Holyrood Shipping Plc.

"Noteholder(s)" has the meaning set forth in the preamble hereof.

"Party" or "Parties" has the meaning set forth in the preamble hereto.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"Participating Holder" means a Noteholder that becomes a party to the RSA.

"Participating Holders" has the meaning set forth in the preamble hereof.

"Plan" means the chapter 11 plan of reorganization filed in the Chapter 11 Cases implementing the terms and conditions of the Restructuring Term Sheet, consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Company and the Requisite Participating Holders, and all exhibits, supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, or modified from time to time.

"Requisite Participating Holders" means holders of the Secured Notes who collectively hold not less than 66 2/3% of the principal amount of the Secured Notes.

"Restructuring" has the meaning set forth in the recitals hereto.

"Restructuring Documents" means the Plan, the Disclosure Statement, Ballots and other solicitation materials in respect of the Plan, any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement, and a proposed confirmation order.

"Restructuring Term Sheet" has the meaning set forth in recitals herein.

"Securities Act" means Securities Act of 1933, as amended.

"Secured Notes" have the meaning set forth in the preamble herein.

"Secured Note Claims" means any and all "claims" (as such term is defined in section 101(5) of the Bankruptcy Code) against any of the Company Parties held by Noteholders arising under or related to the Indenture.

"Termination Date" has the meaning set forth in Section 5.6 hereof.

"Termination Event" has the meaning set forth in Section 5 hereof.

"Transfer" has the meaning set forth in Section 3(b).

2.    Effectuating the Restructuring. As long as a Termination Event has not occurred, subject to the terms and conditions of this RSA, the Parties shall use their commercially reasonable efforts to:

(a)    effectuate and consummate the Restructuring on the terms described in this RSA and the Plan;

(b)    implement the Restructuring;

(c)    obtain all necessary approvals and consents for the Restructuring from all requisite governmental authorities and third parties;

(d)    complete each of the other transactions as contemplated by this RSA and the Plan; and

4

(e)        take no actions inconsistent with this RSA and the Plan or the expeditious consummation of the Restructuring.

Without limiting any other provision hereof, as long as a Termination Event has not occurred, each Party hereby agrees to negotiate and cooperate in good faith in respect of all matters concerning the implementation and consummation of the Restructuring. Furthermore, as long as a Termination Event has not occurred, each Party shall take such action as may be reasonably necessary to carry out the purposes and intent of this RSA.

3.    Agreements of Participating Holders.  Subject to (i) the terms and conditions of this RSA and (ii) approval by the Bankruptcy Court of a Disclosure Statement, and other solicitation materials in respect of the Plan as containing "adequate information" under section 1125 of the Bankruptcy Code, each Participating Holder agrees that:

(a)        as long as a Termination Event (as defined herein) has not occurred or has occurred but has been duly waived in accordance with the terms hereof, so long as it is the legal owner, beneficial owner and/or the investment advisor or manager of or with power and/or authority to bind any Noteholder, it shall (and shall cause each of its Controlled Affiliates, subsidiaries, representatives, agents and employees to) use its commercially reasonable efforts to support the Restructuring and  (i) to vote all Secured Note Claims (as such term is defined in the Plan) as to which it is the legal owner, beneficial owner or otherwise has the power and/or authority to bind any Noteholder now or hereafter in favor of the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and accompanying solicitation materials, and timely return a duly-executed Ballot in connection therewith; (ii) not withdraw or revoke its vote with respect to the Plan; (iii) mark its Ballot to grant any releases provided for in the Plan; and (iv) not take any action, including, without limitation, initiating or joining in any legal proceeding inconsistent with, or which would reasonably lead to a delay in the consummation of the Restructuring and the transactions contemplated under the RSA, the Plan and any other related documents.

(b)        as long as a Termination Event (as defined herein) has not occurred or has occurred but has been duly waived in accordance with the terms hereof, it shall not (and shall cause each of its Controlled Affiliates, subsidiaries, representatives, agents, and employees not to) sell, transfer or assign, or grant, issue or sell any option, right to acquire, voting participation or other interest in (each, a "Transfer") any Secured Notes, unless the transferee party (i) first agrees in writing to be subject to the terms and conditions of the RSA as a "Participating Holder," and executes a counterpart signature page to the RSA and (ii) delivers notice of such transfer along with the executed counterpart signature page to the RSA to the Company Parties.   Any Transfer that does not comply with the foregoing shall be deemed void ab initio.  This RSA shall in no way be construed to preclude the Participating Holders from acquiring additional

5

Secured Notes, <u>provided</u> that any such additional Secured Notes shall automatically be deemed to be subject to the terms of the RSA. In addition, for so long as the RSA has not been terminated in accordance with its terms, a Participating Holder may offer, sell or otherwise transfer any or all of its Secured Notes to any Affiliated Transferee, who shall be automatically deemed bound by this RSA as a Participating Holder; <u>provided</u>, <u>however</u>, that if any Participating Holder sells or otherwise transfers all of its Secured Notes in accordance with this subsection (b) such that it is no longer a Noteholder, such Participating Holder shall no longer have any obligations hereunder.

Nothing in this RSA shall prohibit any Party from appearing as a party-in-interest in any matter in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not inconsistent with this RSA, the Plan or the Restructuring and are not for the purpose of hindering, delaying or preventing consummation of the Restructuring.

4.    <u>Agreement of the Company</u>.    Subject to the terms and conditions of this RSA, the Company Parties:

(a)    agree to use commercially reasonable efforts to (i) support and complete the Restructuring and all other actions contemplated in connection therewith, (ii) take any and all necessary and appropriate actions in furtherance of the Restructuring, (iii) obtain any and all required regulatory approvals and third-party approvals for the Restructuring, and (iv) not take any actions inconsistent with this RSA, the Plan and any other related documents executed by the Company or the expeditious consummation of the Restructuring;

(b)    shall not, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to, or enter into any agreements relating to, any alternative proposal other than the Restructuring, nor shall the Company Parties solicit or direct any person or entity, including, without limitation, any member of the Company's board of directors or any holder of equity in the Company, to undertake any of the foregoing;

(c)    agree that all Restructuring Documents shall be in form and substance acceptable to the Requisite Participating Holders, in their reasonable discretion; and

(d)    agree to pay all reasonable and documented fees and expenses of (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, legal advisor to certain holders of Secured Notes, and (ii) Houlihan Lokey, financial advisor to certain holders of Secured Notes, in connection with the Restructuring (including, without limitation, fees and expenses incurred after the Petition Date without the need to file any interim or final fee applications with the

bankruptcy court or otherwise seek bankruptcy court approval of any such payments).

5.   Termination.

Subject to Sections 5.7, 5.8 and 5.9, this RSA may be terminated upon the occurrence of any of the following events by any Party electing to terminate to the other Parties (each a "Termination Event"):

5.1   by the Requisite Participating Holders:

(a)   if the Company Parties shall have breached any of their obligations under the RSA as set forth herein in any material respect, which breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Requisite Participating Holders;

(b)   if any conditions in the RSA are not satisfied when required to be satisfied, or become incapable of being satisfied, in the reasonable discretion of the Requisite Participating Holders, which conditions remain unsatisfied for a period of five (5) business days after the receipt of written notice thereof from the Requisite Participating Holders;

(c)   the entry of an order by the Bankruptcy Court invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the Secured Note Claims, the Indenture, or the liens securing the Secured Note Claims;

(d)   if an examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Cases or the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code or the Chapter 11 Cases shall have been dismissed by order of the Bankruptcy Court;

(e)   if the Company files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this RSA and such motion or pleading has not been withdrawn within five (5) Business Days of the Company receiving notice from the Requisite Participating Holders that such motion or pleading is inconsistent with this RSA;

(f)   at 11:59 p.m. prevailing Eastern Time if the Company fails to commence the Chapter 11 Cases on or before July 14, 2014, without the written consent of the Requisite Participating Holders;

(g)   at 11:59 p.m. prevailing Eastern Time if the Company fails to file (i) the Plan with the Bankruptcy Court within thirty (30) Business Days of the Petition Date, and (ii) the Disclosure Statement within thirty (30) Business Days of the Petition Date, in each case without the written consent of the Requisite Participating Holders;

(h) at 11:59 p.m. prevailing Eastern Time if the Disclosure Statement shall not have been approved by the Bankruptcy Court within forty-five (45) days of the Filing Date;

(i) at 11:59 p.m. prevailing Eastern Time if the Plan shall not have been confirmed by the Bankruptcy Court within ninety (90) days from the Filing Date;

(j) at 11:59 p.m. prevailing Eastern Time if the Effective Date under the Plan shall not have occurred within one hundred and twenty days (120) from the Filing Date;

(k) any of the Restructuring Documents shall have been modified in any material respect or withdrawn, without the prior consent of the Requisite Participating Holders;

(l) the entry by the Bankruptcy Court of an order (i) denying approval of the Disclosure Statement or confirmation of the Plan, or (ii) granting relief that is inconsistent with this RSA or the Plan in any material respect;

(m) if any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, or prohibiting the Restructuring in a material way that cannot be reasonably remedied by the Parties;

(n) if the Company fails to obtain an order from the Bankruptcy Court within thirty (30) days of the Petition Date, in form and substance reasonably satisfactory to the Requisite Participating Holders, approving the use of cash collateral, which order shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without the prior written consent of the Requisite Participating Holders; or

(o) if the Company amends the Plan or Disclosure Statement in a manner materially adverse to the Participating Holders or if the Restructuring Documents are not reasonably acceptable to the Requisite Participating Holders.

5.2 by the Company Parties:

(a) if a Participating Holder shall have breached any of its material obligations under the RSA as set forth herein or therein in any material respect, which breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Company; provided that the Termination Event arising as a result of such breach shall apply only to such Participating Holder and this RSA shall otherwise remain in full force and effect, so long as the Requisite Participating

Holders have not breached the RSA, with respect to the Company Parties and all other Participating Holders;

(b)        if a Participating Holder has failed to comply with its obligations in Section 3 of this RSA; or

(c)        if any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, or prohibiting the Restructuring in a material way that cannot be reasonably remedied by the Parties.

5.3    by the mutual consent of the Requisite Participating Holders and the Company Parties for any reason.

5.4    The date on which this RSA is terminated in accordance with the foregoing Sections 5.1, 5.2 or 5.3 hereof shall be referred to as the "Termination Date". Notwithstanding any provision in this RSA to the contrary, upon written consent of the Requisite Participating Holders, each of the dates set forth in section 5.1 (f) through (j) (the "Critical Dates") may be extended prior to or upon such date and such later dates agreed to in lieu thereof and shall be of the same force and effect as the dates provided herein.

5.5    In the event any Party to this RSA asserts that a Termination Event has occurred, such Party shall provide written notice to all other Parties to this RSA stating that a Termination Event has occurred and the basis for such assertion.

5.6    Upon receipt of written notice provided under Section 5.8, any Party may seek expedited relief with a court of competent jurisdiction, challenging such assertion that a Termination Event has occurred, and no Party to this RSA shall be permitted to challenge such request for expedited relief.

5.7    If a Termination Event occurs, this RSA shall terminate automatically unless the Requisite Participating Holders provide the Company written notice within three (3) Business Days (such 3 Business Day period to start on the day such Termination Event occurs, if such day is a Business Day, and on the first Business Day after the day such Termination Event occurs, if such day is not a Business Day) that such Termination Event has been waived, cured, modified or the time to perform the requirements herein extended.

6.    Good Faith Cooperation; Further Assurances; Restructuring Documents.  As long as a Termination Event has not occurred, the Participating Holders and the Company hereby covenant and agree to (x) negotiate in good faith the Restructuring Documents, each of which shall (i) contain terms consistent in all material respects with, the terms set forth herein, and (ii) except as otherwise provided for herein, be in form and substance reasonably acceptable in all respects to the Requisite Secured Participating Holders; and (y) execute (to the extent such Party is a party thereto) and otherwise support the Restructuring Documents.  As long as a Termination Event has not occurred, the

Company shall provide draft copies of all "first day" motions or applications that the Company intends to file with the Bankruptcy Court to counsel for the Requisite Participating Holders as soon as reasonably practicable prior to the date when the Company intends to file each such document, which, except as otherwise provided for herein, shall be in form and substance acceptable in all respects to the Requisite Participating Holders.

7.    <u>Effectiveness</u>. This RSA will be effective and binding upon the Company and the undersigned Participating Holders as of the date on which: (i) the Company shall have executed and delivered counterpart signature pages of this RSA to counsel to the Participating Holders, (ii) the Requisite Participating Holders shall have executed and delivered counterpart signature pages of this RSA to counsel to the Company, and (iii) all reasonable and documented fees and expenses, which are due and owing prior to the execution of this RSA, of Paul, Weiss, Rifkind, Wharton & Garrison LLP, have been paid.

8.    <u>Representations and Warranties</u>. Each Party hereby represents and warrants to the other Parties that the following statements are true and correct as of the date hereof:

(a)    it has all requisite corporate, partnership, limited liability company, or similar authority to enter into this RSA and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this RSA and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company, or other similar action on its part;

(b)    the execution, delivery, and performance by such Party of this RSA does not and shall not (i) violate (A) any provision of law, rule, or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(c)    except as otherwise provided herein and except for any filings required to be made with the Securities and Exchange Commission or other securities regulatory authorities under applicable securities laws, the execution, delivery, and performance by such Party of this RSA does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body;

(d)    this RSA is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by

equitable principles relating to enforceability or a ruling of a court of competent jurisdiction; and

(e)     If such Party is a Participating Holder, and subject to any limitations set forth in its signature page's listing of owned securities (e.g., held in total return swap), such Participating Holder, as of the date of this RSA:

(i)     is the beneficial owner of the principal amount of the Secured Notes set forth on the signature page hereto, or is the nominee, investment manager, or advisor for one or more beneficial holders thereof, and has voting power or authority or discretion with respect to, the Secured Notes, including, without limitation, to vote, exchange, assign, and transfer such Secured Notes;

(ii)     holds its notes free and clear, other than pursuant to this RSA, of any claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrances of any kind that could materially adversely affect in any way such Participating Holder's performance of its obligations contained in this RSA at the time such obligations are required to be performed (except that a non-material portion of Secured Notes may be on loan); and

(iii)     (A) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this RSA and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this RSA and (B) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended).

9.     Entire Agreement.  This RSA, including any exhibits, schedules and annexes hereto constitutes the entire agreement of the Company Parties and the Participating Holders with respect to the subject matter of this RSA, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this RSA.

10.     Reservation of Rights.  Except as expressly provided in this RSA, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Party to pursue, protect and preserve its rights, remedies, and interests, including, without limitation, its claims against other Parties or parties or their respective Affiliates. Nothing herein shall be deemed an admission of any kind.  Nothing contained herein effects a modification of the Parties' or the Indenture Trustee's rights under the Secured Notes, the Indenture, or other documents and agreements unless and until the Effective

Date has occurred and only then as set forth in the Restructuring Documents. If the transactions contemplated herein are not consummated, or if this RSA terminates for any reason prior to the Effective Date, the Parties fully reserve any and all of their rights.

11. <u>No Waiver</u>. This RSA is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto. If the transactions contemplated herein are not consummated, or following the occurrence of the Termination Date, if applicable, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights. Pursuant to *Federal Rule of Evidence 408* and any other applicable rules of evidence, this RSA and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

12. <u>Counterparts</u>. This RSA may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered personally or by electronic mail in portable document format (.pdf).

13. <u>Amendments</u>. Except as otherwise provided herein, this RSA may not be modified, amended or supplemented, or any provisions herein or therein waived without the prior written consent of the Requisite Participating Holders (and may be modified, amended or supplemented with such consent).

14. <u>No Assignment</u>. Subject to the terms and conditions of any valid Transfer hereunder, this RSA shall not be assigned by any party hereto without the prior written consent of the Participating Holders.

15. <u>Headings</u>. The headings of the sections, paragraphs and subsections of this RSA are inserted for convenience only and shall not affect the interpretation hereof.

16. <u>Relationship Among Parties</u>. It is understood and agreed that any Participating Holder may trade in the notes or other debt or equity securities of the Company without the consent of the Company or any Participating Holder, subject to applicable securities laws and <u>Section 3(b)</u> hereof. No Party shall have any responsibility for any such trading by any other entity by virtue of this RSA. No prior history, pattern or practice of sharing confidences among or between Parties shall in any way affect or negate this understanding and agreement. For the avoidance of doubt, (i) the execution of this RSA by any Participating Holder shall not create, or be deemed to create, any fiduciary or other duties (actual or implied) to any other Participating Holder, or other party other than as expressly set forth in this RSA and (ii) no Participating Holder shall be responsible for, or have any obligation with respect to, any duties or obligations of any other Participating Holder or other party under the RSA.

17. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this RSA by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an

order of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

18.     <u>Survival</u>.  Notwithstanding (i) any Transfer of the notes in accordance with Section 3(b) of this RSA or (ii) the termination of this RSA in accordance with its terms, only Sections 10, 11, 12, 14, 16, 21 and 23 and this Section 18 shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Participating Holder in accordance with the terms hereof.

19.     <u>Governing Law</u>.  This RSA shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of New York and of the United States of America in each case located in New York County for any action arising out of or relating to this RSA and the transactions contemplated hereby (and agrees not to commence any action relating hereto except in such courts), and further agrees that service of any process, summons, notice or document by U.S. registered mail to its address set forth in Section 20 shall be effective service of process for any action brought against it in any such court.

20.     <u>Notices</u>.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by electronic mail format (.pdf) with first class mail confirmation to the Parties at the following addresses or email addresses:

> If to any of the Company Parties:
>
> Windsor Petroleum Transport Corporation
> c/o Cambridge Fund Management LLC
> 535 Madison Avenue
> New York, New York 10022
> Attn:  Paul M. Leand, Jr.
>
> E-mail:  Pleand@amausa.com
>
> with a copy to (which shall not constitute notice):

Young Conaway Stargatt & Taylor, LLP
Pauline K. Morgan, Esq.
Sean Greecher, Esq.
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, New York 10020
E-mail:  pmorgan@ycst.com
            sgreecher@ycst.com

If to the Requisite Participating Holders:

To the addresses and email addresses set forth on the
signature pages hereto.

with a copy to (which shall not constitute notice):

Andrew N. Rosenberg, Esq.
Elizabeth R. McColm. Esq.
Oksana Lashko, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York  10019
E-mail:  arosenberg@paulweiss.com
            emccolm@paulweiss.com
            olashko@paulweiss.com

or such other address or email address as such party may hereafter specify by like notice to the other parties hereto.  All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 P.M. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

21.    No Third-Party Beneficiaries.  The terms and provisions of this RSA are intended solely for the benefit of the Parties and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

22.    Termination Upon Effective Date of Plan.  Subject to Section 18, this RSA shall terminate automatically without any further required action on the Effective Date of the Plan.

23.    Public Disclosure.  Except as otherwise required by any law, rule, order or regulation, the Company Parties shall not (a) use the name of the Participating Holder or its manager, advisor, or Affiliates in any press release without the Participating Holder's

prior written consent or (b) disclose holdings of the Participating Holder to any Person; provided, however, that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of and aggregate percentage of notes held by the Participating Holders.  The Participating Holders shall not use the name of the Company Parties in any press release without the Company's prior written consent.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Company and any Participating Holder.

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized officers to execute and deliver this RSA as of the date first above written.

WINDSOR HOLDINGS LIMITED

By: _____
       Name:
       Title:

WINDSOR PETROLEUM TRANSPORT CORPORATION

By: _____
       Name:
       Title:

BUCKINGHAM PETRO LIMITED

By: _____
       Name:
       Title:

CAERNARFON PETRO LIMITED

By: _____
       Name:
       Title:

SANDRINGHAM PETRO LIMITED

By: _____
       Name:
       Title:

*Signature Page to Restructuring Support Agreement*

HOLYROOD PETRO LIMITED


By: _____
      Name:
      Title:


BUCKINGHAM SHIPPING PLC


By: _____
      Name:
      Title:

CAERNARFON SHIPPING PLC


By: _____
      Name:
      Title:

SANDRINGHAM SHIPPING PLC


By: _____
      Name:
      Title:


HOLYROOD SHIPPING PLC


By: _____
      Name:
      Title:

EXHIBIT A
**Restructuring Term Sheet**

**WINDSOR PETROLEUM TRANSPORT CORPORATION AND SUBSIDIARIES**
**RESTRUCTURING TERM SHEET**

**JULY 11, 2014**

THIS TERM SHEET (THE "***TERM SHEET***") SETS FORTH THE PRINCIPAL TERMS OF A PROPOSED RESTRUCTURING (THE "***RESTRUCTURING***") OF THE EXISTING INDEBTEDNESS AND OTHER OBLIGATIONS OF WINDSOR HOLDINGS LIMITED, WINDSOR PETROLEUM TRANSPORT COPPORATION AND CERTAIN OF THEIR DIRECT AND INDIRECT SUBSIDIARIES BEING DISCUSSED BY THE COMPANY (AS DEFINED BELOW) AND CERTAIN HOLDERS OF A MAJORITY OF OUTSTANDING PRINCIPAL AMOUNT (THE "***PARTICIPATING HOLDERS***") OF THE 7.84% TERM SECURED NOTES DUE 2021.  SUBJECT IN ALL RESPECTS TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT TO WHICH THIS RESTRUCTURING TERM SHEET WILL BE ATTACHED (THE "***RESTRUCTURING SUPPORT AGREEMENT***"), THE RESTRUCTURING WILL BE CONSUMMATED THROUGH A CASE OR CASES UNDER CHAPTER 11 (THE "***CHAPTER 11 CASE(S)***") OF TITLE 11 OF THE UNITED STATES CODE (THE "***BANKRUPTCY CODE***") IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "***BANKRUPTCY COURT***").  THIS RESTRUCTURING TERM SHEET HAS THE SUPPORT OF THE PARTICIPATING HOLDERS, AS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT.  CAPITALIZED TERMS USED BUT NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE MEANING ASCRIBED TO SUCH TERMS IN THE RESTRUCTURING SUPPORT AGREEMENT, PROVIDED THAT ANY REFERENCE TO REQUISUITE PARTICIPATING HOLDERS IN RESPECT TO A DEBT INSTRUMENT SHALL ONLY BE APPLICABLE TO THE EXTENT THAT SUCH REQUISITE PARTICIPATING HOLDERS HAVE NOT TERMINATED THE RESTRUCTURING SUPPORT AGREEMENT WITH RESPECT TO SUCH DEBT INSTRUMENT.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES, FOREIGN OR DOMESTIC.

THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN AND OTHERWISE BE SATISFACTORY TO THE PARTIES, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DOCUMENTATION.

| Transaction Overview | |
| --- | --- |
| Company | Windsor Holdings Limited ("***Holdings***"), Windsor Petroleum Transport Corporation ("***Windsor Petroleum***"), Buckingham Petro Limited, Caernarfon Petro Limited, Sandringham Petro Limited, Holyrood Petro Limited, Buckingham Shipping Plc, Caernarfon Shipping Plc, Sandringham Shipping Plc, and Holyrood Shipping Plc, and each of their respective subsidiaries and any successors thereto (collectively, the "***SPVs***" and together with Holdings and Windsor Petroleum, the "***Company***"). Holdings, and those of its direct and indirect subsidiaries that file Chapter 11 Cases, shall each be referred to as the "***Debtors***" or the "***Company Parties***" and post-reorganization, the "***Reorganized Company***." |
| Secured Noteholders | Holders (collectively, the "***Secured Noteholders***") of the 7.84% secured notes due 2021 (the "***Secured Notes***" and the claims thereunder, the "***Secured Note Claims***") issued under the Indenture, dated as of November 1, 1997 (as amended, supplemented, or modified from time to |

| | |
|---|---|
| | time, the "*Indenture*"), by and between Windsor Petroleum, as issuer and The Bank of New York Mellon, as successor indenture trustee to The Chase Manhattan Bank (the "*Indenture Trustee*"), in the aggregate principal amount of $239,100,000.00. As of the date hereof, $188.59 million of the principal amount remains outstanding under the Secured Notes. |
| The Restructuring | The Restructuring will be implemented through a pre-arranged Chapter 11 plan of reorganization (the "*Plan*") (upon obtaining acceptances of the Plan from Secured Noteholders of at least two-thirds in dollar amount and a majority in number of the Secured Claims that vote to accept or reject the Plan). |
| Treatment of Claims/Equity Interests | The Plan will provide that each holder of an allowed claim will receive the following on or as soon as practicable after the effective date of the Plan (the "*Plan Effective Date*"), unless different treatment is agreed to by the holder of such allowed claims and the Company with the consent of the Requisite Participating Holders: <br><br> • *Administrative, Priority, and Priority Tax Claims:* Allowed administrative, priority, and tax claims will be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. <br><br> • *GUC Claims:* Allowed general unsecured claims against the Debtors (collectively, the "*GUC Claims*") will either be reinstated or otherwise rendered unimpaired under the Plan. <br><br> • *Secured Note Claims:* On the Plan Effective Date, the holders of Secured Note Claims shall have an allowed claim in the amount of $188,590,000, plus accrued interest. Holders of Secured Note Claims will receive their pro rata share of 100% of the post-restructuring common equity of the Reorganized Company (the "*New Common Stock*"). <br><br> • *Intercompany Claims:* At the Debtors' option, with the consent of the Requisite Participating Holders, all intercompany claims and interests shall be either reinstated or receive no distribution on account of such claims and interests on the Plan Effective Date. <br><br> • *Existing Equity:* All existing equity interests (including common stock, preferred stock and any options, warrants or rights to acquire any equity interests) shall be cancelled on the Plan Effective Date. |
| Management Agreement | On the Plan Effective Date, the Company shall enter into amended management agreements (the "*Management Agreement(s)*") with Frontline (the "*Manager*"), which shall provide for the following: <br><br> 1) Frontline shall receive $125,000 per vessel per year for commercial management of the Windsor vessels. <br><br> 2) The Manager shall be entitled to a profit share of the earnings of the Vessel if such Vessel is bareboat chartered as follows: <br><br> Bareboat Hurdle Rate - Profit split/percentage payable to the |

2

| | |
|---|---|
| | Manager:<br><br>USD 10,000 up to USD 20,000 per day - 5.00%<br><br>USD 20,000 up to USD 30,000 per day - 10.00%<br><br>Greater than USD 30,000 per day     - 15.00%<br><br>Notwithstanding the foregoing, to the extent that such Vessel is chartered on a non-bareboat basis, the hurdles above will be increased by the actual operating and voyage expenses incurred by the Owner.<br><br>3) *Only earnings from vessels following termination of BP charters shall apply for purposes of profit sharing (e.g., earnings generated from vessels already chartered to BP shall be excluded).*<br><br>4) *Earnings shall be measured on an annual basis and any resulting Profit Sharing to Frontline shall be distributed annually.*<br><br>The Company shall not be entitled to terminate the Management Agreements before January 1, 2016 (the "***Fixed Period***"), provided that the Company can terminate the Management Agreements at any time in the event of a material breach by the Manager of the Management Agreements on ten (10) days' written notice to the Manager and Manager's failure to cure such breach within such ten (10) day notice period.  The Company shall be entitled to terminate the Management Agreements after the expiry of the Fixed Period by giving six (6) months written notice to the Manager but only if the Vessel is underperforming in the market as determined by reference to metrics based on London Tanker Broker Panel rate, to be tested annually and based on relevant routes.  Upon notice of termination being given, the Management Agreements shall terminate, in relation to the Vessel, upon the completion of the then current fixture.<br><br>In the event of termination of the Management Agreements, the parties shall consult and cooperate with each other in good faith for the purpose of ensuring an orderly and efficient transfer of the commercial management of the Vessel at a convenient and mutually agreed time and to that end, the Manager will endeavor to cooperate with any new manager of the Vessel appointed by the Owner. |
| Vessel Sale | In the event of sale of the vessels, 100% of net vessel sale proceeds shall be distributed to the Reorganized Company's equity holders until aggregate distributions equal the Principal Amount (defined below).<br><br>Net vessel sale distributions in excess of the Principal Amount shall be split 20% to Frontline and 80% to the Reorganized Company's equity holders.<br><br>"***Principal Amount***" means the principal amount equal to $196.00 million (par plus accrued as reduced by interim distributions to the Reorganized Company's equity holders). |
| Cash Collateral/Bankruptcy Court Filings | In advance of the Chapter 11 Cases, the Company and the Participating Secured Holders shall negotiate a consensual use of cash collateral, adequate to cover administrative costs. |
| Releases and Exculpation | The Plan and Confirmation Order shall provide customary release and exculpation provisions for the benefit of the Debtors, the Participating |

| | |
|---|---|
| | Holders, the Indenture Trustee, and their respective agents, affiliates, principals, officers, directors, attorneys, financial advisors or other professionals or representatives, each in their capacity as such. |
| Cancellation of Notes, Instruments, Certificates and Other Documents | On the Plan Effective Date, except to the extent otherwise provided under the Plan, all notes, instruments, certificates, and other documents evidencing claims against or interests in the Debtors shall be cancelled and the obligations of the Debtors related thereto shall be discharged. |
| Corporate Governance | A Board of Managers will be selected by the Requisite Secured Holders. Shareholders will have customary information rights and other minority protections to be provided for in a shareholder agreement/operating agreement. |
| Tax/Business Considerations | The Participating Holders and the Company shall use good-faith efforts to structure the Restructuring to the maximum extent possible in a tax-efficient and cost-effective manner for the benefit of the Participating Holders. |
| Governing Law | New York governing law and consent to exclusive New York jurisdiction. |