## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------------x
                                    :
                                    :Chapter 11
In re:                              :
                                    :Case No. 14–11708 (PJW)
WINDSOR PETROLEUM TRANSPORT          :
CORPORATION, et al.,[1]             :(Jointly Administered)
                                    :
                    Debtors.        :
                                    :
-------------------------------------------------------------------x
```

### DISCLOSURE STATEMENT FOR THE AMENDED PLAN OF REORGANIZATION OF THE DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

|  | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
|---|---|
|  | Pauline K. Morgan (No. 3650) |
|  | Sean T. Greecher (No. 4484) |
|  | Robert F. Poppiti, Jr. (No. 5052) |
|  | Andrew L. Magaziner (No. 5426) |
|  | Ashley E. Markow (No. 5635) |
| Dated:  October 8, 2014 | Rodney Square |
|  | 1000 N. King Street |
|  | Wilmington, Delaware 19801 |
|  | Telephone:  (302) 571-6600 |
|  | Facsimile:  (302) 571-1253 |
|  | *Counsel for the Debtors and Debtors in Possession* |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, are:  Windsor Petroleum Transport Corporation (1381) ("Windsor Petroleum"),Windsor Holdings Limited, Buckingham Petro Limited, Buckingham Shipping Plc, Caernarfon Petro Limited, Caernarfon Shipping Plc, Sandringham Petro Limited, Sandringham Shipping Plc, Holyrood Petro Limited, and Holyrood Shipping Plc.  The mailing address for Windsor Petroleum is c/o Frontline Ltd., PO Box HM 1593, Par-la-Ville Place, 14 Par-la-Ville Road, Hamilton HM 08, Bermuda.  The mailing address for each of the other Debtors is Fort Anne, Douglas, Isle of Man, IM1 5PD, British Isles.

| DISCLAIMER |
| --- |

The information contained in this disclosure statement including the Exhibits attached hereto (collectively, the "**Disclosure Statement**") is included herein for purposes of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to determine how to vote on the Plan.  No person is authorized by the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation regarding this Disclosure Statement or the Plan other than as contained in this Disclosure Statement and the Exhibits, Appendices, and/or other Schedules attached hereto, incorporated by reference or referred to herein, and if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.

The Disclosure Statement shall not be construed to be advice on the tax, securities or other legal effects of the Plan as to holders of Claims against, or Equity Interests in, the Debtors, the Reorganized Debtors, or any other person.  Each holder should consult with its own legal, business, financial, and tax advisors with respect to any matters concerning the Plan, this Disclosure Statement, the solicitation of votes to accept the Plan, and the transactions contemplated hereby and thereby.

Each holder of an impaired Claim entitled to vote on the Plan should carefully review the Plan, this Disclosure Statement and the Exhibits, Appendices and/or Schedules to both documents in their entirety before casting a ballot.  Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the Exhibits, Appendices, and/or Schedules annexed to the Plan and this Disclosure Statement.  Please be advised, however, that the statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein, and holders of Claims reviewing this Disclosure Statement should not infer at the time of such review that there has not been any change in the information set forth herein since the date hereof unless so specified.  *In the event of any conflict between the descriptions set forth in this Disclosure Statement and the terms of the Plan, the terms of the Plan shall govern.*

This Disclosure Statement and Plan shall not constitute or be construed as an admission of any fact or liability, a stipulation, or a waiver in connection with any existing or possible future litigation involving the Debtors or Reorganized Debtors, but rather as a statement made without prejudice solely for settlement purposes in accordance with Federal Rule of Evidence 408, with full reservation of rights, and is not to be used for any litigation purpose whatsoever by any person, party, or entity.

**The Boards of Directors of the Debtors have approved the Plan and recommend that the holders of Claims in the impaired class entitled to vote (Class 3) vote to accept the Plan.  The Plan has been negotiated with and has the support of holders of over 70% of the principal amount of the Secured Notes (the "Supporting Noteholders").**

**This Disclosure Statement, the Plan and the accompanying documents have been extensively negotiated with the legal and/or financial advisors to the Supporting Noteholders. The votes on the Plan are being solicited in accordance with the Restructuring Support Agreement dated July 14, 2014, which was executed by the Supporting Noteholders.**

The Debtors intend to confirm the Plan and cause the Effective Date to occur promptly after confirmation of the Plan. There can be no assurance, however, as to when and whether confirmation of the Plan and the Effective Date actually will occur. The confirmation and effectiveness of the Plan are subject to certain conditions precedent. *See* Section VII.A and Section VII.B -- "Conditions to Confirmation" and "Conditions to Effectiveness." There is no assurance that these conditions will be satisfied or waived. Procedures for distributions under the Plan are described under Section VI -- "Distributions Under the Plan." Distributions will be made only in compliance with these procedures.

If the Plan is confirmed by the Court and the Effective Date occurs, all holders of Claims against, and Equity Interests in, the Debtors (including, without limitation, those holders of Claims and Equity Interests that do not submit ballots to accept or reject the Plan or that are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

If the financial restructuring of the indebtedness contemplated by the Plan is not approved and consummated, there can be no assurance that the Debtors will be able to effectuate an alternative restructuring or successfully emerge from the Chapter 11 Cases, and the Debtors may be forced into a liquidation under chapter 7 of the Bankruptcy Code or under the laws of other countries. As reflected in the Liquidation Analysis, ***the Debtors believe that if operations are liquidated under chapter 7 of the Bankruptcy Code or otherwise, the value of the assets available for payment of creditors would be significantly lower than the value of the distributions contemplated by and under the Plan.***

This Disclosure Statement contains projected financial information regarding the Reorganized Debtors and certain other forward-looking statements, all of which are based on various estimates and assumptions. The management of the Debtors prepared the projections with the assistance of professional advisors. The Debtors' management did not prepare the projections in accordance with Generally Accepted Accounting Principles ("**GAAP**") or International Financial Reporting Standards ("**IFRS**") or to comply with the rules and regulations of the SEC or any foreign regulatory authority.

01:15870994.8

| **SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS** |
|---|

As of the date of distribution, neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "**SEC**") or any state authority.  The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan.  Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b).  The securities to be issued under the Plan on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act or any securities regulatory authority of any state under any state securities laws ("Blue Sky Laws").

The Debtors intend to rely on the exemption from the Securities Act and Blue Sky Laws registration requirements provided by section 1145(a)(1) of the Bankruptcy Code to exempt the issuance of securities issued under or in connection with the Plan, except to the extent that any person receiving securities under the Plan may be deemed an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "will," "should," "could," "intend," "consider," "expect," "plan," "anticipate," "believe," "predict," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology.  You are cautioned that all forward-looking statements involve risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  Important factors that could cause or contribute to such differences include those in Article X: "Certain Risk Factors to be Considered," generally and in particular "Additional Factors to be Considered--Forward-Looking Statements are not Assured, and Actual Results May Vary."  The Liquidation Analysis set forth in **Exhibit D**, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates or recovery projections may or may not turn out to be accurate.

01:15870994.8

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND EXECUTIVE SUMMARY ..................................................................1
    A.    Overview of Chapter 11.................................................................3
    B.    Voting Rights.................................................................3
    C.    Claims Entitled to Vote.................................................................4
    D.    Solicitation and Voting Process.................................................................5

II. SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER
    THE PLAN ..................................................................6

III. COMPANY BACKGROUND ..................................................................9
    A.    The Company's History and Businesses.................................................................9
    B.    The Company's Prepetition Capital Structure.................................................................11
    C.    Windsor Holdings Limited's Equity Holders.................................................................11

IV. EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11
    CASES ..................................................................12
    A.    The Company's Industry and Key Considerations.................................................................12
    B.    Negotiations with Supporting Noteholders and Restructuring Support
        Agreement.................................................................13

V. THE CHAPTER 11 CASES ..................................................................13
    A.    Significant First Day Motions and Retention of Professionals.................................................................13
    B.    Schedules and Statements of Financial Affairs.................................................................14

VI. SUMMARY OF THE PLAN ..................................................................14
    A.    Classification and Treatment of Administrative and Priority Claims,
        Claims and Equity Interests Under the Plan .................................................................14
        1.    Description and Treatment of Unclassified Claims.................................................................15
        2.    Classification and Treatment of Claims and Equity Interests.................................................................17
    B.    Means for Implementation of the Plan.................................................................20
        1.    General Settlement of Claims and Interests.................................................................20
        2.    Voting of Claims.................................................................21
        3.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.................................................................21
        4.    Limited Liability Company.................................................................21
        5.    Continued Corporate Existence and Vesting of Assets.................................................................22
        6.    Issuance of Common Units of New Holdco.................................................................22
        7.    Restructuring Support Agreement Professional Fees.................................................................23
        8.    Secured Notes Indenture Trustee Fees and Expenses.................................................................23
        9.    Cancellation of Existing Securities.................................................................24
        10.    Cancellation of Existing Securities.................................................................25
    C.    Provisions Regarding Corporate Governance of the Reorganized Debtor .................................................................25
        1.    Appointment of Managers.................................................................25
        2.    Powers of Officers.................................................................25
        3.    Corporate Action.................................................................25

D.  Procedures for Treating Disputed Claims..................................................26
E.  Allowed Claims. ........................................................................................27
F.  Allocation of Consideration.......................................................................28
G.  Insured Claims. .........................................................................................28
H.  Compliance with Tax Requirements..........................................................28
I.  Setoff and Recoupment.............................................................................29
J.  Executory Contracts and Unexpired Leases. .............................................29
    1.  Assumption of Executory Contracts and Unexpired Leases.....................29
    2.  Cure Claims. ......................................................................30
    3.  Reservation of Rights.........................................................30
    4.  Rejection of Executory Contracts and Unexpired Leases........................30
    5.  Assignment. .......................................................................31
    6.  Insurance Policies. .............................................................31
    7.  Post-Petition Contracts and Leases. ...................................32
K.  Effect of Confirmation of the Plan. ...........................................................32
    1.  Binding Effect. ..................................................................32
    2.  Discharge of the Debtors. ..................................................32
    3.  Injunction. .........................................................................32
    4.  Releases, Exculpations and Injunctions of Released Parties. ..................33
    5.  Preservation of Causes of Action.......................................35
    6.  Votes Solicited in Good Faith.............................................35
    7.  Preservation of Insurance. .................................................36
L.  Retention of Jurisdiction. ..........................................................................36
M.  Miscellaneous Provisions..........................................................................37
    1.  Immediate Binding Effect...................................................37
    2.  Governing Law. .................................................................37
    3.  Filing or Execution of Additional Documents....................37
    4.  Term of Injunctions of Stays..............................................37
    5.  Withholding and Reporting Requirements. .........................37
    6.  Exemption From Transfer Taxes. .......................................38
    7.  Payment of Statutory Fees. ................................................38
    8.  Amendment or Modification of the Plan. ............................38
    9.  Plan Supplement. ...............................................................38
    10. Conflicts.............................................................................38

VII. CONFIRMATION AND EFFECTIVENESS OF THE PLAN ...........................39
A.  Conditions Precedent to Confirmation.......................................................39

VIII. CONFIRMATION PROCEDURES ...................................................................41
A.  Confirmation Hearing ...............................................................................41
B.  Confirmation of the Plan. ..........................................................................42
    1.  Acceptance..........................................................................42
    2.  Standards for Confirmation.................................................43
    3.  Feasibility...........................................................................46
    4.  Best Interests Test. .............................................................46

IX. FINANCIAL PROJECTIONS AND VALUATION ............................................................48
    A.    Financial Projections.............................................................................49
        1.    Scope of Financial Projections...............................................50
    B.    Valuation of the Reorganized Debtors as of December 23, 2014........51

X. CERTAIN RISK FACTORS TO BE CONSIDERED ....................................................51
    A.    Certain Bankruptcy Law Considerations..............................................51
    B.    Certain Risks Related to the Debtors' Businesses and Operations.......54
    C.    Certain Risks Relating to the Common Units........................................63
    E.    Additional Factors to Be Considered....................................................65

XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ..........................................................................................................................66
    A.    Alternative Plan of Reorganization or Plan of Liquidation. ................66
    B.    Liquidation Under Chapter 7. ..............................................................67

XII. SECURITIES LAW MATTERS.................................................................................67
    A.    Bankruptcy Code Exemptions from Registration Requirements..........67
        1.    Securities Issued in Reliance on Section 1145 of the Bankruptcy
Code. ...................................................................................67
        2.    Subsequent Transfers of 1145 Securities...................................68

XIII. CERTAIN TAX CONSEQUENCES OF THE PLAN ................................................69
    A.    Federal Income Tax Consequences. .....................................................69
    B.    Certain Marshall Islands Tax Consequences. .......................................69

XIV. RECOMMENDATION AND CONCLUSION................................................................70

01:15870994.8

## TABLE OF EXHIBITS

**Exhibit A:**    List of Debtors

**Exhibit B:**    Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code

**Exhibit C:**    Financial Projections

**Exhibit D:**    Liquidation Analysis

**Exhibit E:**    Analysis of Certain Federal Income Tax Consequences of the Plan

**Exhibit F:**    Corporate Organizational Chart


THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

01:15870994.8

# I. <u>INTRODUCTION AND EXECUTIVE SUMMARY</u>

Windsor Petroleum Transport Corporation ("**Windsor Petroleum**") and certain of its affiliates, as chapter 11 debtors and debtors in possession (each a "**Debtor**" and collectively the "**Debtors**" or the "**Company**"[2]) in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**") submits this Disclosure Statement pursuant to section 1126 of title 11 of the United States Code (the "**Bankruptcy Code**"), for use in the solicitation of votes on the Amended Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code, dated as of October 8, 2014 (as the same may be amended from time to time) (the "**Plan**").  A copy of the Plan is annexed as **<u>Exhibit B</u>** to this Disclosure Statement.  **Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan.**

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make informed decisions on whether to vote to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding the Company's prepetition operating and financial history, the need to seek chapter 11 protection, significant events that are expected to occur during the Chapter 11 Cases, and the Debtors' anticipated organization, operations, and liquidity upon successful emergence from chapter 11 protection.

The Plan and this Disclosure Statement are the result of months of discussions followed by extensive and vigorous negotiations among the Company and the Supporting Noteholders.  The culmination of these negotiations was the entry into the restructuring support agreement filed on the Petition Date (the "**Restructuring Support Agreement**"), upon which the Plan is premised, by the Company and the holders of more than 70% of the principal amount of the Secured Notes.  The key components of the Plan are as follows:

- Holders of Allowed General Unsecured Claims, including Allowed Claims of trade vendors, suppliers, customers and charterers, will not be affected by the filing of the bankruptcy cases and, to the extent such Claims have not been paid in full in the ordinary course of business during the pendency of the Chapter 11 Cases, the Claims will be reinstated and left unimpaired under the Plan in accordance with their terms as part of the overall settlement embodied in the Plan.

- Holders of all Allowed Administrative Claims, Priority Tax Claims, statutory fees, Other Priority Claims and Other Secured Claims shall receive payment in full, in Cash.

- All Claims under the Secured Notes Indenture shall be converted into 100% of the ownership units of New Holdco.

---

[2] All of the Debtors are set forth in **<u>Exhibit A</u>** attached hereto.

The Company and the parties to the Restructuring Support Agreement believe that the proposed restructuring under the Plan is extremely favorable for all stakeholders because it achieves a substantial deleveraging of the Company's balance sheet (approximately $188 million) through consensus with the overwhelming majority of the Company's creditors and eliminates potential deterioration of value – and disruptions to worldwide operations – that could otherwise result from a protracted and contentious bankruptcy case. This complete conversion of debt to equity generates over $30 million of cash flow annually due to the elimination of ongoing interest and amortization expense. Importantly, the Company would not be able to implement the conversion of debt to equity proposed under the Plan without the support of its creditor constituents. In sum, the Plan avoids potential litigation that could decrease value for all stakeholders and delay (and possibly derail) the restructuring process – including the cessation of international operations from Vessel arrests or loss of charter hires that, in turn, would devastate future revenues. The significant support obtained by the Company pursuant to the Restructuring Support Agreement provides a fair and reasonable path for an expeditious consummation of the Plan and the preservation of operations in the ordinary course of business.

**Additionally, as described in Section IX herein, the Plan provides for certain releases of Claims against, among others, the Debtors, the Reorganized Debtors, the parties to the Restructuring Support Agreement, the Supporting Noteholders, the Secured Notes Indenture Trustee, and each of their professionals, employees, officers and directors.**

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, APPENDICES, AND ANY SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, and the instructions accompanying the Ballots, in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. The statements contained in this Disclosure Statement are made only as of the date hereof unless otherwise specified, and there can be no assurance that the statements contained herein will be correct at any time hereafter. All creditors should also carefully read Section X of this Disclosure Statement – the "Risk Factors" – before voting to accept or reject the Plan.

THE DEBTORS AND THE SUPPORTING NOTEHOLDERS BELIEVE THAT IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR STAKEHOLDERS. FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE, (*I.E.*, THE DATE BY WHICH YOUR BALLOT MUST BE **ACTUALLY RECEIVED**), WHICH IS **NOVEMBER 13, 2014 AT 4:00 P.M. (PREVAILING EASTERN TIME)** (THE "**VOTING DEADLINE**").

01:15870994.8

A.      **Overview of Chapter 11**.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its equity interest holders.  Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code, with respect to the distribution of a debtor's assets.  The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan of reorganization binding upon a debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan, and any holder of a claim or equity interest in a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose before confirmation of the plan of reorganization and substitutes the debt with the obligations specified under the confirmed plan of reorganization.

B.      **Voting Rights**.

Only administrative expenses, claims, and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  An "allowed" administrative expense, claim or equity interest means that a debtor agrees, or in the event of a dispute, that the Court determines, that the administrative expense, claim or equity interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, a debtor.  The Bankruptcy Code also requires that, for purposes of treatment and voting, a plan of reorganization categorize the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are typically classified together, as are equity interests of a substantially similar legal nature.  Because an entity may hold multiple claims and/or equity interests that give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under a plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (*i.e.*, altered by the plan) or "unimpaired" (unaltered by the plan).  If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims or equity interests, such as the right to vote on the plan (unless the plan deems the holder to reject the plan), and the right to receive an amount under the plan of reorganization that is not less than the value that the holder would receive if the debtor against which such claims or equity interests are asserted were liquidated under chapter 7.

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is "impaired" unless, with respect to each claim or interest of such class, the plan of reorganization (i) does not alter the legal, equitable or contractual rights of the holders of such

claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights.

**Only holders of allowed claims or equity interests in impaired classes of claims or equity interests that receive or retain property under a proposed plan of reorganization, but are not otherwise deemed to reject the plan, are entitled to vote on such a plan.** Holders of unimpaired claims or equity interests are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Holders of claims or equity interests that do not receive or retain any property on account of such claims or equity interests are deemed to reject the plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote.

C.    <u>Claims Entitled to Vote</u>.

As discussed in further detail below, pursuant to the Plan:

- Holders of Claims in Class 3 are impaired and will receive distributions under the Plan on account of such Claims. As a result, Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan;

- Holders of Claims and Equity Interests in Classes 1, 2, 4, 5, and 6 are unimpaired. As a result, Holders of Claims and Interests in those Classes are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

- Holders of Equity Interests in Windsor Holdings Limited in Class 7 are impaired, will not receive or retain any property on account of such Equity Interests, and are deemed to have rejected the Plan. As a result, Holders of Equity Interests in Class 7 are not entitled to vote to accept or reject the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims actually voted to accept or reject the plan. **Your vote on the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

Section 1129(b) permits confirmation of a plan of reorganization notwithstanding the non-acceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. The Debtors intend to

pursue a "cram down" of the Holders of Equity Interests in Windsor Holdings Limited in Class 7, who are deemed to have rejected the Plan.

### D.     Solicitation and Voting Process.

The following summarizes the procedures to accept or reject the Plan.  Holders of Claims entitled to vote are encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or to consult their own attorneys.

### 1.     The Solicitation Package.

The following materials are provided to each holder of a Class 3 Claim: (a) the applicable Ballot and voting instructions; (b) a Disclosure Statement with all exhibits; and (b) the Plan.

The holders of Claims in Class 3 will receive the Solicitation Package, including the ballot, via first class mail.  If you (a) did not receive a Ballot and believe you are entitled to one; (b) received a damaged Ballot; (c) lost your Ballot; or (d) have any questions concerning this Disclosure Statement, the Plan, or the procedures for voting on the Plan, or the solicitation packet of materials you received, please contact counsel to the Debtors.

### 2.     Voting Deadline.

**To be counted, your Ballot(s) must be actually received by Prime Clerk no later than NOVEMBER 13, 2014 at 4:00 P.M. (PREVAILING EASTERN TIME).**

### 3.     Voting Instructions.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. In accordance with Bankruptcy Rule 3018(c), the Ballots are based on Official Form No. 14, but have been modified to meet the particular needs of these Chapter 11 Cases.  **Holders of Claims in Class 3 are required to vote all of their Claims in Class 3 either to accept or reject the Plan and may not split their votes.  Any Ballot received that does not indicate either an acceptance or rejection of the Plan or that indicates both acceptance and rejection of the Plan will not be counted.  Any Ballot received that is not signed or that contains insufficient information to permit the identification of the holder will be an invalid Ballot and will not be counted.**  In no event may you submit Ballots with respect to Claims in excess of the amount of Claims for which you are the record holder as of the Voting Record Date.

Please sign and complete a separate Ballot with respect to each Claim, and return your Ballot(s) directly to the Company's Claims and Voting Agent, Prime Clerk LLC by regular mail, delivery, or courier at 830 3rd Avenue, 9th Floor, New York, NY 10022 (Attention: Windsor Petroleum Transport Corporation Balloting).

**Only Ballots with signatures will be counted.  Only Ballots received by the Claims and Voting Agent by the applicable voting deadline will be counted.  If delivery of a Ballot is by mail, it is recommended that voters use an air courier with guaranteed next day**

01:15870994.8

- 5 -

delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to ensure timely delivery. The method of such delivery is at the election and risk of the voter.

A Ballot may be withdrawn by delivering a written notice of withdrawal to the Claims and Voting Agent, so that the Claims and Voting Agent receives the notice before the Voting Deadline. In order to be valid, a notice of withdrawal must (a) specify the name of the creditor who submitted the Ballot to be withdrawn, (b) contain a description of the Claim(s) to which it relates, and (c) be signed by the creditor in the same manner as on the Ballot. The Company expressly reserves the right to contest the validity of any withdrawals of votes on the Plan.

After the Voting Deadline, any creditor who has timely submitted a properly-completed Ballot to the Claims and Voting Agent may change or withdraw its vote only with the approval of the Court. If more than one timely, properly-completed Ballot is received with respect to the same Claim and no order of the Court allowing the creditor to change its vote has been entered before the Voting Deadline, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the timely, properly-completed Ballot determined by the Claims and Voting Agent to have been received last.

**EACH BALLOT ADVISES CREDITORS THAT, UNLESS THEY VOTE TO REJECT THE PLAN OR ELECT TO OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN ARTICLE IX OF THE PLAN, THEY SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN. CREDITORS WHO VOTE TO ACCEPT THE PLAN SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.**

## II. SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

The following table summarizes the classification and treatment of Claims and Equity Interests under the Plan and the estimated distributions to be received by the holders of Allowed Claims and Equity Interests thereunder. The summaries in this table are qualified in their entirety by the description of the treatment of such Claims in Article III of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, and Fee Claims have not been classified.

The classification and treatment of Claims will be deemed to apply to each Debtor. If there are no creditors in one or more Classes, then such Class will not apply to the Debtor.

| Class | Claims and Equity Interests | Treatment of Allowed Claims | Status | Voting Rights | Estimated Allowed Amount | Projected Recovery |
|---|---|---|---|---|---|---|
| Class 1 | **Other Priority Claims** | Except to the extent that a holder of an Allowed Other Priority Claim agrees in writing to less favorable treatment, in full and final satisfaction, settlement, release and discharge and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive payment in Cash in an amount equal to such Allowed Other Priority Claim as soon as practicable after the later of (i) the Effective Date and (ii) thirty (30) days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim. | Unimpaired | Deemed to Accept | De Minimis/None | 100% |
| Class 2 | **Other Secured Claims** | Except to the extent that a holder of an Allowed Other Secured Claim agrees in writing to less favorable treatment, at the option of the Debtors with the consent of the Supporting Noteholders, in full and final satisfaction, settlement, release and discharge of and in exchange for such Other Secured Claim, each holder of an Allowed Other Secured Claim shall either:  (i) have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim, if such interest is required to be paid pursuant to sections 506(b) and/or 1129(a)(9) of the Bankruptcy Code, as soon as practicable after the later of (a) the Effective Date, and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) receive the Collateral securing its Allowed Other Secured Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim. | Unimpaired | Deemed to Accept | De Minimis/None | 100% |
| Class 3 | **Secured Noteholder Claims** | On or as soon as practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for each Secured Noteholder Claim, each holder of an Allowed Secured Noteholder Claim shall receive its Pro Rata share of Common Units in New Holdco. | Impaired | Entitled to Vote | $195,941,657 | 67.5% |

01:15870994.8

| Class | Claims and Equity Interests | Treatment of Allowed Claims | Status | Voting Rights | Estimated Allowed Amount | Projected Recovery |
|---|---|---|---|---|---|---|
| Class 4 | General Unsecured Claims | In full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed General Unsecured Claim against the Debtors, on the Effective Date, each holder of an Allowed General Unsecured Claim shall, at the discretion of the Reorganized Debtor:  (i) be Reinstated as an obligation of the Reorganized Debtors, and be paid in accordance with the ordinary course terms, (ii) receive such other treatment as may be agreed between such holder and the Reorganized Debtors, or (iii) receive such other treatment that will render it Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | Deemed to Accept | $2,975,000[3] | 100% |
| Class 5 | Intercompany Claims | On the Effective Date, Intercompany Claims will be Reinstated in full.  On and after the Effective Date, the Debtors and the Reorganized Debtors will be permitted to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes to intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices. | Unimpaired | Deemed to Accept | N/A | 100% |
| Class 6 | Subsidiary Equity Interests | On the Effective Date, Subsidiary Equity Interests shall be Reinstated. | Unimpaired | Deemed to Accept | N/A | 100% |
| Class 7 | Equity Interests in Windsor Holdings Limited | On the Effective Date, Equity Interests in Debtor Windsor Holdings Limited shall be cancelled and discharged and shall be of no further force and effect, whether surrendered for cancellation or otherwise and holders of Class 7 Equity Interests shall not receive or retain any property under the Plan on account of such Equity Interests. | Impaired | Deemed to Reject | N/A | 0% |

---

[3]    The vast majority of the General Unsecured Claims are prepetition trade, insurance or other operational Claims that have been paid pursuant to the First Day Motions (as discussed below).

01:15870994.8

## III.  COMPANY BACKGROUND

### A.    The Company's History and Businesses.[4]

The Debtors' business operations center around the ownership of four very large crude oil carriers named Pioneer, Progress, British Pride and British Purpose (each, a "**Vessel**" and collectively, the "**Vessels**").  As is fairly typical in the shipping industry, the Debtors have no employees.  Instead, the Debtors rely exclusively upon third-party managers to provide for the actual day-to-day operations of the Vessels, including on their commercial manager, Frontline, Ltd ("**Frontline**"), and with respect to certain of the Vessels, operational managers who handle day-to-day operations.

Windsor Petroleum, a company organized under the laws of the State of Delaware, is a special purpose vehicle ("**SPV**") that was established in the United States to issue secured notes as agent on behalf of Debtors Buckingham Shipping Plc, Caernarfon Shipping Plc, Sandringham Shipping Plc, Holyrood Shipping Plc (collectively, the "**Shipping Companies**"). The four Shipping Companies are sister companies of four separate ship owning companies, also SPVs established in the Isle of Man−Debtors Buckingham Petro Limited, Caernarfon Petro Limited, Sandringham Petro Limited, and Holyrood Petro Limited (collectively, the "**Owner Companies**" and together with the Shipping Companies, the "**Operating Companies**").  The Operating Companies and Windsor Petroleum are indirect wholly-owned subsidiaries of WHL, an Isle of Man holding company, which is a wholly-owned subsidiary of Cambridge Oil Transport Corporation ("**COTC**"), a closely held Cayman Islands corporation.

The Vessels were built and delivered between December 1999 and November 2000.  At that time, the Shipping Companies each entered into a head lease with subsidiaries of Abbey National Treasury Services for the Vessels and concurrently bareboat chartered the Vessels to BP Shipping Limited ("**BP Shipping**"), a subsidiary of The British Petroleum Company p.l.c. Once the four head leases were cancelled, ownership of the Vessels was transferred to the Owner Companies.  The Vessels are leased from the Owner Companies by the Shipping Companies under four separate leases.

The obligations of the initial charterer under each initial charter were guaranteed by The British Petroleum Company p.l.c. ("**British Petroleum**") pursuant to a guarantee (each, a "**BP Guarantee**").  The initial charterer was an indirect, wholly-owned subsidiary of British Petroleum.  Pursuant to each initial charter, the initial charterer had the right to terminate such initial charter at any time upon irrevocable written notice twelve months in advance no earlier than the expiration of the period commencing on the delivery date for such Vessel and terminating after approximately 9.0 years for Pioneer, 9.5 years for Progress, 10.0 years for British Pride and 10.5 years for British Purpose (each, a "**Fixed Period**").

During the Fixed Period, charter payments are unconditionally guaranteed by British Petroleum and take place regardless of Vessel usage, except in the case of total loss, which would be covered by BP's guarantee of BP Shipping's obligations under the bareboat

---

[4] An organizational chart listing all of the Debtors is attached hereto as **Exhibit F**.

charters. The bareboat charters give BP Shipping responsibility for every aspect of vessel operation, including possession of the Vessels; crews, maintenance, insurance, and operating funds; and controls to ensure operation in accordance with all U.S. and international maritime and environmental laws.

At the end of the Fixed Period, BP Shipping has the option to cancel each charter or, on a rolling 12-month basis, to renew it at then-current market rates. Cancellation requires twelve months of advance notice and is irrevocable. BP Shipping exercised its option to cancel its charters for Pioneer, Progress, and British Pride. The bareboat charter with BP Shipping Limited for Pioneer terminated on January 10, 2011 at which time the Vessel was re-delivered to the Debtors and a majority-owned subsidiary of Frontline commenced technical management of the Vessel. The bareboat charter with BP Shipping for Progress terminated on March 12, 2014 at which time the Vessel was re-delivered to the Company and a majority-owned subsidiary of Frontline commenced technical management of the Vessel. The bareboat charter with BP Shipping for British Pride is scheduled to be terminated on or around August 27, 2014. BP Shipping delivered a notice of termination of the bareboat charter with British Purpose, indicating that such termination shall be effective as of July 14, 2015.

As a result, Pioneer and Progress currently trade on the spot market, British Pride will trade on the spot market when its charter termination becomes effective, and unless a replacement bareboat charter or purchaser for British Purpose can be found, it will also trade on the spot market when its charter termination becomes effective.[5]

Frontline serves as manager for each of the Vessels pursuant to four separate management agreements. Under the management agreements, the Manager manages all of the administrative and corporate obligations of the Operating Companies, which includes maintaining the books and records of each Operating Company, preparing and filing annual financial statements and tax returns, providing office staff and accommodation for each Operating Company, interacting with the trustee for the bonds with respect to any payments necessary for the operating, chartering and maintenance of the Vessels (which includes providing accounting of expenses and requesting from the trustee and maintaining funds for the ongoing operations of the vessels), obtaining and maintaining insurances, and making necessary payments. Frontline also serves as administrative manager for each of the Vessels. This includes monitoring and enforcing the terms of the bareboat charters with British Petroleum, reviewing and if necessary obtaining insurance policies for the Vessels, reviewing all necessary consents requested by, and assignments and subcharters of the Vessel by, the bareboat charterer, keeping books and records, and providing office accommodation to the extent necessary.

Frontline also serves as remarketing agent, which involves seeking buyers for Vessels that come off bareboat charters in accordance with the requirements of the Secured Notes Indenture (as defined below) and, if no adequate bids can be obtained, chartering the Vessels on the spot market. In connection with the Vessels trading on the spot market, Frontline

---

[5]     Unlike a bareboat charter, under which the party contracting with the ship owner acquires use of a ship for a specified period of time, the party contracting with the ship owner under a spot charter contracts for the ship owner to carry cargo for a fixed fee from a loading port to a discharging port.

contracts on the Debtors' behalf with "technical managers" and "post-fixture managers" who provide the Vessels' day-to-day technical and logistics management, including the staffing and payment of seaborne crew and obtaining supplies, services, and local permits necessary to operate the Vessels, which is far more economical and beneficial than building and operating an international infrastructure directly. Frontline's reputation is an important factor in its ability to obtain spot charters for the Vessels, as companies seeking to charter a vessel generally prefer vessels that are managed by managers with well-established reputations.

> **B.**    **The Company's Prepetition Capital Structure**.

As of the date hereof, the substantial majority of the Debtors' liabilities – in excess of $188 million in the aggregate principal amount outstanding – consist of funded debt (*i.e.*, not trade debt, derivative liability or warrants) comprised of the Secured Notes.

On November 1, 1997, Windsor Petroleum, as agent for the Shipping Companies, issued $239,100,000.00 in the aggregate principal amount of secured notes (the "**Secured Notes**") under that certain Indenture (as amended, modified or supplemented from time to time, the "**Secured Notes Indenture**") between Windsor Petroleum as agent for the Shipping Companies, the Shipping Companies and the Bank of New York Mellon as successor indenture trustee to The Chase Manhattan Bank (the "**Indenture Trustee**") for the benefit of secured noteholders thereunder (the "**Secured Noteholders**" and together with the Indenture Trustee, the "**Secured Parties**"). Only the term notes under the Secured Notes Indenture remain outstanding and unpaid, which accrue interest at a rate of 7.84%. As of the date hereof, $188.59 million remains outstanding under the Secured Notes. The Secured Notes mature on January 15, 2021, with the interest on the Secured Notes payable semi-annually on January 15 and July 15 of each year. The proceeds of the Secured Notes issuance were used along with equity contributions (from Cambridge Oil Transport Corporation, an affiliate of WHL) and funds generated by certain UK finance leases to construct the four Vessels.

The Secured Notes are secured by substantially all assets of the Debtors (the "**Prepetition Collateral**"), including, without limitation, (a) vessel mortgages, (b) management agreements, (c) charters, (d) all rights of each Shipping Company to receive payments of any kind, all charterhire, tolls, rents, issues, profits, products, revenues and other income (including insurance, warranty and sales proceeds) from the Prepetition Collateral, all of the estate, right, title and interest of such Shipping Company in and to the same and every part of said property, (e) all moneys and securities including the trust accounts and any permitted investments under the Secured Notes Indenture, (f) pledges of Shipping Companies' stock and stock of Debtors Buckingham Petro Limited, Caernarfon Petro Limited, Sandringham Petro Limited, and Holyrood Petro Limited by Windsor Holdings Limited pursuant to a Stock Pledge Agreement, dated as of November 1, 1997 (as amended, modified or supplemented from time to time); and (g) all income, payment and proceeds of the foregoing. The obligations under the Secured Notes Indenture are not guaranteed by any of the Debtors.

> **C.**    **Windsor Holdings Limited's Equity Holders**.

As of the date hereof, all of the issued and outstanding shares of Windsor Holdings Limited are held by COTC.

01:15870994.8

## IV.  EVENTS LEADING TO THE
## COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    The Company's Industry and Key Considerations.

In the years preceding the commencement of these Chapter 11 Cases, the Debtors' business operated in a uniquely challenging economic environment.  During this time period, the growth in the supply of international crude oil and product tankers significantly exceeded growth in demand, leading to a sharp fall in rates.

Growth in demand for international crude oil and petroleum product transportation services was depressed in the years prior to the Petition Date due to structural changes in global oil supply and consumption.  First, the global recession, which began in 2008, depressed demand for crude oil and refined petroleum products. Global consumption of crude oil went from 87.1 million barrels of oil per day in 2007 to 85.5 million barrels of oil per day in 2009, reversing a trend of increasing oil consumption that lasted more than 25 years. While consumption rebounded somewhat in 2010 and 2011, the benefit was somewhat offset by reduced growth in demand for seaborne transportation, particularly in North America.

Additionally, a larger portion of global crude oil consumption was and is being supplied from increased domestic production or crude oil inventory stock rather than from foreign suppliers. From 2007 to 2011, consumption by members of the Organization for Economic Co-operation and Development ("**OECD**"), which predominantly includes net importers of crude oil, decreased by 3.7 million barrels per day, or 7.4%, while OECD production for the same period increased. Thus, fewer international tankers were needed to transport crude oil from oil-producing countries to OECD countries.

Moreover, a growing percentage of oil produced by members of the Organization of the Petroleum Exporting Countries ("**OPEC**") was and is being used internally by the members of OPEC or to supply China and the Far East, while U.S. consumption of oil produced by members of OPEC has dropped. For example, oil consumed by the United States from members of OPEC decreased by 21% from 2008 to 2011, from 5.4 million barrels per day to 4.2 million barrels per day. Conversely, Chinese consumption of oil produced by members of OPEC increased from 2.6 million barrels per day in 2008 to 3.4 million barrels per day in 2011 (an increase of 31%). This shift led to a decrease in international tanker usage, as the voyage to the U.S. from the Middle East is one of the longest possible voyages for seaborne crude oil (approximately 44 days one-way from Saudi Arabia to Louisiana via the Cape of Good Hope), while the voyage to China from the Middle East is generally less than half that length (18 days). Overall, demand for international oil tankers decreased because growth of non-OECD demand was not sufficient to offset declining oil demand in OECD areas and increased production in non-OPEC areas.

Against this backdrop of decreased demand for international oil tankers, the global supply of oil and refined product tanker capacity increased steadily from 2002. Improved market conditions during the years 2000 to 2007 resulted in shipping companies ordering a substantial number of new vessels from 2006 to 2008. As new tankers are typically delivered eighteen to thirty-six months after they are ordered, a substantial number of new tankers entered

the market between 2008 and 2011. The size of the global tanker fleet grew from 291 million deadweight tonnage ("**DWT**") in 2002 to 475 million DWT in 2011.  Further, the international order book for new vessels (for tankers greater than 10,000 DWT) that were on order as of November 14, 2012 represented 15 percent of the then-existing supply of new vessels. Thus, deliveries of tankers ordered before the 2008 recession have extended capacity beyond what demand has absorbed.

The increased supply of international crude and product tankers currently in the market, together with decreased demand for international oil tanker services over the four years prior to the Petition Date, caused charter rates for international crude and product vessels to plummet, which has more of a stark impact on the Debtors as more of the Debtors' Vessels trade on the spot market.  The effects of these market pressures have been felt across the industry, resulting in the chapter 11 filing of a number of industry participants.

### B.        Negotiations with Supporting Noteholders and Restructuring Support Agreement.

For many months prior to the filing of the Chapter 11 Cases, the Debtors explored various restructuring alternatives with holders of the Secured Notes, including at least 70%, measured by claim size, of the holders of Secured Notes who are represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP (the "**Supporting Noteholders**"), in order to create a consensual framework that would reduce the Debtors' debt burden and restructure their balance sheet.  On July 14, 2014, after months of good faith and arm's length negotiations, the Company and the Supporting Noteholders entered into the Restructuring Support Agreement, pursuant to which the Supporting Noteholders have agreed, subject to certain terms and conditions, including approval of this Disclosure Statement, to support a restructuring that would substantially reduce the Debtors' debt burden, enhance their liquidity, and solidify the Debtors' long-term growth and operating performance, and to vote in favor of the Plan when solicited to do so.

The Debtors have commenced the Chapter 11 Cases to implement the terms of the Plan.  Given the overwhelming consensus among creditors that is manifest in the Restructuring Support Agreement, the Company believes it can emerge from chapter 11 expeditiously with an optimized balance sheet that will allow the reorganized Debtors to succeed in a competitive industry.  This outcome would be in the best interests of the Debtors and their stakeholders.

## V.  THE CHAPTER 11 CASES

The Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on July 14, 2014.  Upon such filing, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors were stayed under section 362 of the Bankruptcy Code.  The Debtors have continued to operate their businesses and manage their property as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

### A.        Significant First Day Motions and Retention of Professionals.

On the Petition Date, the Debtors filed several "first day" motions seeking authority to, among other things: (i) substantially maintain their existing bank accounts and

continue the Company's integrated cash management system; (ii) pay certain prepetition claims of certain critical and foreign vendors and service providers; (iii) to use the Secured Noteholders' cash collateral subject to an agreed-upon budget and to provide the Secured Noteholders under the Secured Notes Indenture with agreed-upon adequate protection. All of the Debtors' first day motions and retention applications were approved by the Court in substantially the manner requested by the Debtors.

During the Chapter 11 Cases, the Debtors have sought to retain various professionals in connection with the prosecution and administration of their Chapter 11 Cases, as well as the operation of their day-to-day businesses. The Court has approved the Debtors' retention and/or employment of, among others, (i) Young Conaway Stargatt & Taylor, LLP, as bankruptcy counsel, (ii) AMA Capital Partners LLC, to provide Paul M. Leand, Jr. as to serve as the Debtors' Chief Restructuring Officer and to provide various crisis management services related thereto, and (iii) Prime Clerk, to serve as the Debtors' claims and noticing agent, as well as to provide various administrative services during the Chapter 11 Cases.

### B.      Schedules and Statements of Financial Affairs.

On August 27, 2014, each of the Debtors filed their respective Schedules of Assets and Liabilities and Statements of Financial Affairs (as may be amended, the "**Schedules and Statements**") with the Court. Among other things, the Schedules and Statements set forth the Claims of known creditors against the Debtors as of the Petition Date based upon the Debtors' books and records. A copy of the Schedules and Statements can be obtained at no cost from Prime Clerk's website at http://cases.primeclerk.com/windsor or for a fee from the Court's website at http://ecf.deb.uscourts.gov.

## VI.  SUMMARY OF THE PLAN

THE FOLLOWING IS A SUMMARY OF SOME SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT.  ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL IN THE PLAN.

### A.      Classification and Treatment of Administrative and Priority Claims, Claims and Equity Interests Under the Plan

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, and Fee Claims, as described below, have not been classified and thus are excluded from the classes of Claims and Equity Interests set forth in Article III of the Plan.

1.    **Description and Treatment of Unclassified Claims.**

(a)    Treatment of Administrative Expense Claims.

Administrative Expense Claims means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including (i) any actual and necessary costs and expenses of preserving the Estates, (ii) any actual and necessary costs and expenses of operating the Debtors' businesses, (iii) any indebtedness or obligations assumed by the Debtors in connection with the conduct of their businesses during the Chapter 11 Cases, (iv) any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code, (v) any Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code.

The holder of an Administrative Expense Claim accruing on or after July 14, 2014, other than:  (a) a Fee Claim; (b) an Administrative Expense Claim that has been Allowed on or before the Effective Date; and (c) a claim for U.S. Trustee Fees, must submit to the Claims and Voting Agent and serve on New Holdco and its counsel, a request for such Administrative Expense Claim so as to be received by 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after service of notice of occurrence of the Effective Date.  Such request must include at a minimum:  (i) the name of the Debtor(s) that are purported to be liable for the Administrative Expense Claim; (ii) the name of the holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim.  For the avoidance of doubt, this Section of the Plan shall not be applicable to any Indenture Trustee Fee Claims or any Restructuring Support Agreement Professional Fees, which Fee Claims shall be paid pursuant to Sections G and H of Article IV of the Plan, respectively.  **FAILURE TO FILE AND SERVE SUCH NOTICE OR REQUEST TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND EXTINGUISHED.**

(b)    Fee Claims.

Fee Claims are any requests for allowance and payment of claims for fees and expenses for legal, financial advisory, accounting and other services and reimbursement of expenses related thereto that are awardable and allowable under sections 328, 330(a), 331, 503(b) or 1103(a) of the Bankruptcy Code or otherwise and that are rendered (a) prior to the Effective Date, or (b) thereafter in connection with applications filed pursuant to section 330, 331, 503(b) or 1103(a) of the Bankruptcy Code.  To the extent that the Court or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Professional Fees.

All requests for allowance of Fee Claims on a final basis must be filed with the Court and served on New Holdco and its counsel, and the U.S. Trustee, no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court in the Chapter 11 Cases, the

allowed amounts of such Fee Claims shall be determined by the Court.  Parties in interest will have not less than 21 days to object to any Fee Claim.  For the avoidance of doubt, this Section of the Plan shall not be applicable to any Indenture Trustee Fee Claim or any Restructuring Support Agreement Professional Fees, which Fee Claims shall be paid pursuant to Sections G and H of Article IV of the Plan, respectively.  **FAILURE TO FILE AND SERVE FINAL FEE APPLICATIONS TIMELY AND PROPERLY SHALL RESULT IN THE UNDERLYING FEE CLAIMS BEING FOREVER BARRED AND EXTINGUISHED.** Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty (60) days after the Effective Date or such other date as may be established by the Court.  Upon final allowance by the Court of any Fee Claim, New Holdco shall pay the amount of all Allowed but unpaid Professional Fees promptly and directly to the applicable Professional.

The Reorganized Debtors shall pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Professionals that have been retained by the Debtors on and after the Effective Date, in the ordinary course of business and without any further notice to or action, order or approval of the Court.  Upon the Effective Date, any requirement that Professionals retained by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and such Professionals may be employed and paid in the ordinary course of business without any further notice to or action, order, or approval of the Court.

(c)    Priority Tax Claims.

Priority Tax Claims are any Claims entitled to a priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.  Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, at the option of the applicable Reorganized Debtor, in full satisfaction, settlement, release, and discharge, of and in exchange for such Priority Tax Claim, (i) payment in full in Cash as soon as practicable after the Effective Date in an amount equal to the amount of such Allowed Priority Tax Claim, plus statutory interest on any outstanding balance from the Effective Date, calculated at the prevailing rate under applicable nonbankruptcy law for each taxing authority and to the extent provided for by section 511 of the Bankruptcy Code, and in a manner not less favorable than the most favored nonpriority Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors pursuant to section 1122(b) of the Bankruptcy Code); or (ii) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon a Final Order of the Court.

(d)    U.S. Trustee Fees.

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  On and after the Effective Date, the Reorganized Debtors shall be responsible for filing required post-confirmation reports and paying quarterly fees due to the U.S. Trustee for the Reorganized Debtors until the entry of a final decree in such Debtors' Chapter 11 Cases or until such Chapter 11 Cases are converted or dismissed.  Each and every one of the Debtors shall

remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

2.   **Classification and Treatment of Claims and Equity Interests.**

(a)   Classification of Claims and Equity Interests.

Except for those Claims addressed in Article II of the Plan, all Claims and Equity Interests are placed in the Classes set forth below.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled before the Effective Date.

(b)   Distributions of Common Units to Holders of Class 3 Claims.

As soon as practicable after the Effective Date, distributions to holders of Secured Noteholder Claims Against Note Obligor Debtors held through The Depository Trust Company shall be made by mandatory exchange via presentment of the applicable public securities in exchange for the Common Units of New Holdco to which the applicable holders are entitled.

(c)   Summary of Classification and Class Identification.

Below is a chart identifying Classes of Claims and Equity Interests, a description of whether each Class is Impaired, and each Class's voting rights.  If there are no creditors in one or more Classes, then such Class will not apply to that Debtor.

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Noteholder Claims Against Note Obligor Debtors | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 5 | Intercompany Claims | Unimpaired | Deemed to Accept |
| 6 | Subsidiary Equity Interests | Unimpaired | Deemed to Accept |
| 7 | Equity Interests in Windsor Holdings Limited | Impaired | Deemed to Reject |

Consistent with § 1122 of the Bankruptcy Code, a Claim or Equity Interest is classified by the Plan in a particular Class only to the extent the Claim or Equity Interest is within the description of the Class, and a Claim or Equity Interest is classified in a different

Class to the extent it is within the description of that different Class.  The Plan does not effect a substantive consolidation of the Debtors.

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors will seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.  The Debtors reserve the right to modify the Plan in accordance with its provisions, including the right to withdraw the Plan at any time before the Effective Date.

(d)    *Treatment of Classified Claims and Equity Interests.*

(i)    *Class 1 – Other Priority Claims.*  Other Priority Claims are Claims entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than (i) an Administrative Expense Claim or (ii) a Priority Tax Claim.

Except to the extent that a holder of an Allowed Other Priority Claim agrees in writing to less favorable treatment, in full and final satisfaction, settlement, release and discharge and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive payment in Cash in an amount equal to such Allowed Other Priority Claim as soon as practicable after the later of (i) the Effective Date and (ii) thirty (30) days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim.

Class 1 is Unimpaired by the Plan.  Holders of Class 1 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, as applicable and not entitled to vote to accept or reject the Plan.

*Class 2 – Other* Secured *Claims*.  Other Secured Claims are Claims, other than the Secured Noteholder Claims, (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, in each case, to the extent determined pursuant to section 506(a) of the Bankruptcy Code or (b) otherwise Allowed pursuant to the Plan as a Claim that is Secured.

Except to the extent that a holder of an Allowed Other Secured Claim agrees in writing to less favorable treatment, at the option of the Debtors with the consent of the Supporting Noteholders, in full and final satisfaction, settlement, release and discharge of and in exchange for such Other Secured Claim, each holder of an Allowed Other Secured Claim shall either:  (i) have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim, if such interest is required to be paid pursuant to sections 506(b) and/or 1129(a)(9) of the Bankruptcy Code, as soon as practicable after the later of (a) the Effective Date, and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) receive the Collateral securing its Allowed Other Secured Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim.

Class 2 is Unimpaired by the Plan.  Holders of Class 2 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, as applicable and not entitled to vote to accept or reject the Plan.

(ii)    *Class 3 – Secured Noteholder Claims*.  Secured Noteholder Claims are any and all Claims against any of the Debtors held by Secured Noteholders arising under or related to the Secured Notes Indenture.

Each holder of a Secured Noteholder Claim, in full and final satisfaction, settlement, release and discharge of and in exchange for each Secured Noteholder Claim, shall receive its Pro Rata share of Common Units in New Holdco.

Class 3 is Impaired and holders of Class 3 Secured Noteholder Claims are entitled to vote to accept or reject the Plan.

(iii)    *Class 4 – General Unsecured Claims*.  General Unsecured Claims are Claims, other than Intercompany Claims, that are not Secured or entitled to priority under the Bankruptcy Code or an order of the Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code.

Each General Unsecured Claim, on the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed General Unsecured Claim against the Debtors, shall, at the discretion of the Reorganized Debtor:  (i) Reinstated as an obligation of the Reorganized Debtors, and be paid in accordance with the ordinary course terms, (ii) receive such other treatment as may be agreed between such holder and the Reorganized Debtors, or (iii) receive such other treatment that will render it Unimpaired pursuant to section 1124 of the Bankruptcy Code.

Class 4 is Unimpaired.  Therefore, holders of Class 4 General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, as applicable and are not entitled to vote to accept or reject the Plan.

(iv)    *Class 5 – Intercompany Claims*.  Intercompany Claims are any Claims held by a Debtor against another Debtor.  Intercompany Claims, on the Effective Date, will be Reinstated in full.  On and after the Effective Date, the Debtors and the Reorganized Debtors will be permitted to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes to intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices.

Class 5 is Unimpaired.  Therefore, holders of Class 5 Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, as applicable and not entitled to vote to accept or reject the Plan.

(v)    *Class 6 – Subsidiary Equity Interests*.  Subsidiary Equity Interests are the Equity Interests in the Debtor Subsidiaries.  Subsidiary Equity Interests will be

reinstated on the Effective Date and will not receive any distribution on account of such Equity Interests.

Class 6 is Unimpaired.   Holders of Class 6 Subsidiary Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, as applicable and not entitled to vote to accept or reject the Plan.

(vi)   *Class 7 – Equity Interests in Windsor Holdings Limited*. Equity Interests in Windsor Holdings Limited means any "equity security" in Windsor Holdings Limited as such term is defined in section 101(16) of the Bankruptcy Code, including any issues, unissued, authorized or outstanding shares of capital stock in any Debtor together with any warrants, options or contractual to purchase or acquire such Equity Interest at any time and all rights arising with respect thereto or any other instrument evidencing an ownership interest in the Debtors, whether or not transferable.

On the Effective Date, Equity Interests in Windsor Holdings Limited shall be cancelled and discharged and shall be of no further force and effect, whether surrendered for cancellation or otherwise and holders of Class 7 Equity Interests shall not receive or retain any property under the Plan on account of such Equity Interests.

Class 7 is Impaired and holders of Class 7 Equity Interests in Windsor Holdings Limited are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(e)   Special Provision Regarding Unimpaired and Reinstated Claims

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including, but not limited to, legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Cause of Action or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left Unimpaired by the Plan.   Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Causes of Action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim left Unimpaired by the Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

## B.   Means for Implementation of the Plan

### 1.   General Settlement of Claims and Interests.

The provisions of the Plan shall, upon consummation, constitute a good faith compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the

Bankruptcy Code between the Debtors and the Supporting Noteholders and the Debtors and holders of Claims and Equity Interests.  In the event that, for any reason, the Confirmation Order is not entered or the Effective Date does not occur, the Debtors and the Supporting Noteholders reserve all of their respective rights with respect to any and all disputes resolved and settled under the Plan.  The entry of the Confirmation Order shall constitute the Court's approval of each of the compromises and settlements embodied in the Plan, and the Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness.  The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

2.      **Voting of Claims.**

Each holder of a Claim as of the Voting Deadline in an Impaired Class of Claims that is not (a) deemed to have rejected the Plan or (b) conclusively presumed to have accepted the Plan, and that held such Claim that has not been disallowed by the Court as of the Voting Record Date, shall be entitled to vote to accept or reject the Plan.  The instructions for completion of the Ballots are set forth in the instructions accompanying the Ballot.

3.      **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.**

Class 7 Equity Interests in Windsor Holdings Limited are deemed to reject the Plan.  Accordingly, the Plan shall constitute a motion to request that the Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class.

4.      **Limited Liability Company.**

On or before the Effective Date, a new holding company ("**New Holdco**") will be formed as a Marshall Islands limited liability company and all assets of the Debtor Windsor Holdings Limited will be conveyed and transferred to New Holdco.  Pursuant to the Plan, holders of the Secured Noteholder Claims will contribute their Secured Noteholder Claims to New Holdco in exchange for Common Units of New Holdco.  In connection with the vesting and transfer of such assets, any attorney-client privilege, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Reorganized Debtors shall vest in New Holdco and the Reorganized Debtors.  The Debtors are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities.  The Operating Agreement of New Holdco will provide for issuance of Common Units, 100% of which will be distributed to holders of Secured Noteholder Claims.  New Holdco will be managed by a board of managers (the "**Board of Managers**") selected by the Supporting Noteholders prior to the Confirmation Date.  New Holdco will have authority to retain, on behalf of New Holdco, any counsel, financial advisors, claims agents, auditors, or other such professionals as the Board of Managers deems appropriate at all times.  The Board of Managers may select any professionals in their sole discretion, and prior employment in any capacity in the Chapter 11 Cases on behalf of the Debtors and the Debtors' estates shall not preclude New Holdco's retention of such professionals.  The relative duties and responsibilities

01:15870994.8

of the Board of Managers shall be set forth in the Operating Agreement. Consistent with section 1123(a)(6) of the Bankruptcy Code, the Operating Agreement shall include a provision prohibiting the issuance of nonvoting equity securities.

5.    <strong><u>Continued Corporate Existence and Vesting of Assets.</u></strong>

Except as otherwise provided herein:  (i) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable law; and (ii) on the Effective Date, all property of its Estate, and any property acquired by such Debtor or Reorganized Debtor under the Plan, will vest in such Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, Equity Interests and other interests, except for the Liens and Claims established under the Plan.  To the extent any such certificate of incorporation, bylaws or other analogous formation or governing documents are amended in connection with the Plan, such documents are deemed to be amended by the Plan and require no further action or approval other than any requisite filings required under applicable state, provincial or federal law.

On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject only to those restrictions expressly imposed by the Plan or the Confirmation Order as well as the documents and instruments executed and delivered in connection therewith, including the documents, exhibits, instruments and other materials comprising the Plan Supplement.

6.    <strong><u>Issuance of Common Units of New Holdco.</u></strong>

A.    <em><u>Issuance of Common Units</u></em>. Issuance of Common Units shall be authorized under the Certificate of Formation and Operating Agreement of New Holdco, and the Common Units shall be issued on the Effective Date and distributed as soon as practicable thereafter in accordance with the Plan.  The terms of and rights granted to the holders of the Common Units shall be set forth in the Certificate of Formation and Operating Agreement of New Holdco.  The issuance of Common Units is authorized without the need for any further corporate action and without any further action by any holder of a Claim or Equity Interest.

B.    <em><u>Exemption from Registration</u></em>. Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable State or local law requiring registration prior to the offering, issuance, distribution or sale of securities.  In addition, except as otherwise provided in the Plan, to the maximum extent provided under section 1145 of the Bankruptcy Code, any and all Common Units contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to:  (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11)

01:15870994.8

Case 14-11708-PJW    Doc 126    Filed 10/08/14    Page 31 of 141

of the Securities Act, and compliance with any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) applicable regulatory approval.

C.    *Dissolution of Certain Debtors*.    As of the Effective Date, at the sole discretion of the Supporting Noteholders, the Debtors or Reorganized Debtors may (a) cause any or all of the Debtors to be merged into one or more of the Debtors, dissolved, or otherwise consolidated, (b) cause the transfer of assets between or among the Debtors, or (c) engage in any other transaction in furtherance of the Plan.   Any such transaction shall be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the members, managers, stockholders or directors of any of the Debtors or the Reorganized Debtors.   The Debtors shall file with the Plan Supplement the designation of any Debtors that will be merged or dissolved.

## 7.    **Restructuring Support Agreement Professional Fees.**

On the Effective Date, the Reorganized Debtors shall pay, in full, in Cash, the unpaid reasonable fees, expenses, costs, and other charges of the Supporting Noteholders, including the costs, fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Landis Rath & Cobb LLP and Houlihan Lokey Capital Inc., in accordance with the *Final Order (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Secured Parties, and (C) Granting Related Relief*, entered by the Court in these Chapter 11 Cases (the "**Cash Collateral Order**"). Such fees, expenses, costs, and other charges shall be subject to the review process contemplated by paragraph 11 of the Cash Collateral Order.

## 8.    **Secured Notes Indenture Trustee Fees and Expenses.**

In full satisfaction of any Allowed Indenture Trustee Fee Claims for fees and expenses incurred through the Confirmation Date, including to the extent such Allowed Indenture Trustee Fee Claims are secured by any Charging Liens under the Indentures and all Restructuring Support Agreement Professional Fees payable under the Restructuring Support Agreement, the Reorganized Debtors will distribute to the Indenture Trustee on the Effective Date, Cash equal to the amount of the Allowed Indenture Trustee Fee Claims; provided, however, that with respect to Claims to which the U.S. Trustee, the Debtors or the Reorganized Debtors shall have objected within the later of (x) five (5) Business Days prior to the Effective Date, and (y) twenty (20) days of receipt of the request for payment, no distribution shall be payable hereunder until such objection has been resolved. All Allowed Indenture Trustee Fee Claims, including Restructuring Support Agreement Professional Fees payable under the Restructuring Support Agreement and the Plan through the Effective Date, shall be payable by the Reorganized Debtors as soon as practicable after the Effective Date.

As a condition to receiving payment thereof, a holder of an Indenture Trustee Fee Claim shall deliver to the New Board written copies of invoices in respect of such claims, with narrative descriptions of the services rendered (including appropriate redactions to preserve privileged matters) and itemization of expenses incurred in such detail and with such supporting documentation as is reasonably requested by the New Board.   An Indenture Trustee Fee Claim

01:15870994.8

- 23 -

shall be deemed Allowed except to the extent there is a timely objection. If there is a timely objection to the request for payment of any Indenture Trustee Fee Claim, the undisputed amount of any Indenture Trustee Fee Claims with respect to which such objection(s) are pending shall be Allowed and paid by the Reorganized Debtors on the Effective Date or as soon thereafter as reasonably practicable. The Reorganized Debtors shall not be required to make any payments with respect to the disputed portion of an Indenture Trustee Fee Claim as to which the U.S. Trustee, Debtors or Reorganized Debtors have objected until resolved or determined by the Court. In the event such objector(s) are unable to resolve a dispute as to an Indenture Trustee Fee Claim, the Secured Notes Indenture Trustee may, in its sole discretion, elect to (i) submit any such dispute to the Court for resolution by application requesting payment of the disputed portion of the Indenture Trustee Fee Claims in accordance with the reasonableness standard (and not subject to the requirements of sections 503(b)(3) and (4) of the Bankruptcy Code, which shall not apply) or (ii) assert their Charging Liens (to the extent such Lien exists under the Indentures) to obtain payment of a disputed portion of the Indenture Trustee Fee Claim in lieu of Court resolution described in subsection (i).

9. **Cancellation of Existing Securities.**

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under the Secured Notes Indenture, and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in a Debtor giving rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of a Debtor that are specifically reinstated pursuant to the Plan), shall be cancelled as to such Debtor, and the applicable Reorganized Debtor shall not have any continuing obligations thereunder; and (ii) the obligations of a Debtor pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of such Debtor (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of a Debtor that are specifically reinstated pursuant to the Plan or assumed by a Debtor) shall be released and discharged; provided, however, that notwithstanding the occurrence of the Confirmation Date or the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders of such Claims to receive distributions under the Plan as provided herein, (b) allowing the Secured Notes Indenture Trustee to make distributions under the Plan as provided herein, and deduct therefrom such reasonable compensation, fees, and expenses due thereunder or incurred in making such distributions, to the extent not paid by the Debtors and authorized under such indenture or agreement, (c) allowing the Secured Notes Indenture Trustee to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan, (d) allowing the Secured Notes Indenture Trustee to exercise any charging liens it may have under the Secured Notes Indenture against any such distributions and (e) preserving any charging lien or indemnification rights of the Secured Notes Indenture Trustee under the Secured Notes Indenture against the holders of the Secured Notes. For the avoidance of doubt, nothing in this section shall affect the discharge of or result in any obligation, liability or expense of the Debtors or Reorganized Debtors or affect the discharge of Claims or Equity Interests pursuant to the

Bankruptcy Code, the Confirmation Order or the Plan, or result in any additional obligation, expense or liability of the Debtors or Reorganized Debtors. On and after the Effective Date, all duties and responsibilities of the Secured Notes Indenture Trustee shall be discharged except to the extent required to effectuate the Plan.

10.  **Preservation of Causes of Action.**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors may pursue the Causes of Action in their sole discretion. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to the Causes of Action upon, after or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors may exclusively enforce any and all Causes of Action. The Reorganized Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Causes of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Court.

C.  **Provisions Regarding Corporate Governance of the Reorganized Debtor**

1.  **Appointment of Managers.**

As of the Effective Date, the term of the current members of the Debtors' boards of directors shall expire without further action by any Person and such members shall have no continuing obligations to the Debtor(s), Reorganized Debtors or Holdco on or after the Effective Date. Effective as of the Effective Date, the initial managers of the New Board shall be comprised of 3 managers appointed by the Supporting Noteholders and disclosed in the Plan Supplement. Pursuant to 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliation of the directors and officers of each of the other Reorganized Debtors.

2.  **Powers of Officers.**

The officers of the Debtors or the Reorganized Debtors, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

3.  **Corporate Action.**

On or prior to the Effective Date, any Debtor and, after the Effective Date, New Holdco, may enter into or undertake any corporate transactions and may take such actions as may be determined by such Debtor or New Holdco to be necessary or appropriate to effect such

corporate transactions as contemplated by and consistent with the Plan.  The actions to effect the corporate transactions may include, without limitation:   (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms herein and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. The corporate transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors or New Board to be necessary or appropriate to effect the purposes of such transactions for the benefit of New Holdco, including, without limitation, the potential simplification of the organizational structure of the Debtors.  In each case in which the surviving, resulting or acquiring person in any such transaction is a successor to a Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Debtor will perform such obligations.  Implementation of the corporate transactions shall not affect any distributions, discharges, exculpations, releases or injunctions set forth in the Plan.  The corporate transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and title 6 and title 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order or process of any kind, except as otherwise set forth herein or in the Confirmation Order.

> **D.**     Procedures for Treating Disputed Claims.

       1.     *Filing Proofs of Claim*.  Holders of Claims need not file Proofs of Claim with the Court unless specifically required by the Plan.  In the event that a holder of a Claim elects to file a Proof of Claim with the Court, it will be deemed to have consented to the exclusive jurisdiction of the Court for all purposes with respect to the determination, liquidation, allowance, or disallowance of such Claim.

       2.     *Disputed Claims*. If the Debtors dispute any Claim as to which no Proof of Claim has been filed, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced, provided, however, that the Reorganized Debtors may elect, at their sole option, to object under section 502 of the Bankruptcy Code to any Claim or Proof of Claim filed by or on behalf of a holder of a Claim.

       3.     *Objections to Claims*.  Except insofar as a Claim is Allowed under the Plan, after the Effective Date, the Reorganized Debtors shall have the sole and exclusive

authority to object to any Claim.  Notwithstanding the foregoing, the U.S. Trustee retains the right to object to Fee Claims and other Administrative Claims.

        4.    ***Disallowance of Claims*.  Except as provided herein or otherwise agreed, any and all Proofs of Claim shall be deemed expunged from the claims register on the Effective Date without any further notice to or action, order, or approval of the Court and the Claim on which such Proof of Claim was filed shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced.**

      **E.**    <u>Allowed Claims.</u>

        1.    *Delivery of Distributions*.  Except with respect to distributions of Common Units, distributions under the Plan shall be made by the Reorganized Debtors (or their agent or designee) to the holders of Allowed Claims in all Classes for which a distribution is provided in the Plan at the addresses set forth on the Schedules, unless such addresses are superseded by Proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001 (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).

        2.    *Distribution of Cash*.  Any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a bank selected by the Reorganized Debtors.

        3.    *Unclaimed Distributions of Cash*.  Subject to Article VII.B.6 of the Plan, any distribution of Cash under the Plan that is unclaimed after one year after it has been delivered (or attempted to be delivered) shall, pursuant to section 347(b) of the Bankruptcy Code, become the property of the Reorganized Debtors against which such Claim was Allowed notwithstanding any domestic state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim shall be extinguished and forever barred.

        4.    *Unclaimed Distributions of Common Units*.  Subject to Article VII.B.6 herein, any distribution of Common Units under the Plan that is unclaimed after one year after it has been delivered (or attempted to be delivered) shall be retained by the Reorganized Debtors, notwithstanding any domestic state or other escheat or similar laws to the contrary, and the entitlement by the holder of such Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim shall be extinguished and forever barred.

        5.    *Saturdays, Sundays, or Legal Holidays*.  If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

01:15870994.8

6.    *Fractional and De Minimis Distributions*.  Notwithstanding any other provision in the Plan to the contrary, no fractional Common Units shall be issued or distributed pursuant to the Plan.  Whenever any payment of a fraction of Common Unit would otherwise be required under the Plan, the actual distribution made shall reflect a rounding of such fraction to the nearest whole Common Unit (up or down), with half Common Unit or less being rounded down and fractions in excess of a half of Common Unit being rounded up.  The Reorganized Debtors shall not be required to, but may in its sole and absolute discretion, make any payment on account of any Claim in the event that the costs of making such payment exceeds the amount of such payment.

7.    *Distributions to Holders of Claims*:

(a)    *Initial Distribution to Claims Allowed as of the Effective Date*.  On or as soon as reasonably practicable after the Effective Date, or as otherwise expressly set forth in the Plan, the Reorganized Debtors (or their agent or designee) shall distribute Cash or Collateral, as the case may be, to the holders of Allowed Claims as contemplated herein.

(b)    *Claims Allowed after the Effective Date*.  Each holder of a Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive the distribution to which such holder of an Allowed Claim is entitled as set forth in Article III, and distributions to such holder shall be made in accordance with the provisions of the Plan.  As soon as practicable after the date that the Claim becomes an Allowed Claim, the Reorganized Debtors shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

**F.**    Allocation of Consideration.

The aggregate consideration to be distributed to the holders of Allowed Claims in each Class under the Plan shall be treated as first satisfying an amount equal to the principal amount of the Allowed Claim for such holders, and any remaining consideration as satisfying accrued but unpaid interest, as applicable.

**G.**    Insured Claims.

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.

**H.**    **Compliance with Tax Requirements.**

In connection with the Plan, to the extent applicable, the Debtors and the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors or Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending

receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and the Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

## I.      Setoff and Recoupment.

The Debtors or the Reorganized Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant pursuant to section 558 of the Bankruptcy Code or otherwise, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the holder of such Claim.

**Unless otherwise authorized by a Final Order, any holder of a Claim, other than a holder of a Governmental Claim, must assert any setoff rights against a Claim by a Debtor against such Entity by filing an appropriate motion seeking authority to setoff on or before the Confirmation Date or will be deemed to have waived and be forever barred from asserting any right to setoff against a Claim by a Debtor or the Reorganized Debtors, notwithstanding any statement to the contrary in a Proof of Claim or any other pleading or document Filed with the Court or delivered to the Debtors.**

## J.      Executory Contracts and Unexpired Leases.

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Court, to assume or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages, if any, incurred by reason of the rejection.

### 1.      Assumption of Executory Contracts and Unexpired Leases.

Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically assumed pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such executory contract or unexpired lease: (i) is expressly identified on the Rejection Schedule; (ii) has been previously rejected by the Debtors by Final Order or has been rejected by the Debtors by order of the Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to reject pending as of the Effective Date; or (iv) is otherwise rejected pursuant to the terms herein.

The Confirmation Order will constitute an order of the Court approving such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

2.    **Cure Claims.**

At the election of the Debtors or the Reorganized Debtors, as applicable, any monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code in one of the following ways: (i) payment of the Cure Claim in Cash on or as soon as reasonably practicable to occur of (A) thirty (30) days after the determination of the Cure Claim, and (B) the Effective Date or such other date as may be set by the Court, or (ii) on such other terms as agreed to by the Debtors or Reorganized Debtors and the non-Debtor counterparty to such Executory Contract or Unexpired Lease.  In the event of a dispute pertaining to assumption or assignment, the Cure Claim payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the resolution of the dispute in accordance with Article VII.A of the Plan.  The Reorganized Debtors shall be deemed to have provided adequate assurance of future performance through the promise of the applicable Reorganized Debtor to perform all obligations under any Executory Contract or Unexpired Lease under the Plan.

**ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE AND SATISFACTION OF THE CURE CLAIM PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTORS OR REORGANIZED DEBTORS ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE.  ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED MOOT AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE COURT UPON PAYMENT OF ANY CURE CLAIM**.

3.    **Reservation of Rights.**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, as applicable, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  In the event a written objection is filed with the Court asserting that a contract or lease is executory or unexpired, the right of the Debtors or Reorganized Debtors to move to reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Court determining that the contract or lease is executory or unexpired, in which case the deemed assumption provided for in the Plan shall not apply to such contract or lease.

4.    **Rejection of Executory Contracts and Unexpired Leases.**

(a)    <u>Rejection Schedule.</u>  The Debtors will file the Rejection Schedule with the Court no later than five (5) Business Days before the deadline to object to the Plan.  The

Rejection Schedule will include (a) the name of the non-Debtor counterparty, (b) the legal description of the contract or lease to be rejected, and (c) the proposed effective date of rejection. On or as soon as reasonably practicable after the filing of the Rejection Schedule, the Debtors will serve a Rejection Notice as well as notice of filing of the Rejection Schedule upon each non-Debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed rejection of their respective Executory Contract or Unexpired Lease and explain how such disputes will be resolved by the Court if the parties are not able to resolve a dispute consensually.

The Confirmation Order will constitute an order of the Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

(b)    <u>Rejection Damage Claims.</u> If the rejection by the Debtors, pursuant to the Plan or otherwise, of an Executory Contract or Unexpired Lease gives rise to a Rejection Damage Claim, a Proof of Claim must be filed with the Court within (i) forty-five (45) days after the date of entry of an order of the Court approving such rejection, or (ii) if the Executory Contract or Unexpired Lease is listed on the Rejection Schedule, within forty-five (45) days after the date of entry of the Confirmation Order.  For the avoidance of doubt, all Allowed Rejection Damage Claims shall be treated as General Unsecured Claims.

(c)    <u>Requirement to File a Proof of Claim for Rejection Damage Claims.</u>  **<u>ANY REJECTION DAMAGE CLAIMS THAT ARE NOT TIMELY FILED SHALL BE DISALLOWED AUTOMATICALLY, FOREVER BARRED FROM ASSERTION, AND SHALL NOT BE ENFORCEABLE AGAINST ANY REORGANIZED DEBTOR WITHOUT THE NEED FOR ANY OBJECTION BY THE REORGANIZED DEBTORS OR FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE COURT, AND ANY SUCH REJECTION DAMAGE CLAIM SHALL BE DEEMED FULLY SATISFIED, RELEASED AND DISCHARGED, NOTWITHSTANDING ANYTHING IN THE SCHEDULES OR A PROOF OF CLAIM TO THE CONTRARY.</u>**

5.    **<u>Assignment.</u>**

Any Executory Contract or Unexpired Lease, if not expressly assumed and assigned to a third party previously in the Chapter 11 Cases, will be deemed assumed and assigned to that Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.  If an objection to a proposed assumption, assumption and assignment or Cure Claim is not resolved in favor of the Debtors before the Effective Date, the applicable Executory Contract or Unexpired Lease may be designated by the Debtors or the Reorganized Debtors for rejection within five (5) Business Days of the entry of a Final Order of the Court resolving the matter against the Debtors. Such rejection shall be deemed effective as of the Effective Date.

6.    **<u>Insurance Policies.</u>**

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be

deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto.

7.    **Post-Petition Contracts and Leases.**

All contracts, agreements and leases that were entered into by a Debtor or assumed by a Debtor after the Petition Date will be deemed assigned by that Debtor to the applicable Reorganized Debtor on the Effective Date.

K.    **Effect of Confirmation of the Plan**

1.    **Binding Effect.**

From and after and after the Confirmation Date, but subject to the occurrence of the Effective Date, the Plan shall be binding and inure to the benefit of the Debtors, all present and former holders of Claims and Equity Interests, and their respective assigns, including New Holdco.

2.    **Discharge of the Debtors.**

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Equity Interests and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim based upon such debt, right or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Equity Interest based upon such debt, right or Equity Interest is Allowed; or (iii) the holder of such a Claim or Equity Interest has accepted the Plan or is entitled to receive a distribution hereunder.  Any default by the Debtors with respect to any Claim or Equity Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring.**

3.    **Injunction.**

**Except as otherwise provided in the Plan or in any document, instrument, release or other agreement entered into in connection with the Plan or approved by order**

of the Court, the Confirmation Order shall provide, among other things, that from and after the Effective Date all Persons or Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors are (i) permanently enjoined from taking any of the following actions against the Estate(s) or any of their property on account of any such Claims or Equity Interests and (ii) permanently enjoined from taking any of the following actions against any of the Debtors, the Reorganized Debtors or their property on account of such Claims or Equity Interests:  (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting, or enforcing any Lien or encumbrance; (D) asserting a setoff or right of subrogation of any kind against any debt, liability or obligation due to the Debtors; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; _provided_, _however_, that nothing contained herein shall preclude such Persons or Entities from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered or Reinstated under or in connection with the Plan.  By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim or Equity Interest will be deemed to have specifically consented to the injunctions set forth in Article IX.C of the Plan.

4.    Releases, Exculpations and Injunctions of Released Parties.

(a)    *Releases by the Debtors*.    On the Effective Date, and notwithstanding any other provisions of the Plan, the Debtors and the Reorganized Debtors, on behalf of themselves and their Estates, shall be deemed to unconditionally release the Released Parties from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, assertable on behalf of or derivative from the Debtors, based in whole or in part upon actions taken solely in their respective capacities described herein or any omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the Disclosure Statement, the Restructuring Support Agreement, the documents included in the Plan Supplement, or the Plan or related agreements, instruments, or other documents, provided, however, that (a) no individual shall be released from any act or omission that constitutes gross negligence or wilful misconduct as determined by a Final Order, (b) other than with respect to the Secured Noteholder Claims, the Reorganized Debtors shall not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of set-off or recoupment against any Claims, and (c) the foregoing release applies to the Released Parties solely in their respective capacities described herein.

(b)    *Releases by Holders of Claims*.    On the Effective Date, and notwithstanding any other provisions of the Plan, (i) each Releasing Party will be deemed to have forever released and covenanted with the Released Parties not to sue or otherwise seek recovery from any Released Party on account of any Claim, including any Claim or Cause of Action based upon tort, breach of contract, violations of federal or state securities

**laws or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date in any way related to the Debtors or their businesses and affairs and (ii) each Releasing Party will be deemed to have forever released and covenanted with the Released Parties not to assert against any Released Party any Claim, obligation, right, Cause of Action or liability that any holder of a Claim may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the Chapter 11 Cases, the documents included in the Plan Supplement, the Restructuring Support Agreement, the Plan, or the Disclosure Statement or related agreements, instruments or other documents, provided, however, the foregoing release will not (i) apply to obligations arising under the Plan, (ii) be construed to prohibit a party in interest from seeking to enforce the terms of the Plan, and (iii) apply to any act or omission that constitutes gross negligence or wilful misconduct as determined by a Final Order. The foregoing releases apply to the Released Parties solely in their respective capacities described herein.**

Under the Plan, the "Released Parties" means each of: (a) the Debtors and Reorganized Debtors, (b) the Secured Noteholders other than those who voted to reject the Plan or have checked the box on the applicable Ballot indicating that they opt not to grant the releases provided in the Plan, (c) the Secured Notes Indenture Trustee, and (i) with respect to each of the foregoing in clauses (a) through (c), such entities' predecessors, Professionals, successors and assigns, subsidiaries, funds, portfolio companies, and each of their respective current and former officers, directors, employees, managers, attorneys, financial advisors, accountants, investment bankers, consultants, management companies or other professionals or representatives, in each case solely in their capacity as such.

The "Releasing Parties" are defined under the Plan as each of: (a) the Secured Notes Indenture Trustee, (b) the holders of Impaired Claims other than those who voted to reject the Plan or  have checked the box on the applicable Ballot indicating that they opt not to grant the releases provided in the Plan, (c) the Supporting Noteholders, (d) to the fullest extent permissible under applicable law holders of Unimpaired Claims, and (e) with respect to the foregoing entities in clauses (a) through (d), such entity's current subsidiaries, officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, equity holders, partners, and other professionals, in each case solely in their capacity as such.

(c)      ***Exculpation and Injunction***. **The Debtors and their officers, directors, and retained professionals shall have no liability whatsoever to any holder or purported holder of an Administrative Expense Claim, Claim, or Equity Interest for any act or omission that occurred between the Petition Date and the Effective Date in connection with the Chapter 11 Cases, including the preparation, negotiation, and filing of the Plan, the Disclosure Statement, the negotiation of the documents included in the Plan Supplement, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the**

**administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof except for any act or omission that constitutes willful misconduct or gross negligence as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability. Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Expense Claim, Claim or Equity Interest shall be permitted to commence or continue any Cause of Action, employment of process, or any act to collect, offset, or recover any Claim against a Released Party that accrued on or before the Effective Date.**

5.    **Preservation of Causes of Action.**

Section 1123(b)(3) of the Bankruptcy Code provides that a debtor's plan of reorganization may provide for the debtor to retain and enforce any claim or interest on behalf of the debtor's estate for the benefit of its creditors.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors may pursue the Causes of Action in their sole discretion. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to the Causes of Action upon, after or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors may exclusively enforce any and all Causes of Action. The Reorganized Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Causes of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Court.

6.    **Votes Solicited in Good Faith.**

The Debtors have, and upon entry of the Confirmation Order shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors (and their respective affiliates, agents, directors, officers, and Professionals) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under the Plan and therefore have not been, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of the securities offered and distributed under the Plan.

7.      **Preservation of Insurance.**

The Debtors' discharge and release from all Claims as provided herein shall not, except as necessary to be consistent with the Plan, diminish or impair the enforceability of any insurance policy that may provide coverage for Claims against the Debtors, the Reorganized Debtors, their current and former directors and officers, or any other Person.

L.      **Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction: (i) to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, in accordance with the terms of the Plan, any Executory Contracts or Unexpired Leases to the Rejection Schedule or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired; (ii) to determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending before the Court on the Effective Date; (iii) to ensure that distributions to holders of Allowed Claims are accomplished as provided herein; (iv) to resolve disputes as to the ownership of any Claim or Equity Interest; (v) to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests; (vi) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified or vacated; (vii) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (viii) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order; (ix) to hear and determine all applications, and disputes relating thereto, for compensation and reimbursement of expenses of Professionals; (x) to hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan; (xi) to hear and determine any issue for which the Plan requires a Final Order of the Court; (xii) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (xiii) to hear and determine any Causes of Action of the Debtors, all of which have been expressly preserved under the Plan; (xiv) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge; (xv) to hear and determine any matter, case, controversy, suit, dispute, or Cause of Action (a) regarding the existence, nature, and scope of the discharge, releases, injunctions, and exculpation provided under the Plan, and (b) enter such orders as may be necessary or appropriate to implement such discharge, releases, injunctions, exculpations, and other provisions; (xvi) to enter a final decree closing the Chapter 11 Cases; (xvii) to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain

01:15870994.8

interference by any entity with consummation or enforcement of the Plan; (xviii) to adjudicate any and all disputes arising from or relating to distributions under the Plan; (xix) to enforce all orders previously entered by the Court; and (xx)to hear any other matter not inconsistent with the Bankruptcy Code.

### M.   Miscellaneous Provisions.

#### 1.   Immediate Binding Effect.

Subject to the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with any Debtor.

#### 2.   Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware (without reference to the conflicts of laws provisions thereof that would require or permit the application of the law of another jurisdiction) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

#### 3.   Filing or Execution of Additional Documents.

On or before the Effective Date, the Debtors or the Reorganized Debtors shall (on terms materially consistent with the Plan) file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, which shall be in form and substance acceptable to the Debtors and the Supporting Noteholders in accordance with the Restructuring Support Agreement.

#### 4.   Term of Injunctions of Stays

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

#### 5.   Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any United States federal, state, local or non-U.S. taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

01:15870994.8

Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distribution pending receipt of information necessary or appropriate to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

### 6. <u>Exemption From Transfer Taxes.</u>

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, all transfers of property pursuant hereto, including (i) the issuance, transfer or exchange under the Plan of Common Units, (ii) the making or assignment of any lease or sublease, or (iii) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan, shall not be subject to any stamp tax or similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax.

### 7. <u>Payment of Statutory Fees.</u>

All fees payable pursuant to section 1930 of title 28, United States Code, as determined by the Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

### 8. <u>Amendment or Modification of the Plan.</u>

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan, subject to the written consent of the Supporting Noteholders.

### 9. <u>Plan Supplement.</u>

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  The documents contained in the Plan Supplement shall be available online at www.pacer.gov and cases.primeclerk.com/windsor. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to counsel to the Debtors.  The Debtors reserve the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any part of the Plan Supplement after they are filed and shall promptly make such changes available online at www.pacer.gov and cases.primeclerk.com/windsor.

### 10. <u>Conflicts.</u>

The terms of the Plan will govern in the event of any inconsistency between the Plan and the Disclosure Statement.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order will govern with respect to such inconsistency.

01:15870994.8

## VII.  CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### A.      Conditions Precedent to Confirmation

The Plan provides that the following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived in accordance with Article VI.B of the Plan:

1.      The Court shall have approved the Disclosure Statement with respect to the Plan in an order in form and substance reasonably acceptable to the Debtors and the Supporting Noteholders.

2.      The Confirmation Order, the Plan and Plan Supplement shall be in form and substance acceptable to the Debtors and the Supporting Noteholders.

3.      All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors.

4.      In accordance with the provisions of the Plan, the New Board of Managers of Reorganized Debtors shall have been selected and shall have agreed to serve in such capacity.

### B.      Conditions to Effectiveness.

The Plan shall not become effective unless and until:

1.      The Certificate of Formation, the other constituent documents of the Reorganized Debtors, and the Operating Agreement, as necessary and applicable, in form and substance acceptable to the Debtors and the Supporting Noteholders, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdictions' corporation or limited liability company laws;

2.      the Confirmation Order shall have been entered by the Court and shall be a Final Order;

3.      the Plan Supplement documents shall have been executed and become effective;

4.      all other documents and agreements necessary to implement the Plan on the Effective Date, in form and substance acceptable to the Debtors and the Supporting Noteholders, to the extent required herein or in the Restructuring Support Agreement, shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

5.      all Restructuring Support Agreement Professional Fees payable under the Restructuring Support Agreement and the Plan through the Confirmation Dateshall be paid by the Debtors prior to or on the Effective Date without any further notice to or action, order, or approval of the Court; and

6.      the Amended Management Agreement shall have been executed and be in full force and effect.

## C.      **Waiver of Conditions.**

The Debtors, with the written consent of the Supporting Noteholders, to the extent not prohibited by law, may waive one or more of the conditions to (i) confirmation of the Plan set forth in Article VIII.A of the Plan at any time without leave of or order of the Court and without any formal action; or (ii) to effectiveness of the Plan set forth in Article VIII.B of the Plan at any time.

## D.      **Effect of Failure of Conditions.**

In the event that the Effective Date does not occur on or before one hundred and twenty (120) days after the Confirmation Date, upon notification submitted by the Debtors to the Court:  (i) the Confirmation Order may be vacated, (ii) no distributions under the Plan shall be made; (iii) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver, release, or discharge of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors unless extended by Court order.

## E.      **Vacatur of Confirmation Order.**

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall:  (i) constitute a waiver, release or discharge of any Claims against or Equity Interests in the Debtor; (ii) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (iii) prejudice in any manner any right, remedy or claim of the Debtors; or (iv) be deemed an admission against interest by the Debtors.  If a Final Order denying confirmation of the Plan is entered, the Restructuring Support Agreement shall be deemed null and void in all respects.

## F.      **Modification of the Plan.**

Subject to the limitations contained in the Plan, and subject to the written consent of the Supporting Noteholders as set forth herein and in the Restructuring Support Agreement, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors (with the written consent of the Supporting

Noteholders) or the Reorganized Debtors, as the case may be, may amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code.

G.        **Revocation, Withdrawal, or Non-Consummation.**

1.        *Right to Revoke or Withdraw*.  The Debtors reserve the right to revoke or withdraw the Plan at any time before the Effective Date; provided, however, that such action shall not alter the rights of the parties to the Restructuring Support Agreement.

2.        *Effect of Withdrawal, Revocation, or Non-Consummation*.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), the assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document, including the Restructuring Support Agreement, or agreement executed pursuant to the Plan shall be null and void.  In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Equity Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

## VIII.  CONFIRMATION PROCEDURES

A.        **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Court, after notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on November 20, 2014 at 3:00 p.m., prevailing Eastern Time, before the Honorable Peter J. Walsh, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Sixth Floor, Courtroom 2, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.  The Company will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code and consistent with the terms, conditions, consent and consultation rights set forth in the Restructuring Support Agreement, and has reserved the right to modify the Plan to the extent required.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Court, together with proof of service, and served so that they are received **on or before November 13, 2014 at 4:00 p.m., prevailing Eastern Time** by the following parties:

**Counsel to the Debtors:**

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Facsimile:  (302) 571-1253
Attn:   Pauline K. Morgan, Esq.
          Sean T. Greecher, Esq.

**The U.S. Trustee:**

Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box 35
Wilmington, Delaware 19801
Facsimile: (302) 573-6497
Attn:   Benjamin Hackman, Esq

**Counsel to the Supporting Noteholders:**

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Facsimile: (212) 757-3990
Attn:   Andrew N. Rosenberg, Esq.
          Elizabeth R. McColm, Esq.
          Oksana Lashko, Esq.

**Counsel to the Indenture Trustee:**

Emmet, Marvin & Martin, LLP
120 Broadway, 32nd Floor
New York, New York 10271
Facsimile: (212) 238-3100
Attn:   Edward P. Zujkowski, Esq.
Thomas A. Pitta, Esq.

### B.    Confirmation of the Plan.

At the Confirmation Hearing, the Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that the plan is (i) accepted by all Impaired classes of Claims and Equity Interests or, if rejected by an Impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan.

### 1.    Acceptance.

Under section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are conclusively deemed to have accepted a plan and their votes are not solicited.  Holders of impaired claims and interests are entitled to vote on a plan (unless such claims or interests are in a class that is deemed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code, and therefore, must accept a plan for it to be confirmed without application of the "unfair discrimination" and "fair and equitable" tests to such classes.  As class of claims or interests is deemed to accept a plan if accepted by at least two-thirds (2/3) in amount of each such class (other than any interests designated under section 1126(e) of the Bankruptcy Code) and a majority in number of holders that has voted to accept or reject a plan.

Classes 1, 2, 4, 5 and 6 of the Plan are Unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan.

Class 3 of the Plan is Impaired under the Plan and Class 7 is deemed to reject the Plan.  Thus, only Class 3 is entitled to vote on the Plan.   The Debtors will seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code, with respect to Class 7.

01:15870994.8

Finally, the Debtors reserve their right to amend the Plan in accordance with Article XI.I. of the Plan with respect to any rejecting Class(es).

   2. **Standards for Confirmation**.

    (a) <u>Requirements of Section 1129(a) of the Bankruptcy Code.</u>

    The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Court may confirm a chapter 11 plan of reorganization:

    (i) The plan complies with the applicable provisions of the Bankruptcy Code.

    (ii) The proponent of the plan complies with the applicable provisions of the Bankruptcy Code.

    (iii) The plan has been proposed in good faith and not by any means forbidden by law.

    (iv) Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Court as reasonable.

    (v) The proponent of a plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy.

    (vi) The proponent of the plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

    (vii) Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

    (viii) With respect to each iimpaired class of claims or interests (x) each holder of a claim or interest of such class (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or (y) if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim, property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(ix)    With respect to each class of claims or interests, such class has (a) accepted the plan; or (b) such class is not Impaired under the plan (subject to the "cramdown" provisions discussed below; see "Requirements of Section 1129(b) of the Bankruptcy Code").

(x)    Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(a)    with respect to a claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b)    with respect to a class of claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (a) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(c)    with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim, regular installment payments in cash:

(i)    of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii)    over a period ending not later than five (5) years after the date of the order for relief under sections 301, 302, or 303 of the Bankruptcy Code; and

(iii)    in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); and

(d)    with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in the bullet points above.

(i)    If a class of claims is Impaired under the plan, at least one class of claims that is Impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider (as defined in section 101 of the Bankruptcy Code).

(ii)    Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

(iii)    All fees payable under section 1930 of title 28 of the United States Code, as determined by the Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

(iv)    The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtors believe that the Plan meets all the applicable requirements of section 1129(a) of the Bankruptcy Code.

(b)    Requirements of Section 1129(b) of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code sets forth the so-called "cramdown" provisions for confirmation of a plan even if it is not accepted by all Impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one Impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any Impaired class that has not accepted the plan.

(i)    *Fair and Equitable*.

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting Impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

(e)    *Secured Creditors*.    A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides: (i) that each of the holders of the secured claims included in the rejecting class (A) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (B) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (ii) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (iii) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (i) or (ii) hereof.

(f)    *Unsecured Creditors*.    A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (i) each holder of a claim included in the rejecting class receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan.

(g)   *Holders of Equity Interests*.   A plan is fair and equitable as to a class of equity interests that rejects the plan if the plan provides that: (i) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (A) any fixed liquidation preference to which such holder is entitled, (B) the fixed redemption price to which such holder is entitled, or (C) the value of the interest; or (ii) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan.

The Debtors believe the Plan is fair and equitable as to all creditors and equity interest holders.

(ii)   *Unfair Discrimination*.

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its Claims or Equity Interests.   The Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

3.   **Feasibility**.

Section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by liquidation or the need for further financial reorganization of the debtor.   For purposes of determining whether the Plan meets this requirement, the Debtors analyzed their ability to meet their obligations under the Plan.   Based upon the Debtors' Financial Projections annexed hereto and the assumptions set forth therein, the Debtors believe that it will be able to make all distributions required under the Plan and to fund their operations going forward and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

The Plan substantially deleverages the Debtors' balance sheet by converting 100% of the Secured Notes into equity.   This results in an approximately $196 million reduction in funded debt with significantly improved cash flow of over $30 million per year due to the reduced interest expense and amortization.

4.   **Best Interests Test**.

With respect to each Impaired Class of Claims and Equity Interests, Confirmation of the Plan requires that each holder of an Allowed Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.   To determine what holders of Claims and Equity Interests in each Impaired Class would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Court must determine the dollar amount that would be generated from the

liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the Debtors' unencumbered assets and properties, augmented by the unencumbered Cash, if any, held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that a trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors during the Chapter 11 Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Allowed Secured Noteholder Claims, Allowed General Unsecured Claims, and if applicable Allowed Equity Interests.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors and Equity Interest holders in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the likely erosion in value of assets and Vessels in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere that would prevail under a chapter 7 liquidation and (iii) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis is attached hereto as **Exhibit D**. The information set forth in **Exhibit D** provides a summary of the liquidation values of the Company's assets, assuming a chapter 7 liquidation in which a trustee appointed by the Court would liquidate the assets of the Debtors' estates.

Underlying the Liquidation Analysis is a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the

Company and its management.  The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change.  Accordingly, the values reflected might not be realized if the Company was, in fact, to undergo such a liquidation.  The chapter 7 liquidation period is assumed to be a period of 6 months, allowing for, among other things, the (i) discontinuation of the Company's operations, (ii) sale of assets and (iii) collection of receivables.

THE LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE DEBTORS' ASSETS.   NUMEROUS ESTIMATES AND ASSUMPTIONS UNDERLIE THE LIQUIDATION ANALYSIS REGARDING PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE COMPANY'S MANAGEMENT AND ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES BEYOND THE CONTROL OF THE COMPANY OR A CHAPTER 7 TRUSTEE. ADDITIONALLY, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE.   THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE DEBTORS' ASSETS WILL RESULT IN AN ACCURATE ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS UNDERWENT AN ACTUAL LIQUIDATION.

NEITHER THE COMPANY NOR ITS ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS.  THE ACTUAL AMOUNT OF CLAIMS OR EQUITY INTERESTS AGAINST THE DEBTORS OR ITS ESTATE COULD VARY SIGNIFICANTLY FROM THE ESTIMATES SET FORTH HEREIN, DEPENDING ON THE CLAIMS ASSERTED DURING THE PENDENCY OF HYPOTHETICAL CHAPTER 7 CASES. ACCORDINGLY, THE COMPANY'S ACTUAL LIQUIDATION VALUE IS SPECULATIVE IN NATURE AND COULD VARY MATERIALLY FROM THE ESTIMATES PROVIDED HEREIN.

## IX.  FINANCIAL PROJECTIONS AND VALUATION

The Company, with the assistance of professional advisors, developed a set of financial projections (as summarized in **Exhibit C**, the "**Financial Projections**") for the purposes set forth below. The Financial Projections reflect the Company's most recent estimates of the financial position, results of operations and cash flows after confirmation of the Plan, based upon the Company's assumptions and judgments as to future market and business conditions, expected future operating performance, and the occurrence or nonoccurrence of certain future events, all of which are subject to change.  Actual operating results and values may vary.

A.     **Financial Projections**.

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.  In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Company's management has, through the development of the Financial Projections, analyzed the Debtors' ability to meet its obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct its business subsequent to its emergence from these Chapter 11 Cases.  The Financial Projections were also prepared to assist those holders of Allowed Claims entitled to vote on the Plan in determining whether to accept or reject the Plan.

For the purpose of demonstrating Plan feasibility, the Company prepared the Financial Projections with the assistance of its professional advisors. The Financial Projections present, to the best of the Company's knowledge, the Reorganized Debtors' projected financial position, results of operations, and cash flows for the four fiscal years 2014 through 2018 and reflect the Debtors' assumptions and judgments as of August 2014.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE COMPANY'S INDEPENDENT ACCOUNTANT HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE COMPANY DOES NOT INTEND TO, AND DISCLAIMS ANY OBLIGATION TO (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF COMMON UNITS OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE COMPANY'S MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL.  THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE COMPANY'S ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE

FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.

1.   **Scope of Financial Projections**.

The Financial Projections are based on the assumption that the Effective Date will occur on or about December 23, 2014.  If the Effective Date is significantly delayed, additional expenses, including professional fees, may be incurred and operating results may be negatively impacted.  It is also assumed that the Reorganized Debtors will conduct operations substantially similar to their current businesses.

The Financial Projections do not fully reflect the application of fresh start accounting, which, if required pursuant to U.S. GAAP, is not anticipated to have a material impact on the underlying economics of the Plan.  Any formal fresh-start reporting adjustments that may be required in accordance with Statement of Position 90-7 Financial Reporting by Entities in Reorganization under the Bankruptcy Code, including any allocation of the Company's reorganization value to the Company's assets in accordance with the procedures specified in Financial Accounting Standards Board Statement 141, will be made after the Company emerges from bankruptcy.

The shipping industry has historically been and continues to be subject to significant volatility due to continuously evolving dynamics as they relate to the supply of vessels and demand for shipping services. The unpredictable nature of factors, such as weather, seasonal demand for resources and asymmetrical timing of vessel deliveries results in significant freight rate volatility and could cause actual results to differ.

The Financial Projections include the (i) Projected Consolidated Balance Sheet of New Holdco, (ii) Projected Consolidated Cash Income Statement of New Holdco, and (iii) Projected Consolidated Cash Flow Statement of New Holdco.

The Financial Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Factors that could cause actual results to differ materially include, but are not limited to: the ability of New Holdco to operate the Reorganized Debtors' business consistent with its projections generally, including the ability to maintain or increase revenue and cash flow to satisfy its liquidity needs and to manage its future operating expenses and make necessary capital expenditures; the loss or reduction in business from the Debtors' significant customers or the failure of the Debtors' significant customers to perform their obligations to the Debtors; the loss or material downtime of major suppliers; material declines in demand for shipping services or the rates in the shipping market; greater than anticipated levels of vessel new building orders or lower than anticipated rates of vessel scrapping; changes in the typical seasonal variations in charter rates; changes in the itineraries of the Vessels; increases in costs including, without limitation, crew wages, insurance, provisions, repairs and maintenance; changes in rules and regulations applicable to the shipping industry including, without limitation, legislation adopted by international organizations such as the IMO and the European Union or by individual countries; actions by the courts, the United States Coast

01:15870994.8

Guard, the U.S. Department of Justice or other governmental or regulatory authorities, and the results of the legal proceedings to which the Reorganized Debtors or any of their affiliated Vessels may be subject; changes in the condition of the Debtors' Vessels or applicable maintenance or regulatory standards (which may affect, among other things, the Debtors' anticipated drydocking or maintenance and repair costs); the Reorganized Debtors' ability to attract and maintain relationships with managers for their Vessels; changes in general domestic and international political conditions; and adverse changes in foreign currency exchange rates affecting the Debtors' expenses. See also Section IX ("Certain Risk Factors to be Considered," generally and in particular "Additional Factors to be Considered--Forward-Looking Statements are not Assured, and Actual Results May Vary").

### B.   Valuation of the Reorganized Debtors as of December 23, 2014.

The Debtors have estimated the post-confirmation enterprise value of the Reorganized Debtors to be approximately $132,350,000.  The implied equity value of the Reorganized Debtors is approximately $132,350,000, given that there is anticipated to be no debt owed by the Reorganized Debtors as of the Effective Date of the Plan outside of ordinary course operating expenses.

The foregoing estimates of the post-confirmation equity value of the Reorganized Debtors are based on a number of assumptions, including no material adverse changes in the spot rate market, no ship arrests, the continuing employment of the Debtors' Vessels, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

The valuation assumptions herein are not a prediction or reflection of post-confirmation trading prices of the Common Units.  The value of securities issued under a plan of reorganization is subject to many unforeseen circumstances and therefore cannot be predicted.

## X.  CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.   Certain Bankruptcy Law Considerations.

### 1.   Parties in Interest May Object to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a debtor may only place a claim or an equity interest in a particular class under a plan of reorganization only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests in the Plan complies with

the Bankruptcy Code requirements because the Debtors classified Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Court will reach the same conclusion.

2.      **Risk of Non-Confirmation, Non-Occurrence or Delay of the Plan.**

The Debtors have operated their business and managed their assets under the supervision of the Court since the Petition Date. Before it can be consummated, the Plan must be accepted by at least two-thirds in dollar amount and a majority in number of the Claims of Classes (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) entitled to vote to accept or reject the Plan. There can be no assurance that the Plan will be approved by the required majority of impaired creditors, and that even if approved, the Court will confirm the Plan. The failure of any of these conditions will delay the consummation of the Plan.

The Plan provides that the Debtors will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code. While the Debtors believe that the Plan satisfies the requirements for nonconsensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Plan, there can be no assurance that the Court will reach the same conclusion. In addition, there can be no assurance that any challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Plan. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes to accept the Plan, as modified.

3.      **Risk of Non-Occurrence of the Effective Date**.

The Restructuring Support Agreement provides for an outside Effective Date of December 23, 2014.  The impact that a prolonging of the Chapter 11 Cases may have on the Company's operations cannot be accurately predicted or quantified.  The continuation of the Chapter 11 Cases, particularly if the Plan is not approved, confirmed, or implemented within the time frame currently contemplated, could adversely affect operations and relationships between the Company and its customers and charterers, suppliers, service providers and creditors; result in increased professional fees and similar expenses; and the Debtors' ability to continue to use cash collateral may be threatened.  Failure to confirm the Plan could further weaken the Company's liquidity position, which could jeopardize the Company's exit from chapter 11.

4.      **The Debtors' Cash Collateral May Be Insufficient to Fund the Debtors' Business Operations, or May Be Unavailable if the Debtors Do Not Comply with its Terms.**

Although the Debtors project that they will have sufficient liquidity to operate their businesses through the Effective Date, there can be no assurance that the revenue generated by the Company's business operations and the cash made available to the Debtors under the cash collateral order will be sufficient to fund the Company's operations.  The Company has not

sought financing in the form of a debtor in possession credit facility. In the event that revenue flows are not sufficient to meet the Company's liquidity requirements, the Company may be required to seek additional financing. There can be no assurance that such additional financing would be available or, if available, offered on terms that are acceptable to the Company or the Court. If, for one or more reasons, the Company is unable to obtain such additional financing, the Company's business and assets may be subject to liquidation under chapter 7 of the Bankruptcy Code and the Company may cease to continue as going concern.

The cash collateral order provides for affirmative and negative covenants applicable to the Company, including negative covenants restricting the ability of Windsor Holdings Limited and its subsidiaries to incur additional indebtedness, grant liens, as well as financial covenants applicable to the Debtors including compliance with a budget. There can be no assurance that the Company will be able to comply with these covenants and meet its obligations as they become due or to comply with the other terms and conditions of the cash collateral order.

Any Event of Default under the cash collateral order could result in a default of the Company's obligations under the Restructuring Support Agreement which could imperil the Company's ability to confirm the Plan.

5.   **The Plan is Based Upon Assumptions the Debtors Developed Which May Prove Incorrect and Could Render the Plan Unsuccessful**

The Plan affects both the Debtors' capital structure and the ownership, structure and operation of their businesses and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to (i) the ability to implement the substantial changes to the capital structure; (ii) the ability to maintain adequate liquidity and, if necessary, obtain financing sources; (iii) the ability to maintain customers' confidence in the Reorganized Debtors' viability as a continuing entity and to attract and retain sufficient business from them; and (iv) the overall strength and stability of general global economic conditions of the financial and shipping industries. The failure of any of these factors could materially adversely affect the successful reorganization of our businesses.

In addition, the Plan relies upon financial projections, including with respect to revenues, EBITDA, and cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. In our case, the forecasts are even more speculative than normal, because they involve fundamental changes in the nature of our capital structure. Accordingly, the Company expects that its actual financial condition and results of operations will differ, perhaps materially, from what was anticipated. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization we may implement will occur or, even if they do occur, that they will have the anticipated effects on us and our subsidiaries or our businesses or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of any plan of

01:15870994.8

reorganization.

**B.    Certain Risks Related to the Debtors' Businesses and Operations**.

1.    **Volatility and Competition in the Tanker Industry.**

Historically, the tanker industry has been highly cyclical, with volatility in profitability, charter rates and asset values resulting from changes in the supply of, and demand for, tanker capacity. After reaching highs during the summer of 2008, charter rates for crude oil carriers fell dramatically in connection with the commencement of the global financial crisis and current rates continue to remain at relatively low levels compared to the rates achieved in the years preceding the global financial crisis. Fluctuations in charter rates and tanker values result from changes in the supply of and demand for tanker capacity and changes in the supply of and demand for oil and oil products. These factors may adversely affect New Holdco's ability to recharter the Vessels currently operating in the spot market. New Holdco's ability to re-charter the Vessels on the expiration of current spot charters, and the charter rates payable under any renewal or replacement charters, will depend upon, among other things, economic conditions in the tanker market and it cannot be guaranteed that any renewal or replacement charter will be sufficient to allow New Holdco to operate our Vessels profitably.

Factors that influence demand for tanker capacity include: (i) supply and demand for oil and oil products; (ii) global and regional economic and political conditions, including developments in international trade, national oil reserves policies, fluctuations in industrial and agricultural production and armed conflicts; (iii) regional availability of refining capacity; (iv) environmental and other legal and regulatory developments; (v) the distance oil and oil products are to be moved by sea; (vi) changes in seaborne and other transportation patterns, including changes in the distances over which tanker cargoes are transported by sea; (vii) increases in the production of oil in areas linked by pipelines to consuming areas, the extension of existing, or the development of new, pipeline systems in markets we may serve, or the conversion of existing non-oil pipelines to oil pipelines in those markets; (ix) currency exchange rates; (x) weather and acts of God and natural disasters; (xi) competition from alternative sources of energy and from other shipping companies and other modes of transport; (xii) international sanctions, embargoes, import and export restrictions, nationalizations, piracy and wars; and (xiii) regulatory changes including regulations adopted by supranational authorities and/or industry bodies, such as safety and environmental regulations and requirements by major oil companies.

Factors that influence the supply of tanker capacity include: (i) current and expected purchase orders for tankers; (ii) the number of tanker newbuilding deliveries; (iii) any potential delays in the delivery of newbuilding vessels and/or cancellations of newbuilding orders; (iv) the scrapping rate of older tankers; (v) the successful implementation of the phase-out of single-hull tankers; (vi) technological advances in tanker design and capacity; (vii) tanker freight rates, which are affected by factors that may effect the rate of newbuilding, swapping and laying up of tankers; (viii) port and canal congestion; (ix) the price of steel and vessel equipment; (x) conversion of tankers to other uses or conversion of other vessels to tankers; (xi) the number of tankers that are out of service; and (xii) changes in environmental and other regulations that may limit the useful lives of tankers.

01:15870994.8

The factors affecting the supply and demand for tankers have been volatile and are outside of the Company's control, and the nature, timing and degree of changes in industry conditions are unpredictable, including those discussed above. While market conditions have improved, continued volatility may reduce demand for transportation of oil over longer distances and increase supply of tankers to carry that oil, which may have a material adverse effect on our business, financial condition, results of operations and cash flows.

The operation of tanker vessels and transportation of crude and petroleum products is an extremely competitive business. Competition arises primarily from other tanker owners, including major oil companies as well as independent tanker companies. Competition for the transportation of oil and oil products can be intense and depends on price, location, size, age, condition and the acceptability of the tanker and its operators to the charterers. Due in part to the fragmented tanker market, competitors with greater resources could enter and operate larger fleets through acquisitions or consolidations and may be able to offer better prices and fleets, which could result in lower revenues.

2.    **Risks Inherent in the Spot Charter Market.**

Three of the Vessels will be employed in the spot market. Frontline will continue to attempt to arrange replacement charters, including shorter-term time charters, or may continue to operate the Vessels on the spot market, which is subject to greater fluctuation than the time charter market. Historically, the tanker market has been volatile as a result of the many conditions and factors that can affect the price, supply and demand for tanker capacity. The ongoing global economic situation may further reduce demand for transportation of oil over longer distances and supply of tankers to carry such oil, which may materially affect our revenues, profitability and cash flows. The spot charter market may fluctuate significantly based upon supply and demand of vessels and oil. The successful operation of the Vessels in the competitive spot charter market depends upon, among other things, obtaining profitable spot charters and minimizing, to the extent possible, time spent waiting for charters and time spent traveling unladen to pick up cargo. If future spot charter rates decline, New Holdco may be unable to operate the Vessels trading in the spot market profitably. Furthermore, as charter rates for spot charters are fixed for a single voyage, which may last up to several weeks, during periods in which spot charter rates are rising, the Company will generally experience delays in realizing the benefits from such increases.

Charter rates in the tanker industry are volatile. Future demand for the Vessels, and in turn future charter rates, is anticipated to be dependent upon economic growth in the world's economies, as well as seasonal and regional changes in demand and changes in the capacity of the world's fleet. We believe that the relatively high charter rates that were paid prior to 2008 were the result of economic growth in the world economies that exceeded growth in global vessel capacity. Since 2008, charter rates have been volatile and there can be no assurance that economic growth will not stagnate or decline leading to a decrease in vessel values and charter rates. A decline in vessel values and charter rates would have an adverse effect on New Holdco's business, financial condition and results of operation.

In recent years, shipyards have produced a large number of new tankers. If the capacity of new vessels delivered exceeds the capacity of tankers being scrapped and converted

to non-trading tankers, tanker capacity will increase. If the supply of tanker capacity increases and the demand for tanker capacity does not increase correspondingly, charter rates and vessel values could materially decline. A reduction in charter rates and the value of the Vessels may have a material adverse effect on earnings.

3.      **Demand for Crude Oil.**

The demand for use of the Vessels derives primarily from demand for Arabian Gulf, West African, North Sea and Caribbean crude oil, which, in turn, primarily depends on the economies of the world's industrial countries and competition from alternative energy sources. A wide range of economic, social and other factors can significantly affect the strength of the world's industrial economies and their demand for crude oil from the mentioned geographical areas. Any decrease in shipments of crude oil from the above mentioned geographical areas would have a material adverse effect on our financial performance. Among the factors which could lead to such a decrease are: (i) increased crude oil production from other areas; (ii) increased refining capacity in the Arabian Gulf or West Africa; (iii) increased use of existing and future crude oil pipelines in the Arabian Gulf or West Africa; (iv) a decision by Arabian Gulf or West African oil-producing nations to increase their crude oil prices or to further decrease or limit their crude oil production; (v) armed conflict in the Arabian Gulf and West Africa and political or other factors; and (vi) the development and the relative costs of nuclear power, natural gas, coal and other alternative sources of energy.

In addition, continuing volatile economic conditions affecting the United States and world economies may result in reduced consumption of oil products and a decreased demand for the Vessels and lower charter rates, which could have a material adverse effect on earnings.

4.      **Seasonal Fluctuations.**

The Vessels operate in markets that have historically exhibited seasonal variations in demand and, as a result, charter rates. This seasonality may result in quarter-to-quarter volatility in operating results, as long as the Vessels are employed in the spot market. Peaks in tanker demand quite often precede seasonal oil consumption peaks, as refiners and suppliers anticipate consumer demand. Seasonal peaks in oil demand can broadly be classified into two main categories: increased demand prior to Northern Hemisphere winters as heating oil consumption increases and increased demand for gasoline prior to the summer driving season in the United States.

5.      **Value of Vessels.**

The fair market value of the Vessels may increase and decrease depending on but not limited to the following factors: (i) general economic and market conditions affecting the shipping industry; competition from other shipping companies; (iii) types and sizes of vessels; (iv) the availability of other modes of transportation; (v) cost of newbuildings; (vi) shipyard capacity; (vii) governmental or other regulations; (viii) age of vessels; (ix) prevailing level of charter rates; (x) the need to upgrade secondhand and previously owned vessels as a result of charterer requirements; and (xi) technological advances in vessel design or equipment or otherwise.

01:15870994.8

If New Holdco were to sell any the Vessels at a time when ship prices have fallen, the sale may be at less than the Vessel's carrying amount on its financial statements, with the result that New Holdco could incur a loss and a reduction in earnings. In addition, if New Holdco determine at any time that any Vessel's future limited useful life and earnings require an impairment of its value on financial statements, that could result in a charge against earnings and a reduction of Unitholders' equity.

6.    **Risks Related to Global Economic Conditions.**

Negative trends in the global economy that emerged in 2008 continue to adversely affect global economic conditions. In addition, the world economy continues to face a number of challenges, including the recent turmoil and hostilities in the Middle East, North Africa and other geographic areas and countries and continuing economic weakness in the European Union. There has historically been a strong link between the development of the world economy and demand for energy, including oil and gas. An extended period of deterioration in the outlook for the world economy could reduce the overall demand for oil and gas and for use of the Vessels. While market conditions have improved, continued and developing economic and governmental factors, together with the concurrent volatility in charter rates and vessel values, have had a material adverse effect on the Company's results of operations, financial condition and cash flows.

The economies of the United States, the European Union and other parts of the world continue to experience relatively slow growth or remain in recession and exhibit weak economic trends. The credit markets in the United States and Europe have experienced significant contraction, deleveraging and reduced liquidity, and the U.S. federal government and state governments and European authorities continue to implement a broad variety of governmental action and/or new regulation of the financial markets. Global financial markets and economic conditions have been, and continue to be, severely disrupted and volatile. Since 2008, lending by financial institutions worldwide remain at low levels compared to the period preceding 2008.

The continued economic slowdown in the Asia Pacific region, especially in Japan and China, may exacerbate the effect on us of the recent slowdown in the rest of the world. Before the global economic financial crisis that began in 2008, China had one of the world's fastest growing economies in terms of gross domestic product, or GDP, which had a significant impact on shipping demand. The growth rate of China's GDP for the year ended December 31, 2013, is estimated to remain around 7.7%, approximately the same growth rate for the year ended December 31, 2012, remaining below pre-2008 levels. China has imposed measures to restrain lending, which may further contribute to a slowdown in its economic growth. China and other countries in the Asia Pacific region may continue to experience slowed or even negative economic growth in the future. Moreover, the current economic slowdown in the economies of the United States, the European Union and other Asian countries may further adversely affect economic growth in China and elsewhere. New Holdco's financial condition and results of operations, as well as our future prospects, would likely be impeded by a continuing or worsening economic downturn in any of these countries.

As a result of the credit crisis in Europe, in particular in Greece, Italy, Ireland, Portugal and Spain, the European Commission created the European Financial Stability Facility, or the EFSF, and the European Financial Stability Mechanism, or the EFSM, to provide funding to Eurozone countries in financial difficulties that seek such support. In March 2011, the European Council agreed on the need for Eurozone countries to establish a permanent stability mechanism, the European Stability Mechanism, or the ESM, which was established on September 27, 2012 to assume the role of the EFSF and the EFSM in providing external financial assistance to Eurozone countries. As of the end of 2013, financial assistance disbursements under the ESM and EFSF were being made to Greece, Portugal and Cyprus, with Ireland and Spain exiting the EFSF in December 2013. Despite these measures, concerns persist regarding the debt burden of certain Eurozone countries and their ability to meet future financial obligations. Potential adverse developments in the outlook for European countries could reduce the overall demand for oil cargoes and for New Holdco's services. Market perceptions concerning these and related issues, could affect New Holdco's financial position, results of operations and cash flow.

### 7.    <u>Risks Related to World Events.</u>

The operation of an ocean-going vessel carries inherent risks. These risks include the possibility of: (i) a marine disaster; (ii) terrorism; (iii) environmental accidents; (iv) cargo and property losses or damage; and (v) business interruptions caused by mechanical failure, human error, war, terrorism, piracy, political action in various countries, labor strikes, or adverse weather conditions.  Any of these circumstances or events could increase costs or lower revenues.

Continuing conflicts in the Middle East and North Africa, and the presence of United States and other armed forces in Afghanistan, may lead to additional acts of terrorism and armed conflict around the world, which may contribute to further economic instability in the global financial markets. In the past, political conflicts have also resulted in attacks on vessels, mining of waterways and other efforts to disrupt international shipping, particularly in the Arabian Gulf region.

Acts of piracy have historically affected ocean-going vessels trading in regions of the world such as the South China Sea, the Indian Ocean and in the Gulf of Aden off the coast of Somalia. Although the frequency of sea piracy worldwide decreased during 2013 to its lowest level since 2007, sea piracy incidents continue to occur, particularly in the Gulf of Aden off the coast of Somalia and increasingly in the Gulf of Guinea, with tankers particularly vulnerable to such attacks. If these piracy attacks result in regions in which the Vessels are deployed being characterized by insurers as "war risk" zones by insurers or Joint War Committee "war and strikes" listed areas, premiums payable for such coverage could increase significantly and such insurance coverage may be more difficult to obtain, which could affect management costs and the availability of insurance to cover losses from these incidents, which could have a material adverse effect on us. Any of these occurrences, or the perception that the Vessels are potential targets for terrorism or piracy, could have a material adverse impact on business, financial conditions and results of operations.

8.    **Risks Regarding Vessel Requirements.**

The hull and machinery of every commercial vessel must be certified as being "in class" by a classification society authorized by its country of registry. The classification society certifies that a vessel is safe and seaworthy in accordance with the applicable rules and regulations of the country of registry of the vessel and the Safety of Life at Sea Convention.

A vessel must undergo annual surveys, intermediate surveys and special surveys. In lieu of a special survey, a vessel's machinery may be placed on a continuous survey cycle, under which the machinery would be surveyed periodically over a five-year period. We expect the Vessels to be on special survey cycles for hull inspection and continuous survey cycles for machinery inspection. The Vessels are also required to be drydocked every two to three years for inspection of underwater parts.

Compliance with the above requirements may result in significant expense. If any Vessel does not maintain its class or fails any annual, intermediate or special survey, the Vessel will be unable to trade between ports and will be unemployable, which could have a material adverse effect on business, results of operations, cash flows and financial condition.

9.    **Risks Regarding International Laws and Regulations.**

The Company's operations are subject to numerous laws and regulations, in the form of international conventions and treaties, national, state and local laws and national and international regulations in force in the jurisdictions in which the Vessels operate or are registered, which can significantly affect the ownership and operation of the Vessels. These requirements include, but are not limited to, European Union regulations, the U.S. Oil Pollution Act of 1990, or OPA, the U.S. Clean Air Act, the U.S. Clean Water Act, the International Maritime Organization, or IMO, International Convention on Civil Liability for Oil Pollution Damage of 1969, generally referred to as CLC, the IMO International Convention on Civil Liability for Bunker Oil Pollution Damage, the IMO International Convention for the Prevention of Pollution from Ships of 1973, generally referred to as MARPOL, the IMO International Convention for the Safety of Life at Sea of 1974, generally referred to as SOLAS, the IMO International Convention on Load Lines of 1966 and the U.S. Maritime Transportation Security Act of 2002. Compliance with such laws and regulations, where applicable, may require installation of costly equipment or operational changes and may affect the resale value or useful life of the Vessels. Compliance with such laws and regulations may require the Company to obtain certain permits or authorizations prior to commencing operations. Failure to obtain such permits or authorizations could materially impact the business results of operations and financial conditions by delaying or limiting the ability to accept charterers. The Company may also incur additional costs in order to comply with other existing and future regulatory obligations, including, but not limited to, costs relating to air emissions including greenhouse gases, the management of ballast waters, maintenance and inspection, development and implementation of emergency procedures and insurance coverage or other financial assurance of the Company's ability to address pollution incidents. Additionally, the Company cannot predict the cost of compliance with any new regulations that may be promulgated as a result of the 2010 BP plc Deepwater Horizon oil spill in the Gulf of Mexico. These costs could have a material adverse effect on business, results of operations, cash flows and financial condition.

A failure to comply with applicable laws and regulations may result in administrative and civil penalties, criminal sanctions or the suspension or termination of operations. Environmental laws often impose strict liability for remediation of spills and releases of oil and hazardous substances, which could subject the Company to liability, without regard to actual negligence or fault. Under OPA, for example, owners, operators and bareboat charterers are jointly and severally strictly liable for the discharge of oil in U.S. waters, including the 200-nautical mile exclusive economic zone around the United States. An oil spill could also result in significant liability, including fines, penalties, criminal liability and remediation costs for natural resource damages under other international and U.S. Federal, state and local laws, as well as third-party damages, including punitive damages, and could harm our reputation with current or potential charterers of the Vessels. The Company is required to satisfy insurance and financial responsibility requirements for potential oil (including marine fuel) spills and other pollution incidents for spot chartered Vessels. Although the Company's technical manager has arranged insurance to cover the Vessels with respect to certain environmental risks, there can be no assurance that such insurance will be sufficient to cover all such risks or that any claims will not have a material adverse effect on business, results of operations, cash flows and financial condition.

The operation of the Vessels is affected by the requirements set forth in the IMO's International Management Code for the Safe Operation of Ships and Pollution Prevention, or the ISM Code. The ISM Code requires shipowners, ship managers and bareboat charterers to develop and maintain an extensive "Safety Management System" that includes the adoption of a safety and environmental protection policy setting forth instructions and procedures for safe operation and describing procedures for dealing with emergencies. If the Company were to fail to comply with the ISM Code, it may be subject to increased liability, may invalidate existing insurance or decrease available insurance coverage for the Vessels and such failure may result in a denial of access to, or detention in, certain ports.

10.    **Risks Related to Certain United States Laws And Regulations.**

From time to time on charterers' instructions, the Vessels may call on ports located in countries subject to sanctions and embargoes imposed by the U.S. government and countries identified by the U.S. government as state sponsors of terrorism, such as Cuba, Iran, Sudan and Syria. The U.S. sanctions and embargo laws and regulations vary in their application, as they do not all apply to the same covered persons or proscribe the same activities, and such sanctions and embargo laws and regulations may be amended or strengthened over time. With effect from July 1, 2010, the U.S. enacted the Comprehensive Iran Sanctions Accountability and Divestment Act, or CISADA, which expanded the scope of the Iran Sanctions Act. Among other things, CISADA expands the application of the prohibitions to companies, such as ours, and introduces limits on the ability of companies and persons to do business or trade with Iran when such activities relate to the investment, supply or export of refined petroleum or petroleum products. In addition, on May 1, 2012, President Obama signed Executive Order 13608 which prohibits foreign persons from violating or attempting to violate, or causing a violation of any sanctions in effect against Iran or facilitating any deceptive transactions for or on behalf of any person subject to U.S. sanctions. Any persons found to be in violation of Executive Order 13608 will be deemed a foreign sanctions evader and will be banned from all contacts with the United States, including conducting business in U.S. dollars. Also in 2012, President Obama signed into

01:15870994.8

law the Iran Threat Reduction and Syria Human Rights Act of 2012, or the Iran Threat Reduction Act, which created new sanctions and strengthened existing sanctions. Among other things, the Iran Threat Reduction Act intensifies existing sanctions regarding the provision of goods, services, infrastructure or technology to Iran's petroleum or petrochemical sector. The Iran Threat Reduction Act also includes a provision requiring the President of the United States to impose five or more sanctions from Section 6(a) of the Iran Sanctions Act, as amended, on a person the President determines is a controlling beneficial owner of, or otherwise owns, operates, or controls or insures a vessel that was used to transport crude oil from Iran to another country and (1) if the person is a controlling beneficial owner of the vessel, the person had actual knowledge the vessel was so used or (2) if the person otherwise owns, operates, or controls, or insures the vessel, the person knew or should have known the vessel was so used. Such a person could be subject to a variety of sanctions, including exclusion from U.S. capital markets, exclusion from financial transactions subject to U.S. jurisdiction, and exclusion of that person's vessels from U.S. ports for up to two years.

On November 24, 2013, the P5+1 (the United States, United Kingdom, Germany, France, Russia and China) entered into an interim agreement with Iran entitled the "Joint Plan of Action" ("**JPOA**"). Under the JPOA it was agreed that, in exchange for Iran taking certain voluntary measures to ensure that its nuclear program is used only for peaceful purposes, the U.S. and EU would voluntarily suspend certain sanctions for a period of six months. On January 20, 2014, the U.S. and E.U. indicated that they would begin implementing the temporary relief measures provided for under the JPOA. These measures include, among other things, the suspension of certain sanctions on the Iranian petrochemicals, precious metals, and automotive industries from January 20, 2014 until July 20, 2014.

In addition, charterers and other parties may be affiliated with persons or entities that are now or may soon be the subject of sanctions imposed by the Obama administration and/or the European Union or other international bodies in March 2014 in response to recent events relating to Russia, Crimea and the Ukraine. If it is determined that such sanctions require the termination of existing contracts or if the Company is found to be in violation of such sanctions, New Holdco may suffer reputational harm and the results of operations may be adversely affected.

Although the Company believes it has been in compliance with all applicable sanctions and embargo laws and regulations, and intends to maintain such compliance, there can be no assurance that New Holdco will be in compliance in the future, particularly as the scope of certain laws may be unclear and may be subject to changing interpretations. Any such violation could result in fines, penalties or other sanctions.

International shipping is subject to security and customs inspection and related procedures in countries of origin, destination and trans-shipment points. Under the U.S. Maritime Transportation Security Act of 2002, or MTSA, the U.S. Coast Guard issued regulations requiring the implementation of certain security requirements aboard vessels operating in waters subject to the jurisdiction of the United States. These security procedures can result in delays in the loading, offloading or trans-shipment and the levying of customs duties, fines or other penalties against exporters or importers and, in some cases, carriers. Future changes to the existing security procedures may be implemented that could affect the tanker sector. These

01:15870994.8

changes have the potential to impose additional financial and legal obligations on carriers and, in certain cases, to render the shipment of certain types of goods uneconomical or impractical. These additional costs could reduce the volume of goods shipped, resulting in a decreased demand for vessels and have a negative effect on the business, revenues and customer relations.

Additionally, the Company operates in a number of countries throughout the world, including countries known to have a reputation for corruption. The Company has been committed to doing business in accordance with applicable anti-corruption laws and in a manner consistent and in full compliance with the U.S. Foreign Corrupt Practices Act of 1977. The Company is subject, however, to the risk that it or its officers, directors, and agents may take actions determined to be in violation of such anti-corruption laws, including the U.S. Foreign Corrupt Practices Act. Any such violation could result in substantial fines, sanctions, civil and/or criminal penalties, curtailment of operations in certain jurisdictions, and might adversely affect business, results of operations or financial condition.

## 11.    **Risks Related to Insurance.**

The Vessels are insured against those risks that the Company believes the shipping industry commonly insures. These insurances include hull and machinery insurance, protection and indemnity insurance, which include environmental damage and pollution insurance coverage, and war risk insurance. It cannot be assured that New Holdco will be able to obtain adequate insurance coverage for the Vessel in the future or renew such policies on commercially reasonable terms, or at all, or that any particular claim will be paid. For example, more stringent environmental regulations have in the past led to increased costs for, and in the future may result in the lack of availability of, protection and indemnity insurance against risks of environmental damage or pollution. Any uninsured or underinsured loss could harm the business, results of operations, cash flows and financial condition. In addition, insurance may be voidable by the insurers as a result of certain actions, such as the Vessels failing to maintain certification with applicable maritime self-regulatory organizations. Further, it cannot be assured that the Company's insurance policies will cover all losses that incurred, or that disputes over insurance claims will not arise with insurance carriers. In addition, the insurance policies may be subject to deductibles, limitations and exclusions, which may increase costs or lower revenues, thereby possibly having a material adverse effect on the business, results of operations, cash flows and financial condition. Furthermore, even if insurance coverage is adequate to our cover losses, it may not be possible to timely obtain a replacement ship in the event of a loss of a Vessel.

## 12.    **Risk of Vessel Arrest.**

Crew members, suppliers of goods and services to a vessel, shippers of cargo and other parties may be entitled to a maritime lien against a vessel for unsatisfied debts, claims or damages. In many jurisdictions, a maritime lienholder may enforce its lien by "arresting" or "attaching" a vessel through foreclosure proceedings. The arrest or attachment of a Vessel could result in a significant loss of earnings for the related off-hire period.

01:15870994.8

13. **Risk of Vessel Requisition.**

A government of a Vessel's registry could requisition for title or seize a Vessel. Requisition for title occurs when a government takes control of a vessel and becomes the owner. A government could also requisition a Vessel for hire. Requisition for hire occurs when a government takes control of a vessel and effectively becomes the charterer at dictated charter rates. Generally, requisitions occur during a period of war or emergency. Government requisition of a Vessel could have a material adverse effect on the business, results of operation, cash flows, and financial condition.

14. **Effect of Fluctuations in Fuel or Bunker Prices.**

For vessels on voyage charters, fuel oil, or bunkers, is a significant, if not the largest, expense. Changes in the price of fuel may adversely affect profitability to the extent Vessels are on voyage charters. The price and supply of fuel is unpredictable and fluctuates based on events outside the Company's control, including geopolitical developments, supply and demand for oil and gas, actions by OPEC and other oil and gas producers, war and unrest in oil producing countries and regions, regional production patterns and environmental concerns. Further, fuel may become much more expensive in the future, which may reduce the profitability and competitiveness of the business versus other forms of transportation, such as truck or rail.

15. **The Company's Limited Business Purpose.**

The Company's activity is limited to engaging in the acquisition, disposition, ownership, and chartering of the four Vessels. It is anticipated that the only source of operating revenue for the Company will be from operating the Vessels.

C.     Certain Risks Relating to the Common Units.

1. **Significant Holders.**

After the Effective Date, the Secured Noteholders will receive 100% of the New Common Units under the Plan. If certain of such holders of Common Units were to act as a group, such holders would be in a position to control the outcome of all actions requiring approval of the Unitholders, including the election of directors, without the approval of other Unitholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the Common Units.

2. **Restrictions on Transfer of Common Units.**

Securities issued under the Plan to affiliates of New Holdco will be subject to restrictions on resale. These persons will be permitted to transfer or sell such securities only pursuant to the provisions of Rule 144 promulgated under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act. These restrictions may adversely impact the value of the Common Units and make it more difficult for holders to dispose of their Common Units, or to realize value on the Common Units, at a time

when they may wish to do so.  See Section XI "Securities Law Matters" for additional information regarding restrictions on resales of the Common Units.

### 3.      **Lack of Established Market for Common Units.**

A liquid trading market for the Common Units does not exist. The future liquidity of the trading markets for Common Units will depend, among other things, upon the number of holders of such securities and whether such securities become listed for trading on an exchange or trading system at some future time.  New Holdco is under no obligation to list the Common Units on any securities exchange and has no current intention to do so.

### 4.      **Historical Financial Information of the Debtors May Not Be Comparable to the Financial Information of the Reorganized Debtors**

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 5.      **The Projections Set forth in this Disclosure Statement May Not Be Achieved.**

The Projections cover the operations of the Reorganized Debtors through 2018. The Projections are based on numerous assumptions that are an integral part thereof, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, competition, adequate financing, absence of material claims, the ability to make necessary capital expenditures, the ability to establish strength in new markets and to maintain, improve and strengthen existing markets, customer purchasing trends and preferences, the ability to increase gross margins and control future operating expenses and other matters, many of which are beyond the control of the Reorganized Debtors. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the operations of the Reorganized Debtors. These variations may be material and adverse. Because the actual results achieved throughout the periods covered by the Projections will vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

### 6.      **Formation under the Laws of the Republic of the Marshall Islands and Enforcement of United States Judgments by Investors.**

New Holdco will be formed in the Republic of the Marshall Islands and most of its subsidiaries will be organized in the Republic of the Marshall Islands.  The corporate affairs of New Holdco will be governed by its certificate of formation and Operating Agreement (as described herein) and by the Republic of the Marshall Islands Limited Liability Company Act (the "**LLCA**").  The provisions of the LLCA resemble provisions of the corporation laws of a number of states in the United States.  However, there have been few judicial cases in the Republic of the Marshall Islands interpreting the LLCA.  For example, the rights and fiduciary responsibilities of directors under the laws of the Republic of the Marshall Islands are not as

clearly established as the rights and fiduciary responsibilities of directors under statutes or judicial precedent in existence in certain United States jurisdictions.  Although the LLCA does specifically incorporate the non-statutory law, or judicial case law, of the State of Delaware for non-resident domestic limited liability companies, the Unitholders of New Holdco may have more difficulty in protecting their interests in the face of actions by management, directors or controlling Unitholders than would unitholders of a corporation incorporated in a United States jurisdiction.

In addition, substantially all of New Holdco's assets and those of its subsidiaries are located outside the United States.  As a result, it may be difficult or impossible for United States investors to serve process within the United States upon New Holdco or to enforce judgment upon New Holdco for civil liabilities in United States courts.  It should not be assumed that courts in the countries in which the Debtors are incorporated or where their assets are located (i) would enforce judgments of United States courts obtained in actions against the Debtor based upon the civil liability provisions of applicable United States federal and state securities laws or (ii) would enforce, in original actions, liabilities against the Debtors based upon these laws.

E.    Additional Factors to Be Considered.

1.    **The Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Company has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Court.

2.    **No Representations Outside this Disclosure Statement Are Authorized.**

No representations concerning or related to the Company, the Chapter 11 Cases, or the Plan are authorized by the Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.    **Forward-Looking Statements Are Not Assured, and Actual Results May Vary.**

This Disclosure Statement contains forward-looking statements. These forward-looking statements are based on the current expectations and observations of the Company's management, and include factors that could cause actual results to differ materially such as: those factors described in Section VII.A.1 of this Disclosure Statement; the Company's ability to meet current operating needs, including its ability to maintain contracts that are critical to its operation, to obtain and maintain acceptable terms with its vendors, customers and managers; the Company's ability to maintain adequate liquidity to fund operations after emergence from the Chapter 11 Cases; the Company's ability in the future to arrange and consummate financing or

sale transactions or to access capital; the effects of changes in the Company's credit ratings; the timing and realization of the recoveries of assets and the payments of Claims and the amount of expenses projected to recognize such recoveries and reconcile such Claims; the occurrence of any event, change or other circumstance that could give rise to the termination of the Restructuring Support Agreement or the Equity Commitment Agreement; and the other factors described in this Section IX.

4. **No Legal or Tax Advice Is Provided to You by This Disclosure Statement.**

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of Claims against the Company should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such holder's Claims. This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

## XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative plan of reorganization or a plan of liquidation.

### A. **Alternative Plan of Reorganization or Plan of Liquidation**.

The Court could confirm a plan different from the Plan. While the Plan provides for the reorganization of the Company's business as a going concern, a different plan might involve either a reorganization and continuation of the Company's business or, in the alternative, a liquidation of the Company's assets. The Company believes that any reorganization of its business would require a substantial investment of capital by a third party. In the event that the Plan is not confirmed, there is no guaranty that the Company will be able to obtain any new investment at all, let alone one on terms as favorable to its stakeholders as the terms set forth in the Restructuring Support Agreement for the elimination of nearly $200 million of secured debt. The Company cannot impose (e.g., cram down) the significant conversion of secured debt into new equity upon the Secured Noteholders and, as such, any alternative plan would need to either (i) provide for treatment acceptable to the Secured Noteholders or (ii) repayment in full of the Secured Notes. As an alternative to a going concern reorganization, liquidation of the Company's assets would, in the Company's view, result in the termination of all of its commercial agreements and would be unlikely to provide returns equal or greater to the returns provided by the Plan.

The Company believes that any alternative to the Plan would provide far less certainty and could involve a larger Claims pool, diminished recoveries, significant delay, and larger administrative costs. The Company believes that the Plan, as described herein, enables creditors to realize the highest and best value under the circumstances as compared to any foreseeable alternative.

B.      **Liquidation Under Chapter 7.**

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth in the Liquidation Analysis attached as **Exhibit D** to this Disclosure Statement.  For the reasons above, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in smaller distributions being made to creditors than those provided for in the Plan.

## XII.  SECURITIES LAW MATTERS

No registration statement will be filed under the Securities Act of 1933, as amended (the "**Securities Act**"), or pursuant to any state securities laws with respect to the offer and distribution of securities under the Plan.  The Debtors believe that the provisions of section 1145(a)(1) of the Bankruptcy Code will exempt the issuance and distribution of securities issued under the Plan (the "**1145 Securities**") from federal and state securities registration requirements.  The 1145 Securities issued to holders of Secured Noteholder Claims will be treated as issued pursuant to section 1145(a)(1), but will be subject to the restrictions on resale of securities held by affiliates of an issuer.

A.      **Bankruptcy Code Exemptions from Registration Requirements**.

1.      **Securities Issued in Reliance on Section 1145 of the Bankruptcy Code**.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must each hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or other property.

The exemptions provided for in section 1145 do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.  Section 1145(b) defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":

01:15870994.8

(a)      purchases a claim against, an interest in, or a claim for administrative expense against, the debtor, with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

(b)      offers to sell securities offered under a plan for the holders of such securities ("distributors");

(c)      offers to buy securities from the holders of such securities, if the offer to buy is (i) with a view to distributing such securities and (ii) made under a distribution agreement; and

(d)      is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act, which includes affiliates of the issuer, defined as persons who are in a relationship of "control" with the issuer.

Persons who are not deemed "underwriters" may generally resell the securities they receive that comply with the requirements of Section 1145(a)(1) without registration under the Securities Act or other applicable law.  Persons deemed "underwriters" may sell such securities without registration only pursuant to exemptions from registration under the Securities Act and other applicable law.

## 2.      **Subsequent Transfers of 1145 Securities**

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to section 1145(a)(1) are deemed to have been issued in a public offering.  In general, therefore, resales of and subsequent transactions in the 1145 Securities will be exempt from registration under the Securities Act pursuant to section 4(a)(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter" or a "dealer" with respect to such securities.  For these purposes, an "issuer" includes any "affiliate" of the issuer, defined as a person directly or indirectly controlling, controlled by or under common control with the issuer. "Control," as defined in Rule 405 promulgated under the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.  A "dealer," as defined in section 2(a)(12) of the Securities Act, is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.  Whether or not any particular person would be deemed to be an "affiliate" of New Holdco or an "underwriter" or a "dealer" with respect to any 1145 Securities will depend upon various facts and circumstances applicable to that person.

Notwithstanding the provisions of section 1145(b) of the Bankruptcy Code regarding accumulators and distributors, the staff of the SEC has taken the position that resales of securities distributed under a plan of reorganization by accumulators and distributors of securities who are not affiliates of the issuer of such securities are exempt from registration under the Securities Act if effected in "ordinary trading transactions." The staff of the SEC has indicated in this context that a transaction by such non-affiliates may be considered an "ordinary

trading transaction" if it is made on a national securities exchange or in the over-the-counter market and does not involve any of the following factors:

(a)     (i) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (ii) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

(b)     the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a bankruptcy court-approved disclosure statement and supplements thereto, and documents filed with the SEC pursuant to the Securities Exchange Act of 1934, as amended; or

(c)     the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

The staff of the SEC has not provided any guidance for privately arranged trades. The views of the staff of the SEC on these matters have not been sought by the Debtors and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above.  Any person intending to rely on such exemption is urged to consult their counsel as to the applicability thereof to their circumstances.

The 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states. However, the availability of such state exemptions depends on the securities laws of each state, and holders of Claims may wish to consult with their own legal advisors regarding the availability of these exemptions in their particular circumstances.

## XIII.  CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.     Federal Income Tax Consequences.

A detailed discussion of the potential federal income tax consequences of the Plan can be found in the Analysis of Certain Federal Income Tax Consequences of the Plan attached hereto as **Exhibit E**.

### B.     Certain Marshall Islands Tax Consequences.

New Holdco will be incorporated under the laws of the Marshall Islands. Under current Marshall Islands law and based on its contemplated activities, New Holdco will not be subject to Marshall Islands tax on its income or capital gains. In addition, under current Marshall Islands law and based on its contemplated activities, Marshall Islands withholding tax will not be imposed upon payments of dividends by New Holdco to holders of Common Units or upon payments of interest by New Holdco.

01:15870994.8

## XIV.  RECOMMENDATION AND CONCLUSION

**The Debtors believe that confirmation of the Plan is in the best interests of all Creditors and Equity Interest holders and urge all creditors in Class 3 to vote in favor of the Plan.**

Dated:    October 8, 2014
          Wilmington, Delaware

                              Respectfully submitted,

                              **Windsor Petroleum Transport Corporation, et al.**

                              By:    _____/s/ *Paul M. Leand, Jr.*_____
                                     Paul M. Leand, Jr.
                                     Chief Restructuring Officer

## EXHIBIT A TO THE DISCLOSURE STATEMENT

## DEBTORS

| | |
|---|---|
| Windsor Holdings Limited | Windsor Petroleum Transport Corporation |
| Buckingham Petro Limited | Buckingham Shipping Plc |
| Caernarfon Petro Limited | Caernarfon Shipping Plc |
| Sandringham Petro Limited | Sandringham Shipping Plc |
| Holyrood Petro Limited | Holyrood Shipping Plc |

**EXHIBIT B TO THE DISCLOSURE STATEMENT**

**PLAN OF REORGANIZATION OF THE DEBTORS UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------x
:
:
In re:                                              :  **Chapter 11**
:
**WINDSOR PETROLEUM TRANSPORT**         :  **Case No. 14–11708 (PJW)**
**CORPORATION, *et al.*,**[1]                  :
:  **(Jointly Administered)**
                    Debtors.                         :
:
-------------------------------------------------------------------x

---

## AMENDED PLAN OF REORGANIZATION OF THE DEBTORS
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

Dated:  Wilmington, Delaware
          October 8, 2014

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
Robert F. Poppiti, Jr. (No. 5052)
Andrew L. Magaziner (No. 5426)
Ashley E. Markow (No. 5635)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, are:  Windsor Petroleum Transport Corporation (1381),Windsor Holdings Limited, Buckingham Petro Limited, Buckingham Shipping Plc, Caernarfon Petro Limited, Caernarfon Shipping Plc, Sandringham Petro Limited, Sandringham Shipping Plc, Holyrood Petro Limited, and Holyrood Shipping Plc. The mailing address for Windsor Petroleum is c/o Frontline Ltd., PO Box HM 1593, Par-la-Ville Place, 14 Par-la-Ville Road, Hamilton HM 08, Bermuda.  The mailing address for each of the other Debtors is Fort Anne, Douglas, Isle of Man, IM1 5PD, British Isles.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

ARTICLE I. DEFINITIONS AND CONSTRUCTION OF TERMS ........................................... 1
    A.    Definitions. ................................................................................................ 1
    B.    Interpretation, Application of Definitions and Rules of Construction................. 9
    C.    Computation of Time.................................................................................... 9
    D.    Reference to Monetary Figures..................................................................... 10

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS............................................... 10
    A.    Administrative Expense Claims.................................................................... 10
    B.    Fee Claims. ................................................................................................ 11
    C.    Priority Tax Claims..................................................................................... 11
    D.    U.S. Trustee Fees. ...................................................................................... 12

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
               INTERESTS ............................................................................................... 12
    A.    Classification of Claims and Equity Interests................................................ 12
    B.    Distributions of Common Units to Holders of Class 3 Claims...................... 12
    C.    Summary of Classification and Class Identification....................................... 12
    D.    Treatment of Classified Claims and Equity Interests. .................................... 13
    E.    Special Provision Regarding Unimpaired and Reinstated Claims..................... 16

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN........................................ 16
    A.    General Settlement of Claims and Interests.................................................... 16
    B.    Voting of Claims. ....................................................................................... 16
    C.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code................. 17
    D.    Limited Liability Company. ......................................................................... 17
    E.    Continued Corporate Existence and Vesting of Assets. ................................... 17
    F.    Issuance of Common Units of New Holdco. .................................................. 18
    G.    Restructuring Support Agreement Professional Fees. ...................................... 18
    H.    Secured Notes Indenture Trustee Fees and Expenses....................................... 19
    I.    Cancellation of Existing Securities................................................................ 20
    J.    Preservation of Causes of Action.................................................................. 20

ARTICLE V. PROVISIONS REGARDING CORPORATE GOVERNANCE  OF THE
               REORGANIZED DEBTOR ............................................................................ 21
    A.    Appointment of Managers. .......................................................................... 21
    B.    Powers of Officers. ..................................................................................... 21
    C.    Corporate Action......................................................................................... 21

ARTICLE VI. DISTRIBUTIONS UNDER THE PLAN ...................................................... 22
    A.    Procedures for Treating Disputed Claims....................................................... 22
    B.    Allowed Claims. ........................................................................................ 23
    C.    Allocation of Consideration......................................................................... 24

D.      Insured Claims. .................................................................................. 24
E.      Compliance with Tax Requirements ................................................... 24
F.      Setoff and Recoupment ...................................................................... 24

ARTICLE VII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................... 25
A.      Assumption of Executory Contracts and Unexpired Leases. ............. 25
B.      Cure Claims. ....................................................................................... 25
C.      Reservation of Rights .......................................................................... 26
D.      Rejection of Executory Contracts and Unexpired Leases. ................. 26
E.      Assignment. ........................................................................................ 27
F.      Insurance Policies. .............................................................................. 27
G.      Post-Petition Contracts and Leases. ................................................... 27

ARTICLE VIII. CONFIRMATION AND CONSUMMATION OF THE PLAN ...................... 27
A.      Conditions to Confirmation. ............................................................... 27
B.      Conditions to Effectiveness. ............................................................... 28
C.      Waiver of Conditions. ......................................................................... 29
D.      Effect of Failure of Conditions. ......................................................... 29
E.      Vacatur of Confirmation Order. ......................................................... 29
F.      Modification of the Plan. .................................................................... 29
G.      Revocation, Withdrawal, or Non-Consummation. ............................. 29

ARTICLE IX. EFFECT OF CONFIRMATION AND INDEMNIFICATION, RELEASE,
            INJUNCTIVE AND RELATED PROVISIONS ................................. 30
A.      Binding Effect. .................................................................................... 30
B.      Discharge of the Debtors. ................................................................... 30
C.      Injunction. ........................................................................................... 31
D.      Releases, Exculpations and Injunctions of Released Parties. ............ 31
E.      Votes Solicited in Good Faith. ............................................................ 33
F.      Preservation of Insurance .................................................................... 33

ARTICLE X. RETENTION OF JURISDICTION ........................................................... 33

ARTICLE XI. MISCELLANEOUS PROVISIONS ........................................................... 35
A.      Immediate Binding Effect. .................................................................. 35
B.      Governing Law. ................................................................................... 35
C.      Filing or Execution of Additional Documents. .................................. 35
D.      Term of Injunctions of Stays. ............................................................. 35
E.      Withholding and Reporting Requirements. ........................................ 35
F.      Exemption From Transfer Taxes. ....................................................... 36
G.      Plan Supplement. ................................................................................ 36
H.      Payment of Statutory Fees. ................................................................. 36
I.      Amendment  or Modification of this Plan. ......................................... 36
J.      Severability of Plan Provisions. ......................................................... 36
K.      Successors and Assigns. ...................................................................... 37
L.      Notices. ............................................................................................... 37
M.      Conflicts. ............................................................................................. 37

01:15863019.6

iii

## INTRODUCTION

The Debtors propose the following plan of reorganization under section 1121(a) of chapter 11 of title 11 of the United States Code.  Capitalized terms used in the Plan and not otherwise defined shall have the meaning ascribed to such terms in Article I.

Claims against, and Equity Interests in, the Debtors will be treated as set forth herein.  Reference is made to the Disclosure Statement accompanying the Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, results of operations, and projections for future operations and risk factors, together with a summary and analysis of the Plan.

Parties are encouraged to read the Plan and the Disclosure Statement and their respective exhibits and schedules in their entirety before voting to accept or reject the Plan.  No materials other than the Disclosure Statement and the respective schedules and exhibits attached thereto and referenced therein have been authorized by the Court for use in soliciting acceptances or rejections of the Plan.

## ARTICLE I.
## DEFINITIONS AND CONSTRUCTION OF TERMS

**A.**     **Definitions.**

Unless otherwise defined herein the following terms shall have the respective meanings set forth below.  Any term that is used and not otherwise defined herein, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to it in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.     *Administrative Expense Claim*:  means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including (i) any actual and necessary costs and expenses of preserving the Estate, (ii) any actual and necessary costs and expenses of operating the Debtors' businesses, (iii) any indebtedness or obligations assumed by the Debtors in connection with the conduct of their businesses during the Chapter 11 Cases, (iv) any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code, (v) any Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code.

2.     *Allowed*:  means, with reference to any Claim or Equity Interest, (i) any Claim or Equity Interest as to which no objection, action to reclassify, subordinate or otherwise limit recovery with respect thereto or request for estimation has been Filed on or before the Effective Date or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder of such claim, (ii) any Claim as to which the liability of the Debtors or Reorganized Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than

the Court; (iii) a Claim as to which the Debtors and Supporting Noteholders or the Reorganized Debtors agree to the amount and/or priority thereof in writing, or (iv) a Claim or Equity Interest that is expressly Allowed pursuant to the terms of this Plan. If a Claim is Allowed only in part, any provisions hereunder with respect to Allowed Claims are applicable solely to the Allowed portion of such Claim.

3.    *Amended Management Agreement*:    means the amended management agreements by and between Frontline Ltd., as successor manager to Cambridge Fund Management L.L.C., and each of Buckingham Shipping Plc, Caernarfon Shipping Plc, Sandringham Shipping Plc, and Holyrood Shipping Plc.

4.    *Ballots*:    means each of the ballots distributed with the Disclosure Statement to each holder of an Impaired Claim that is entitled to vote to accept or reject the Plan.

5.    *Bankruptcy Code*:    means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect with respect to the Chapter 11 Cases.

6.    *Bankruptcy Rules*:    means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and local rules of the Court, as the context may require, as in effect with respect to the Chapter 11 Cases.

7.    *Business Day*:    means any day on which commercial banks are open for business, and not authorized to close, in New York, New York, except any day designated as a legal holiday by Bankruptcy Rule 9006(a).

8.    *Cash*:    means cash and cash equivalents, including, but not limited to, bank deposits, wire funds, checks and legal tender of the United States of America or equivalents thereof.

9.    *Causes of Action*:    means, without limitation, any and all claims, causes of actions, cross-claims, counterclaims, third-party claims, indemnity claims, contribution claims, defenses, demands, rights, actions, debts, damages, judgments, remedies, Liens, indemnities, guaranties, suits, obligations, liabilities, accounts, offsets, recoupments, powers, privileges, licenses, and franchises of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, whether arising before, on or after the Petition Date, including through the Effective Date, in contract or in tort, in law or in equity, and/or pursuant to any other theory of law.   For the avoidance of doubt, the term "Causes of Action" shall include:   (i) all rights of setoff, counterclaim or recoupment and claims on contracts or for breaches of duties imposed by law or in equity; (ii) the right to object to Claims and Administrative Expense Claims; (iii) all claims pursuant to sections 362, 510, 542, 543, 544 through 550, 552 or 553 of the Bankruptcy Code; (iv) such claims and defenses such as fraud, mistake, duress, and/or usury and/or any other defenses set forth in section 558 of the Bankruptcy Code; or (v) any state law fraudulent transfer claims.

10.    *Chapter 11 Cases*:    means the chapter 11 cases commenced by the Debtors.

01:15863019.6

- 2 -

11.     *Claim*:  means a "claim" against a Debtor, as such term is defined in section 101(5) of the Bankruptcy Code.

12.     *Claims and Voting Agent*:  means Prime Clerk LLC.

13.     *Class*:  means a group of Claims or Equity Interests classified under the Plan.

14.     *Collateral*:  means any property or interest in property of an Estate subject to a Lien to secure the payment or performance of an Allowed Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or is otherwise invalid under the Bankruptcy Code or applicable law.

15.     *Common Units*:  means a limited liability company membership interest in New Holdco having the powers, preferences, priorities and rights and qualifications, limitations and restrictions as set forth in the Operating Agreement.

16.     *Confirmation*:  means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

17.     *Confirmation Date*:  means the date of Confirmation.

18.     *Confirmation Hearing*:  means the confirmation hearing held by the Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Court will consider confirmation of the Plan.

19.     *Confirmation Order*:  means the order entered by the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors and the Supporting Noteholders.

20.     *Court*:  means (i) the United States Bankruptcy Court for the District of Delaware, (ii) to the extent there is no reference pursuant to section 157 of title 28 of the United States Code, the United States District Court for the District of Delaware and (iii) any other court having jurisdiction over the Chapter 11 Cases or proceedings arising therein.

21.     *Cure Claim*:  means a claim in an amount equal to all unpaid monetary obligations under an Executory Contract or Unexpired Lease assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.  Any Cure Claim to which the holder thereof disagrees with the priority and/or amount thereof as determined by the Debtors shall be deemed a Disputed Claim under this Plan.

22.     *Debtor:*  means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

23.     *Debtors*:      means collectively, Windsor Holdings Limited, Windsor Petroleum Transport Corporation, Buckingham Shipping Plc, Caernarfon Shipping Plc,

Sandringham Shipping Plc, Holyrood Shipping Plc, Buckingham Petro Limited, Caernarfon Petro Limited, Sandringham Petro Limited, and Holyrood Petro Limited.

24.     *Disclosure Statement*:  means the *Disclosure Statement for the Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code*, in furtherance of this Plan, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references there that relate to the Plan, and that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law..

25.     *Disputed*:  means, with reference to any Claim, any Claim that is not yet an Allowed Claim.

26.     *DTC*:  means the Depository Trust Company.

27.     *Effective Date*:  means the date which is the first Business Day selected by the Debtors, on which (a) all of the conditions to the occurrence of the Effective Date specified in Article VIII have been satisfied or waived in accordance with this Plan and (b) no stay of the Confirmation Order is in effect, provided that if the first Business Day is a designated legal holiday in the United States or the United Kingdom, then the Effective Date will be the next Business Day in the United States or the United Kingdom.

28.     *Entity*:  means an "entity" as such term is defined in section 101(15) of the Bankruptcy Code.

29.     *Equity Interest*:  means any "equity security" in a Debtor as such term is defined in section 101(16) of the Bankruptcy Code, including any issues, unissued, authorized or outstanding shares of capital stock in any Debtor together with any warrants, options or contractual to purchase or acquire such Equity Interest at any time and all rights arising with respect thereto or any other instrument evidencing an ownership interest in the Debtors, whether or not transferable.

30.     *Estates*:  means the estates of the Debtors created in the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

31.     *Exchange Act*:  means the Securities Exchange Act of 1934, as amended.

32.     *Executory Contract*:  means a contract to which one or more Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

33.     *Fee Claim*:  means any request for allowance and payment of claims for Professional Fees.

34.     *Final Order*:  means an order or judgment of the Court which has not been modified, amended, reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Court shall have been affirmed by the highest

court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Bankruptcy Rule 8002; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

35.    *General Unsecured Claim*:  means any Unsecured Claim that is not an Intercompany Claim.

36.    *Governmental Unit*:  has the meaning set forth in section 101(27) of the Bankruptcy Code.

37.    *Impaired*:  means, when used with reference to Claims or Equity Interests, Claims or Equity Interests that are "impaired" within the meaning of section 1124 of the Bankruptcy Code.

38.    *Indenture Trustee Fee Claims*:  means the claims of the Secured Notes Indenture Trustee for compensation and reimbursement of expenses pursuant to the terms of the Indentures and/or documents ancillary thereto.

39.    *Insured Claim*:  means any Claim or portion of a Claim that is or may be insured under any insurance policies issued for the benefit of the Debtors.

40.    *Intercompany Claim*:  means any Claim held by a Debtor against another Debtor.

41.    *Lien*:  has the meaning set forth in section 101(37) of the Bankruptcy Code.

42.    *New Board*:  means the board of managers of Reorganized Windsor to be constituted as of the Effective Date pursuant to Article V.A.

43.    *New Holdco:* has the meaning set forth in Article IV.D.

44.    *Note Obligor Debtors*:  means, collectively, Windsor Petroleum Transport Corporation, Buckingham Shipping Plc, Caernarfon Shipping Plc, Sandringham Shipping Plc, and Holyrood Shipping Plc.

45.    *Operating Agreement:*  means the limited liability company agreement with respect to Reorganized Windsor in form and substance as that attached to the Plan Supplement, which has been approved in writing by the Supporting Noteholders.

46.    *Other Priority Claim*:  means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than (i) an Administrative Expense Claim or (ii) a Priority Tax Claim.

47.    *Other Secured Claim*:  means any Claim that is Secured, other than a Secured Noteholder Claim.

48.    *Person*:  means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, Governmental Unit or any political subdivision thereof, or any other entity or organization.

49.    *Petition Date*:  means the date on which each of the Debtors commenced the Chapter 11 Cases.

50.    *Plan*:  means this *Amended Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code*, together with all addenda, exhibits, schedules or other attachments, if any, including the Plan Supplement, each of which is incorporated herein by reference, and as may be amended, modified, or supplemented from time to time in accordance with the terms herein and in the Restructuring Support Agreement, as applicable.

51.    *Plan Supplement*:  means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed with the Court on notice to parties-in-interest, including the following:  (i) the Rejection Schedule, (ii) the Operating Agreement, and (iii) the identity of the officers and members of the New Board of Reorganized Windsor.  The Debtors shall file substantially complete versions of the materials comprising the Plan Supplement no later than five (5) Business Days before the deadline to object to the confirmation of the Plan.  All Plan Supplement documents shall be in form and substance acceptable to Debtors and the Supporting Noteholders.

52.    *Priority Tax Claim*:  means any Claim that is entitled to a priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

53.    *Professional*:  means any professional employed or retained in the Chapter 11 Cases pursuant to sections 327, 328, 330, or 1103 of the Bankruptcy Code.

54.    *Professional Fees:*  means fees and expenses for legal, financial advisory, accounting and other services and reimbursement of expenses related thereto that are awardable and allowable under sections 328, 330(a), 331, 503(b) or 1103(a) of the Bankruptcy Code or otherwise and that are rendered (a) prior to the Effective Date, or (b) thereafter in connection with applications filed pursuant to section 330, 331, 503(b) or 1103(a) of the Bankruptcy Code.  To the extent that the Court or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Professional Fees.

55.    *Proof of Claim*:  means a written proof of Claim filed in the Chapter 11 Cases.

56.    *Pro Rata*:  means, with respect to any Claim, the proportion that the amount of such Claim bears to the aggregate amount of all Claims (including Disputed Claims) in the applicable Class or group of Classes, unless the Plan provides otherwise, provided, for the avoidance of doubt, that each Creditor that holds an Allowed Claim against multiple Debtors arising out of the same liability shall be entitled to a single recovery under the Plan on account of such collective Allowed Claims.

57.    *Reinstated*:  means, with respect to a Claim, (a) in accordance with section 1124(1) of the Bankruptcy Code, being treated such that the legal, equitable, and contractual rights to which such Claim entitles its holder are left unaltered, or (b) if applicable under section 1124 of the Bankruptcy Code:  (i) having all prepetition and postpetition defaults with respect thereto other than defaults relating to the insolvency or financial condition of the Debtors or their status as debtors under the Bankruptcy Code cured, (ii) having its maturity date reinstated, (iii) compensating the holder of such Claim for damages incurred as a result of its reasonable reliance on a provision allowing the Claim's acceleration, and (iv) not otherwise altering the legal, equitable and contractual rights to which the Claim entitles the holder thereof.

58.    *Rejection Damage Claims*:  means Claims for damages arising from the rejection of Executory Contracts or Unexpired Leases.  All Rejection Damage Claims shall be deemed Disputed Claims upon the filing of an objection to such Claims and shall be treated as General Unsecured Claims.

59.    *Rejection Notice*:  means a notice of an Executory Contract or Unexpired Lease to be rejected under the Plan pursuant to section 365 of the Bankruptcy Code which notice shall include (i) the procedures for objection to proposed rejection of Executory Contracts and Unexpired Leases, (ii) the procedures for filing Rejection Damage Claims, and (iii) procedures for resolution by the Court of any related disputes.

60.    *Rejection Schedule*:  means the schedule of Executory Contracts and Unexpired Leases to be rejected pursuant to the Plan and the effective date of such rejection, which shall be included in the Plan Supplement.

61.    *Released Parties*:  means each of:  (a) the Debtors and Reorganized Debtors, (b) the Secured Noteholders other than those who voted to reject the Plan or have checked the box on the applicable Ballot indicating that they opt not to grant the releases provided in the Plan, (c) the Secured Notes Indenture Trustee, and (i) with respect to each of the foregoing in clauses (a) through (c), such entities' predecessors, Professionals, successors and assigns, subsidiaries, funds, portfolio companies, and each of their respective current and former officers, directors, employees, managers, attorneys, financial advisors, accountants, investment bankers, consultants, management companies or other professionals or representatives, in each case solely in their capacity as such.

62.    *Releasing Parties*:  means each of:  (a) the Secured Notes Indenture Trustee, (b) the holders of Impaired Claims other than those who voted to reject the Plan or have checked the box on the applicable Ballot indicating that they opt not to grant the releases provided in the Plan, (c) the Supporting Noteholders, and (d) with respect to the foregoing entities in clauses (a) through (c), solely to the extent such party is entitled to assert claims on behalf of the foregoing entities, such entity's current subsidiaries, officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, equity holders, partners, and other professionals, in each case solely in their capacity as such.

63.    *Reorganized Debtor(s)*:  means any Debtor, or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date.

64.    *Reorganized Windsor*:  means New Holdco or any successor thereto by merger, consolidation or otherwise, on and after the Effective Date.

65.    *Restructuring Support Agreement*:  means the agreement, dated as of July 11, 2014, among the Debtors and the Supporting Noteholders, as it may be amended, modified or supplemented by the parties thereto in accordance with the terms of such agreement.

66.    *Restructuring Support Agreement Professional Fees*:  means (i) the reasonable and documented fees and expenses due and owing to Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel to the Supporting Noteholders and Landis Rath & Cobb LLP, local counsel to the Supporting Noteholders, and (ii) $1,500,000 due and owing to Houlihan Lokey Capital, Inc., financial advisor to the Supporting Noteholders.

67.    *Secured Noteholders*:  means the holders of Claims against any of the Debtors arising under or related to the Secured Notes Indenture.

68.    *Secured Noteholder Claim*:  means any and all Claims against any of the Debtors held by Secured Noteholders arising under or related to the Secured Notes Indenture.

69.    *Secured Notes Indenture*:  means that certain Indenture, dated as of November 1, 1997 (as amended, modified or supplemented from time to time), by and among Buckingham Shipping Plc, Caernarfon Shipping Plc, Sandringham Shipping Plc, Holyrood Shipping Plc, Windsor Petroleum Transport Corporation, as agent therefor and the Secured Notes Indenture Trustee, pursuant to which the Secured Notes were issued.

70.    *Secured Notes Indenture Trustee*:  means The Bank of New York Mellon, as indenture trustee under the Secured Notes Indenture, or any duly appointed successor thereto.

71.    *Secured Notes Indenture Trustee Charging Lien*:  means a lien that secures repayment of the Secured Notes Indenture Trustee Expenses, to the extent provided for in the Secured Notes Indenture.

72.    *Secured Notes Indenture Trustee Expenses*:  means any reasonable and documented fees and out-of-pocket costs and expenses, incurred prior to or after the Petition Date by the Secured Notes Indenture Trustee that are required to be paid under the Secured Notes Indenture.

73.    *Securities Act*:  means the Securities Act of 1933, as amended.

74.    *Schedules*:  means the schedules of assets and liabilities, statements of financial affairs, and lists of holders of Claims and Equity Interests, filed with the Court by the Debtors, including any amendments or supplements thereto.

75.    *Secured*:  means when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, in each case, to the extent determined pursuant

to section 506(a) of the Bankruptcy Code or (b) otherwise Allowed pursuant to the Plan as a Claim that is Secured.

76.     *Subsidiary Equity Interests:* means Equity Interests in Debtors Windsor Petroleum Transport Corporation, Buckingham Petro Limited, Buckingham Shipping Plc, Caernarfon Petro Limited, Caernarfon Shipping Plc, Sandringham Petro Limited, Sandringham Shipping Plc, Holyrood Petro Limited, and Holyrood Shipping Plc.

77.     *Supporting Noteholders*:  means the approximately 70%, measured by claim size, of the Secured Noteholders who are represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP.

78.     *Unexpired Lease*:  means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

79.     *Unimpaired*:  means any Class of Claims or Equity Interests that is not Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code.

80.     *Unsecured Claim*:  means any Claim that is not Secured or entitled to priority under the Bankruptcy Code or an order of the Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code.

81.     *U.S. Trustee*:  means the United States Trustee for the District of Delaware.

82.     *Voting Deadline*:  means the deadline for submitting Ballots to either accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, which shall be November 13, 2014 at 4:00 p.m. (prevailing Eastern Time).

83.     *Voting Record Date*:  means October 8, 2014.

**B.     Interpretation, Application of Definitions and Rules of Construction.**

Capitalized terms that are not defined herein shall have the same meanings assigned to such terms by the Bankruptcy Code or Bankruptcy Rules, as the case may be. Meanings of capitalized terms shall be equally applicable to both the singular and plural forms of such terms.  The words "herein," "hereof," and "hereunder" and other words of similar import refer to the Plan as a whole (and, for the avoidance of doubt, the Plan Supplement) and not to any particular section or subsection in the Plan unless expressly provided otherwise.  The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included.  Captions and headings to articles, sections and exhibits are inserted for convenience of reference only, are not a part of this Plan, and shall not be used to interpret this Plan.  The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan.

**C.     Computation of Time.**

01:15863019.6

Except as otherwise specifically provided in the Plan, in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**D.      Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

**ARTICLE II.**
**ADMINISTRATIVE AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, and Fee Claims, as described below, have not been classified and thus are excluded from the classes of Claims and Equity Interests set forth in Article III.

**A.      Administrative Expense Claims.**

1.      *Administrative Expense Claims*.

Each holder of an Allowed Administrative Expense Claim as of the Effective Date shall receive from the applicable Debtor (i) Cash in an amount equal to the amount of such Allowed Administrative Expense Claim as soon as practicable after the later of (a) the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date, (b) thirty (30) days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim if such Administrative Expense Claim is Disputed as of or following the Effective Date, or (c) the date such Allowed Administrative Expense Claim becomes due and payable by its terms, or as soon thereafter as is practicable or (ii) such other treatment as the Debtor and such holder shall have agreed upon in writing, with the consent of the Supporting Noteholders; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

2.      *Time for Filing Administrative Expense Claims*.

The holder of an Administrative Expense Claim accruing on or after July 14, 2014, other than:  (a) a Fee Claim; (b) an Administrative Expense Claim that has been Allowed on or before the Effective Date; and (c) a claim for U.S. Trustee Fees, must submit to the Claims and Voting Agent and serve on New Holdco and its counsel, a request for such Administrative Expense Claim so as to be received by 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after service of notice of occurrence of the Effective Date.  Such request must include at a minimum:  (i) the name of the Debtor(s) that are purported to be liable for the Administrative Expense Claim; (ii) the name of the holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim.  For the avoidance of doubt, this Section of the Plan shall not be applicable to any Indenture Trustee

Fee Claims or any Restructuring Support Agreement Professional Fees, which Fee Claims shall be paid pursuant to Sections G and H of Article IV of the Plan, respectively.  **FAILURE TO FILE AND SERVE SUCH NOTICE OR REQUEST TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND EXTINGUISHED.**

B.      **Fee Claims.**

      1.      *Professional Compensation and Reimbursement Claims.*

      All requests for allowance of Fee Claims on a final basis must be filed with the Court and served on New Holdco and its counsel, and the U.S. Trustee, no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court in the Chapter 11 Cases, the allowed amounts of such Fee Claims shall be determined by the Court.  Parties in interest will have not less than 21 days to object to any Fee Claim.  For the avoidance of doubt, this Section of the Plan shall not be applicable to any Indenture Trustee Fee Claim or any Restructuring Support Agreement Professional Fees, which Fee Claims shall be paid pursuant to Sections G and H of Article IV of the Plan, respectively. **FAILURE TO FILE AND SERVE FINAL FEE APPLICATIONS TIMELY AND PROPERLY SHALL RESULT IN THE UNDERLYING FEE CLAIMS BEING FOREVER BARRED AND EXTINGUISHED.**

      Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty (60) days after the Effective Date or such other date as may be established by the Court.

      Upon final allowance by the Court of any Fee Claim, New Holdco shall pay the amount of all Allowed but unpaid Professional Fees promptly and directly to the applicable Professional.

      2.      *Post-Effective Date Fees and Expenses.*

      The Reorganized Debtors shall pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Professionals that have been retained by the Debtors on and after the Effective Date, in the ordinary course of business and without any further notice to or action, order or approval of the Court.  Upon the Effective Date, any requirement that Professionals retained by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and such Professionals may be employed and paid in the ordinary course of business without any further notice to or action, order, or approval of the Court.

C.      **Priority Tax Claims.**

      Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, at the option of the applicable Reorganized Debtor, in full satisfaction, settlement, release, and discharge, of and in exchange for such Priority Tax Claim, (i) payment in full in Cash as soon as practicable after the Effective Date in an amount equal to

the amount of such Allowed Priority Tax Claim, plus statutory interest on any outstanding balance from the Effective Date, calculated at the prevailing rate under applicable nonbankruptcy law for each taxing authority and to the extent provided for by section 511 of the Bankruptcy Code, and in a manner not less favorable than the most favored nonpriority Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors pursuant to section 1122(b) of the Bankruptcy Code); or (ii) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon a Final Order of the Court.

**D.**     **U.S. Trustee Fees.**

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  On and after the Effective Date, the Reorganized Debtors shall be responsible for filing required post-confirmation reports and paying quarterly fees due to the U.S. Trustee for the Reorganized Debtors until the entry of a final decree in such Debtors Chapter 11 Cases or until such Chapter 11 Cases are converted or dismissed.  Each and every one of the Debtors shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLAIMS AND EQUITY INTERESTS

**A.**     **Classification of Claims and Equity Interests.**

Except for those Claims addressed in Article II, all Claims and Equity Interests are placed in the Classes set forth below.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled before the Effective Date.

**B.**     **Distributions of Common Units to Holders of Class 3 Claims.**

As soon as practicable after the Effective Date, distributions to holders of Class 3 Secured Noteholder Claims Against Note Obligor Debtors held through The Depository Trust Company shall be made by mandatory exchange via presentment of the applicable public securities in exchange for the Common Units of New Holdco to which the applicable holders are entitled.

**C.**     **Summary of Classification and Class Identification.**

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, and unless otherwise explained herein, the classifications set forth below shall be deemed to

01:15863019.6

- 12 -

apply to each Debtor, as applicable. If there are no Claims or Equity Interests in each such class for a particular Debtor, such class shall not exist with respect to that Debtor's Plan. Below is a chart identifying Classes of Claims and Equity Interests, a description of whether each Class is Impaired, and each Class's voting rights.

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Noteholder Claims Against Note Obligor Debtors | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 5 | Intercompany Claims | Unimpaired | Deemed to Accept |
| 6 | Subsidiary Equity Interests | Unimpaired | Deemed to Accept |
| 7 | Equity Interests in Windsor Holdings Limited | Impaired | Deemed to Reject |

Consistent with § 1122 of the Bankruptcy Code, a Claim or Equity Interest is classified by the Plan in a particular Class only to the extent the Claim or Equity Interest is within the description of the Class, and a Claim or Equity Interest is classified in a different Class to the extent it is within the description of that different Class. This Plan does not effect a substantive consolidation of the Debtors.

The treatment in this Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each entity holding an Allowed Claim or an Allowed Equity Interest may have in or against the applicable Debtor or its property. This treatment supersedes and replaces any agreements or rights those entities have in or against the applicable Debtor or its property. All distributions under the Plan will be tendered to the Person holding the Allowed Claim or Allowed Equity Interest in accordance with the terms of this Plan.

**D.      Treatment of Classified Claims and Equity Interests.**

1.      *Class 1 – Other Priority Claims*.

(a)      Classification:  Class 1 consists of Other Priority Claims.

(b)      Treatment:  Except to the extent that a holder of an Allowed Other Priority Claim agrees in writing to less favorable treatment, in full and final satisfaction, settlement, release and discharge and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive payment in Cash in an amount equal to such Allowed Other Priority Claim as soon as practicable after the later of (i) the Effective Date and (ii) thirty (30) days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim.

(c)      Voting:  Class 1 is Unimpaired by the Plan, and each holder of a Class 1 Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.      *Class 2 – Other Secured Claims*.

(a)      <u>Classification</u>:  Class 2 consists of Other Secured Claims.

(b)      <u>Treatment</u>:  Except to the extent that a holder of an Allowed Other Secured Claim agrees in writing to less favorable treatment, at the option of the Debtors with the consent of the Supporting Noteholders, in full and final satisfaction, settlement, release and discharge of and in exchange for such Other Secured Claim, each holder of an Allowed Other Secured Claim shall either:  (i) have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim, if such interest is required to be paid pursuant to sections 506(b) and/or 1129(a)(9) of the Bankruptcy Code, as soon as practicable after the later of (a) the Effective Date, and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) receive the Collateral securing its Allowed Other Secured Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim.

(c)      <u>Voting</u>:  Class 2 is Unimpaired by the Plan, and each holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.      *Class 3 – Secured Noteholder Claims Against Note Obligor Debtors*.

(a)      <u>Classification</u>:    Class 3 consists of Secured Noteholder Claims against Note Obligor Debtors.

(b)      <u>Treatment</u>:    Upon the Effective Date of the Plan, the Secured Noteholder Claims shall be Allowed, in the aggregate, in the amount of $195,941,657.29.  On or as soon as practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for each Secured Noteholder Claim, each holder of an Allowed Secured Noteholder Claim shall receive its Pro Rata share of Common Units in Reorganized Windsor.

(c)      <u>Voting</u>:    Class 3 is Impaired.    Therefore, holders of Class 3 Secured Noteholder Claims are entitled to vote to accept or reject the Plan.

4.      *Class 4 – General Unsecured Claims*

(a)      <u>Classification</u>:    Class 4 consists of General Unsecured Claims against the Debtors.

(b)      <u>Treatment</u>:    In full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed General Unsecured Claim against the Debtors, on the Effective Date, each holder of an Allowed General Unsecured Claim shall, at the discretion of the Reorganized Debtor:  (i) be Reinstated as an obligation of the Reorganized Debtors, and be paid in accordance with the ordinary course terms, (ii) receive such other treatment as may be

agreed between such holder and the Reorganized Debtors, or (iii) receive such other treatment that will render it Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)     Voting:  Class 4 is Unimpaired.  Therefore, holders of Class 4 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

5.     *Class 5 – Intercompany Claims*.

(a)     Classification: Class 5 consists of Intercompany Claims.

(b)     Treatment:  On the Effective Date, Intercompany Claims will be Reinstated in full.  On and after the Effective Date, the Debtors and the Reorganized Debtors will be permitted to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes to intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices.

(c)     Voting:  Class 5 is Unimpaired.  Holders of Class 5 Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, as applicable.  Therefore, holders of Class 5 Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.     *Class 6 –Subsidiary Equity Interests*.

(a)     Classification:  Class 6 consists of any and all Subsidiary Equity Interests.

(b)     Treatment:  On the Effective Date, Subsidiary Equity Interests shall be Reinstated.

(c)     Voting:  Class 6 is Unimpaired.  Holders of Class 6 Subsidiary Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 6 Subsidiary Equity Interests are not entitled to vote to accept or reject the Plan.

7.     *Class 7 –Equity Interests in Windsor Holdings Limited*.

(a)     Classification:  Class 7 consists of any and all Equity Interests in Debtor Windsor Holdings Limited.

(b)     Treatment:  On the Effective Date, Equity Interests in Debtor Windsor Holdings Limited shall be cancelled and discharged and shall be of no further force and effect, whether surrendered for cancellation or otherwise and holders of Class 7 Equity Interests shall not receive or retain any property under the Plan on account of such Equity Interests.

(c)     Voting:  Class 7 is Impaired.  Holders of Class 7 Equity Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the

01:15863019.6

Bankruptcy Code.  Therefore, holders of Class 7 Equity Interests are not entitled to vote to accept or reject the Plan.

**E.**     **Special Provision Regarding Unimpaired and Reinstated Claims.**

Except as otherwise specifically provided in this Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including, but not limited to, legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in this Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Cause of Action or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left Unimpaired by this Plan.  Except as otherwise specifically provided in this Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Causes of Action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim left Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.**     **General Settlement of Claims and Interests.**

The provisions of the Plan shall, upon consummation, constitute a good faith compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code between the Debtors and the Supporting Noteholders and the Debtors and holders of Claims and Equity Interests.  In the event that, for any reason, the Confirmation Order is not entered or the Effective Date does not occur, the Debtors and the Supporting Noteholders reserve all of their respective rights with respect to any and all disputes resolved and settled under the Plan.  The entry of the Confirmation Order shall constitute the Court's approval of each of the compromises and settlements embodied in the Plan, and the Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness.  The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

**B.**     **Voting of Claims.**

Each holder of a Claim as of the Voting Deadline in an Impaired Class of Claims that is not (a) deemed to have rejected the Plan or (b) conclusively presumed to have accepted the Plan, and that held such Claim that has not been disallowed by the Court as of the Voting Record Date, shall be entitled to vote to accept or reject the Plan.  The instructions for completion of the Ballots are set forth in the instructions accompanying the Ballot.  Approval for

the procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan will be sought in the Plan Scheduling Motion.  The procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan are described in the Disclosure Statement.

## C.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.

Class 7 of Equity Interests in Windsor Holdings Limited is deemed to reject this Plan.  Accordingly, this Plan shall constitute a motion to request that the Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class.

## D.      Limited Liability Company.

On or before the Effective Date, a new holding company ("**New Holdco**") will be formed as a Marshall Islands limited liability company and all assets of the Debtor Windsor Holdings Limited will be conveyed and transferred to New Holdco.  In connection with the vesting and transfer of such assets, any attorney-client privilege, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Reorganized Debtors shall vest in New Holdco and the Reorganized Debtors.  The Debtors are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities.  The Operating Agreement will provide for issuance of Common Units, 100% of which will be distributed to holders of Secured Noteholder Claims.  New Holdco will be managed by a board of managers (the "**Board of Managers**") selected by the Supporting Noteholders prior to the Confirmation Date.  New Holdco will have authority to retain, on behalf of New Holdco, any counsel, financial advisors, claims agents, auditors, or other such professionals as the Board of Managers deems appropriate at all times.  The Board of Managers may select any professionals in their sole discretion, and prior employment in any capacity in the Chapter 11 Cases on behalf of the Debtors and the Debtors' estates shall not preclude New Holdco's retention of such professionals.  The relative duties and responsibilities of the Board of Managers shall be set forth in the Operating Agreement.  Consistent with section 1123(a)(6) of the Bankruptcy Code, the Operating Agreement shall include a provision prohibiting the issuance of nonvoting equity securities.

## E.      Continued Corporate Existence and Vesting of Assets.

Except as otherwise provided herein:  (i) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable law; and (ii) on the Effective Date, all property of its Estate, and any property acquired by such Debtor or Reorganized Debtor under the Plan, will vest in such Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, Equity Interests and other interests, except for the Liens and Claims established under the Plan.  To the extent any such certificate of incorporation, bylaws or other analogous formation or governing documents are amended in connection with the Plan, such documents are deemed to be amended by the Plan and require no further action or approval other than any requisite filings required under applicable state, provincial or federal law.

01:15863019.6

On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject only to those restrictions expressly imposed by the Plan or the Confirmation Order as well as the documents and instruments executed and delivered in connection therewith, including the documents, exhibits, instruments and other materials comprising the Plan Supplement.

F.     **Issuance of Common Units of New Holdco.**

1.     *Issuance of Common Units*.  Issuance of Common Units shall be authorized under the Certificate of Formation and Operating Agreement of New Holdco, and the Common Units shall be issued on the Effective Date and distributed as soon as practicable thereafter in accordance with the Plan.  All Common Units, issuable in accordance with the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.  The issuance of Common Units is authorized without the need for any further corporate action and without any further action by any holder of a Claim or Equity Interest.

2.     *Exemption from Registration*.  Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any securities pursuant to this Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable State or local law requiring registration prior to the offering, issuance, distribution or sale of securities.  In addition, except as otherwise provided in this Plan, to the maximum extent provided under section 1145 of the Bankruptcy Code, any and all New Common Shares contemplated by this Plan and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to:  (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) applicable regulatory approval.

3.     *Dissolution of Certain Debtors*.  As of the Effective Date, at the sole discretion of the Supporting Noteholders, the Debtors or Reorganized Debtors may (a) cause any or all of the Debtors to be merged into one or more of the Debtors, dissolved, or otherwise consolidated, (b) cause the transfer of assets between or among the Debtors, or (c) engage in any other transaction in furtherance of this Plan.  Any such transaction shall be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the members, managers, stockholders or directors of any of the Debtors or the Reorganized Debtors.  The Debtors shall file with the Plan Supplement the designation of any Debtors that will be merged or dissolved.

G.     **Restructuring Support Agreement Professional Fees.**

On the Effective Date, the Reorganized Debtors shall pay, in full, in Cash, the unpaid reasonable fees, expenses, costs, and other charges of the Supporting Noteholders,

including the costs, fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Landis Rath & Cobb LLP and Houlihan Lokey Capital Inc., in accordance with the *Final Order (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Secured Parties, and (C) Granting Related Relief*, entered by the Court in these Chapter 11 Cases (the "**Cash Collateral Order**"). Such fees, expenses, costs, and other charges shall be subject to the review process contemplated by paragraph 11 of the Cash Collateral Order.

## H.    Secured Notes Indenture Trustee Fees and Expenses.

In full satisfaction of any Allowed Indenture Trustee Fee Claims for fees and expenses incurred through the Confirmation Date, including to the extent such Allowed Indenture Trustee Fee Claims are secured by any Charging Liens under the Indentures and all Restructuring Support Agreement Professional Fees payable under the Restructuring Support Agreement, the Reorganized Debtors will distribute to the Secured Notes Indenture Trustees on the Effective Date Cash equal to the amount of the Allowed Indenture Trustee Fee Claims; provided, however, that with respect to any portion of such Indenture Trustee Fee Claims to which the U.S. Trustee, the Debtors or the Reorganized Debtors shall have objected within the later of (x) five (5) Business Days prior to the Effective Date, and (y) twenty (20) days of receipt of the request for payment, no distribution shall be payable hereunder until such objection has been resolved. All Allowed Indenture Trustee Fee Claims, including Restructuring Support Agreement Professional Fees payable under the Restructuring Support Agreement and the Plan through the Effective Date, shall be payable by the Reorganized Debtors as soon as practicable after the Effective Date.

As a condition to receiving payment thereof, a holder of an Indenture Trustee Fee Claim shall deliver to the Debtors or the New Board, as applicable, written copies of invoices in respect of such claims, with narrative descriptions of the services rendered (including appropriate redactions to preserve privileged matters) and itemization of expenses incurred in such detail and with such supporting documentation as is reasonably requested by the Debtors or the New Board. An Indenture Trustee Fee Claim shall be deemed Allowed except to the extent there is a timely objection. If there is a timely objection to the request for payment of any Indenture Trustee Fee Claim, the undisputed amount of any Indenture Trustee Fee Claims with respect to which such objection(s) are pending shall be Allowed and paid by the Reorganized Debtors on the Effective Date or as soon thereafter as reasonably practicable. The Reorganized Debtors shall not be required to make any payments with respect to the disputed portion of an Indenture Trustee Fee Claim as to which the U.S. Trustee, the Debtors or Reorganized Debtors have objected until resolved or determined by the Court. In the event such objector(s) are unable to resolve a dispute as to an Indenture Trustee Fee Claim, the Secured Notes Indenture Trustee may, in its sole discretion, elect to (i) submit any such dispute to the Court for resolution by application requesting payment of the disputed portion of the Indenture Trustee Fee Claims in accordance with the reasonableness standard (and not subject to the requirements of sections 503(b)(3) and (4) of the Bankruptcy Code, which shall not apply) or (ii) assert their Charging Liens (to the extent such Lien exists under the Indentures) to obtain payment of a disputed portion of the Indenture Trustee Fee Claim in lieu of Court resolution described in subsection (i).

## I.    Cancellation of Existing Securities.

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under the Secured Notes Indenture, and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in a Debtor giving rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of a Debtor that are specifically reinstated pursuant to the Plan), shall be cancelled as to such Debtor, and the applicable Reorganized Debtor shall not have any continuing obligations thereunder; and (ii) the obligations of a Debtor pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of such Debtor (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of a Debtor that are specifically reinstated pursuant to the Plan or assumed by a Debtor) shall be released and discharged; provided, however, that notwithstanding the occurrence of the Confirmation Date or the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders of such Claims to receive distributions under the Plan as provided herein, (b) allowing the Secured Notes Indenture Trustee to make distributions under the Plan as provided herein, and deduct therefrom such reasonable compensation, fees, and expenses due thereunder or incurred in making such distributions, to the extent not paid by the Debtors and authorized under such indenture or agreement, (c) allowing the Secured Notes Indenture Trustee to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan, (d) allowing the Secured Notes Indenture Trustee to exercise any charging liens it may have under the Secured Notes Indenture against any such distributions and (e) preserving any charging lien or indemnification rights of the Secured Notes Indenture Trustee under the Secured Notes Indenture against the holders of the Secured Notes.  For the avoidance of doubt, nothing in this section shall affect the discharge of or result in any obligation, liability or expense of the Debtors or Reorganized Debtors or affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any additional obligation, expense or liability of the Debtors or Reorganized Debtors.  On and after the Effective Date, all duties and responsibilities of the Secured Notes Indenture Trustee shall be discharged except to the extent required to effectuate the Plan.

## J.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors may pursue the Causes of Action in their sole discretion.  The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to the Causes of Action upon, after or as a consequence of the

Confirmation or Consummation.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors may exclusively enforce any and all Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Causes of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Court.

## ARTICLE V.
## PROVISIONS REGARDING CORPORATE GOVERNANCE
## OF THE REORGANIZED DEBTORS

**A.     Appointment of Managers.**

As of the Effective Date, the term of the current members of the Debtors' boards of directors shall expire without further action by any Person and such members shall have no continuing obligations to the Debtor(s), Reorganized Debtors or Holdco on or after the Effective Date.  Effective as of the Effective Date, the initial managers of the New Board shall be comprised of 3 managers appointed by the Supporting Noteholders and disclosed in the Plan Supplement.  Pursuant to 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliation of the directors and officers of each of the other Reorganized Debtors.

**B.     Powers of Officers.**

The officers of the Debtors or the Reorganized Debtors, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

**C.     Corporate Action.**

On or prior to the Effective Date, any Debtor and, after the Effective Date, New Holdco, may enter into or undertake any corporate transactions and may take such actions as may be determined by such Debtor or New Holdco to be necessary or appropriate to effect such corporate transactions as contemplated by and consistent with the Plan.  The actions to effect the corporate transactions may include, without limitation:   (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms herein and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. The corporate transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions,

liquidations or dissolutions, as may be determined by the applicable Debtors or New Board to be necessary or appropriate to effect the purposes of such transactions for the benefit of New Holdco, including, without limitation, the potential simplification of the organizational structure of the Debtors.  In each case in which the surviving, resulting or acquiring person in any such transaction is a successor to a Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Debtor pursuant to this Plan to pay or otherwise satisfy the Allowed Claims against such Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Debtor will perform such obligations.  Implementation of the corporate transactions shall not affect any distributions, discharges, exculpations, releases or injunctions set forth in this Plan.  The corporate transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and title 6 and title 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order or process of any kind, except as otherwise set forth herein or in the Confirmation Order.

## ARTICLE VI.
## DISTRIBUTIONS UNDER THE PLAN

### A.    Procedures for Treating Disputed Claims.

1.    *Filing Proofs of Claim.*  Holders of Claims need not file Proofs of Claim with the Court unless specifically required herein.  In the event that a holder of a Claim elects to file a Proof of Claim with the Court, it will be deemed to have consented to the exclusive jurisdiction of the Court for all purposes with respect to the determination, liquidation, allowance, or disallowance of such Claim.

2.    *Disputed Claims.*  If the Debtors dispute any Claim as to which no Proof of Claim has been filed, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced, provided, however, that the Reorganized Debtors may elect, at their sole option, to object under section 502 of the Bankruptcy Code to any Claim or Proof of Claim filed by or on behalf of a holder of a Claim.

3.    *Objections to Claims.*  Except insofar as a Claim is Allowed under the Plan, after the Effective Date, the Reorganized Debtors shall have the sole and exclusive authority to object to any Claim.  Notwithstanding the foregoing, the U.S. Trustee retains the right to object to Fee Claims and other Administrative Claims.

4.    ***Disallowance of Claims.  Except as provided herein or otherwise agreed, any and all Proofs of Claim shall be deemed expunged from the claims register on the Effective Date without any further notice to or action, order, or approval of the Court and the Claim on which such Proof of Claim was filed shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced.***

B.    **Allowed Claims.**

1.    *Delivery of Distributions.*  Except with respect to distributions of Common Units, distributions under the Plan shall be made by the Reorganized Debtors (or their agent or designee) to the holders of Allowed Claims in all Classes for which a distribution is provided in this Plan at the addresses set forth on the Schedules, unless such addresses are superseded by Proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001 (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).

2.    *Distribution of Cash.*  Any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a bank selected by the Reorganized Debtors.

3.    *Unclaimed Distributions of Cash.*  Subject to Article VI.B.6 herein, any distribution of Cash under the Plan that is unclaimed after one year after it has been delivered (or attempted to be delivered) shall, pursuant to section 347(b) of the Bankruptcy Code, become the property of the Reorganized Debtors against which such Claim was Allowed notwithstanding any domestic state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim shall be extinguished and forever barred.

4.    *Unclaimed Distributions of Common Units.*  Subject to Article VI.B.6 herein, any distribution of Common Units under the Plan that is unclaimed after one year after it has been delivered (or attempted to be delivered) shall be retained by the Reorganized Debtors, notwithstanding any domestic state or other escheat or similar laws to the contrary, and the entitlement by the holder of such Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim shall be extinguished and forever barred.

5.    *Saturdays, Sundays, or Legal Holidays.*  If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

6.    *Fractional and De Minimis Distributions.*  Notwithstanding any other provision in the Plan to the contrary, no fractional Common Units shall be issued or distributed pursuant to the Plan.  Whenever any payment of a fraction of Common Unit would otherwise be required under the Plan, the actual distribution made shall reflect a rounding of such fraction to the nearest whole Common Unit (up or down), with half Common Unit or less being rounded down and fractions in excess of a half of Common Unit being rounded up.  The Reorganized Debtors shall not be required to, but may in its sole and absolute discretion, make any payment on account of any Claim in the event that the costs of making such payment exceeds the amount of such payment.

7.      *Distributions to Holders of Claims*:

(a)      *Initial Distribution to Claims Allowed as of the Effective Date.*  On or as soon as reasonably practicable after the Effective Date, or as otherwise expressly set forth in the Plan, the Reorganized Debtors (or their agent or designee) shall distribute Cash or Collateral, as the case may be, to the holders of Allowed Claims as contemplated herein.

(b)      *Claims Allowed after the Effective Date.*  Each holder of a Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive the distribution to which such holder of an Allowed Claim is entitled as set forth in Article III, and distributions to such holder shall be made in accordance with the provisions of this Plan.  As soon as practicable after the date that the Claim becomes an Allowed Claim, the Reorganized Debtors shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim.

C.      **Allocation of Consideration.**

The aggregate consideration to be distributed to the holders of Allowed Claims in each Class under the Plan shall be treated as first satisfying an amount equal to the principal amount of the Allowed Claim for such holders, and any remaining consideration as satisfying accrued but unpaid interest, as applicable.

D.      **Insured Claims.**

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.

E.      **Compliance with Tax Requirements.**

In connection with the Plan, to the extent applicable, the Debtors and the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors or Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and the Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

F.      **Setoff and Recoupment.**

The Debtors or the Reorganized Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against

the claimant pursuant to section 558 of the Bankruptcy Code or otherwise, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the holder of such Claim.

**Unless otherwise authorized by a Final Order, any holder of a Claim, other than a holder of a Governmental Claim, must assert any setoff rights against a Claim by a Debtor against such Entity by filing an appropriate motion seeking authority to setoff on or before the Confirmation Date or will be deemed to have waived and be forever barred from asserting any right to setoff against a Claim by a Debtor or the Reorganized Debtors, notwithstanding any statement to the contrary in a Proof of Claim or any other pleading or document Filed with the Court or delivered to the Debtors.**

## ARTICLE VII.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      <u>Assumption of Executory Contracts and Unexpired Leases</u>.

Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically assumed pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such executory contract or unexpired lease:  (i) is expressly identified on the Rejection Schedule; (ii) has been previously rejected by the Debtors by Final Order or has been rejected by the Debtors by order of the Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to reject pending as of the Effective Date; or (iv) is otherwise rejected pursuant to the terms herein.

The Confirmation Order will constitute an order of the Court approving such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

B.      <u>Cure Claims</u>.

At the election of the Debtors or the Reorganized Debtors, as applicable, any monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code in one of the following ways: (i) payment of the Cure Claim in Cash on or as soon as reasonably practicable to occur of (A) thirty (30) days after the determination of the Cure Claim, and (B) the Effective Date or such other date as may be set by the Court, or (ii) on such other terms as agreed to by the Debtors or Reorganized Debtors and the non-Debtor counterparty to such Executory Contract or Unexpired Lease.  In the event of a dispute pertaining to assumption or assignment, the Cure Claim payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the resolution of the dispute in accordance with Article VII.A of this Plan.  The Reorganized Debtors shall be deemed to have provided adequate assurance of future performance through the promise of the applicable Reorganized Debtor to perform all obligations under any Executory Contract or Unexpired Lease under this Plan.

**ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE AND SATISFACTION OF THE CURE CLAIM PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTORS OR REORGANIZED DEBTORS ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED MOOT AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE COURT UPON PAYMENT OF ANY CURE CLAIM**.

**C.** **Reservation of Rights.**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, as applicable, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. In the event a written objection is filed with the Court asserting that a contract or lease is executory or unexpired, the right of the Debtors or Reorganized Debtors to move to reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Court determining that the contract or lease is executory or unexpired, in which case the deemed assumption provided for in the Plan shall not apply to such contract or lease.

**D.** **Rejection of Executory Contracts and Unexpired Leases.**

1. *Rejection Schedule.* The Debtors will file the Rejection Schedule with the Court no later than five (5) Business Days before the deadline to object to the Plan. The Rejection Schedule will include (a) the name of the non-Debtor counterparty, (b) the legal description of the contract or lease to be rejected, and (c) the proposed effective date of rejection. On or as soon as reasonably practicable after the filing of the Rejection Schedule, the Debtors will serve a Rejection Notice as well as notice of filing of the Rejection Schedule upon each non-Debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed rejection of their respective Executory Contract or Unexpired Lease and explain how such disputes will be resolved by the Court if the parties are not able to resolve a dispute consensually.

The Confirmation Order will constitute an order of the Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

2. *Rejection Damage Claims.* If the rejection by the Debtors, pursuant to the Plan or otherwise, of an Executory Contract or Unexpired Lease gives rise to a Rejection Damage Claim, a Proof of Claim must be filed with the Court within (i) forty-five (45) days after

the date of entry of an order of the Court approving such rejection, or (ii) if the Executory Contract or Unexpired Lease is listed on the Rejection Schedule, within forty-five (45) days after the date of entry of the Confirmation Order.  For the avoidance of doubt, all Allowed Rejection Damage Claims shall be treated as General Unsecured Claims.

3. ___REQUIREMENT TO FILE A PROOF OF CLAIM FOR REJECTION DAMAGE CLAIMS___.  **ANY REJECTION DAMAGE CLAIMS THAT ARE NOT TIMELY FILED SHALL BE DISALLOWED AUTOMATICALLY, FOREVER BARRED FROM ASSERTION, AND SHALL NOT BE ENFORCEABLE AGAINST ANY REORGANIZED DEBTOR WITHOUT THE NEED FOR ANY OBJECTION BY THE REORGANIZED DEBTORS OR FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE COURT, AND ANY SUCH REJECTION DAMAGE CLAIM SHALL BE DEEMED FULLY SATISFIED, RELEASED AND DISCHARGED, NOTWITHSTANDING ANYTHING IN THE SCHEDULES OR A PROOF OF CLAIM TO THE CONTRARY.**

E.     **Assignment.**

Any Executory Contract or Unexpired Lease, if not expressly assumed and assigned to a third party previously in the Chapter 11 Cases, will be deemed assumed and assigned to that Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.  If an objection to a proposed assumption, assumption and assignment or Cure Claim is not resolved in favor of the Debtors before the Effective Date, the applicable Executory Contract or Unexpired Lease may be designated by the Debtors or the Reorganized Debtors for rejection within five (5) Business Days of the entry of a Final Order of the Court resolving the matter against the Debtors.  Such rejection shall be deemed effective as of the Effective Date.

F.     **Insurance Policies.**

Notwithstanding anything in this Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto.

G.     **Post-Petition Contracts and Leases.**

All contracts, agreements and leases that were entered into by a Debtor or assumed by a Debtor after the Petition Date shall be deemed assigned by that Debtor to the applicable Reorganized Debtor on the Effective Date.

## ARTICLE VIII.
## CONFIRMATION AND CONSUMMATION OF THE PLAN

A.     **Conditions to Confirmation.**

The following are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived in accordance with Article VIII.B:

1.      The Court shall have approved the Disclosure Statement with respect to this Plan in an order in form and substance reasonably acceptable to the Debtors and the Supporting Noteholders.

2.      The Confirmation Order, the Plan and Plan Supplement shall be in form and substance acceptable to the Debtors and the Supporting Noteholders.

3.      All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement this Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors. In accordance with the provisions of the Plan, the New Board of Managers of Reorganized Debtors shall have been selected and shall have agreed to serve in such capacity.

B.      **Conditions to Effectiveness.**

The Plan shall not become effective unless and until:

1.      The Certificate of Formation, the other constituent documents of the Reorganized Debtors, and the Operating Agreement, as necessary and applicable, in form and substance acceptable to the Debtors and the Supporting Noteholders, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdictions' corporation or limited liability company laws;

2.      the Confirmation Order shall have been entered by the Court and shall be a Final Order;

3.      the Plan Supplement documents shall have been executed and become effective;

4.      all other documents and agreements necessary to implement this Plan on the Effective Date, in form and substance acceptable to the Debtors and the Supporting Noteholders, to the extent required herein or in the Restructuring Support Agreement, shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

5.      all Restructuring Support Agreement Professional Fees payable under the Restructuring Support Agreement and the Plan through the Confirmation Date shall be paid by the Debtors prior to or on the Effective Date without any further notice to or action, order, or approval of the Court; and

6.      the Amended Management Agreement shall have been executed and be in full force and effect.

## C.    Waiver of Conditions.

The Debtors, with the written consent of the Supporting Noteholders, to the extent not prohibited by law, may waive one or more of the conditions to (i) confirmation of the Plan set forth in Article VIII.A above at any time without leave of or order of the Court and without any formal action; or (ii) to effectiveness of the Plan set forth in Article VIII.B above at any time.

## D.    Effect of Failure of Conditions.

In the event that the Effective Date does not occur on or before one hundred and twenty (120) days after the Confirmation Date, upon notification submitted by the Debtors to the Court:  (i) the Confirmation Order may be vacated, (ii) no distributions under the Plan shall be made; (iii) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver, release, or discharge of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors unless extended by Court order.

## E.    Vacatur of Confirmation Order.

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall:  (i) constitute a waiver, release or discharge of any Claims against or Equity Interests in the Debtor; (ii) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (iii) prejudice in any manner any right, remedy or claim of the Debtors; or (iv) be deemed an admission against interest by the Debtors.  If a Final Order denying confirmation of the Plan is entered, the Restructuring Support Agreement shall be deemed null and void in all respects.

## F.    Modification of the Plan.

Subject to the limitations contained in the Plan, and subject to the written consent of the Supporting Noteholders as set forth herein and in the Restructuring Support Agreement, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors (with the written consent of the Supporting Noteholders) or the Reorganized Debtors, as the case may be, may amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code.

## G.    Revocation, Withdrawal, or Non-Consummation.

1.    *Right to Revoke or Withdraw*.  The Debtors reserve the right to revoke or withdraw the Plan at any time before the Effective Date; provided, however, that such action shall not alter the rights of the parties to the Restructuring Support Agreement.

2.       *Effect of Withdrawal, Revocation, or Non-Consummation*.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), the assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document, including the Restructuring Support Agreement, or agreement executed pursuant to the Plan shall be null and void.  In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Equity Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

## ARTICLE IX.
## EFFECT OF CONFIRMATION AND INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

A.       **Binding Effect**.

From and after and after the Confirmation Date, but subject to the occurrence of the Effective Date, this Plan shall be binding and inure to the benefit of the Debtors, all present and former holders of Claims and Equity Interests, and their respective assigns, including New Holdco.

B.       **Discharge of the Debtors**.

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Equity Interests and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim based upon such debt, right or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Equity Interest based upon such debt, right or Equity Interest is Allowed; or (iii) the holder of such a Claim or Equity Interest has accepted the Plan or is entitled to receive a distribution hereunder.  Any default by the Debtors with respect to any Claim or Equity Interest that existed immediately before or on account of the filing of the**

Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring.

C.      <u>Injunction.</u>

        Except as otherwise provided in this Plan or in any document, instrument, release or other agreement entered into in connection with this Plan or approved by order of the Court, the Confirmation Order shall provide, among other things, that from and after the Effective Date all Persons or Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors are (i) permanently enjoined from taking any of the following actions against the Estate(s) or any of their property on account of any such Claims or Equity Interests and (ii) permanently enjoined from taking any of the following actions against any of the Debtors, the Reorganized Debtors or their property on account of such Claims or Equity Interests:  (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting, or enforcing any Lien or encumbrance; (D) asserting a setoff or right of subrogation of any kind against any debt, liability or obligation due to the Debtors; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; <u>provided</u>, <u>however</u>, that nothing contained herein shall preclude such Persons or Entities from exercising their rights pursuant to and consistent with the terms of this Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered or Reinstated under or in connection with this Plan.  By accepting distributions pursuant to this Plan, each Holder of an Allowed Claim or Equity Interest will be deemed to have specifically consented to the injunctions set forth in this Article IX.C.

D.      <u>Releases, Exculpations and Injunctions of Released Parties.</u>

        1.      <u>***Releases by the Debtors***</u>.  On the Effective Date, and notwithstanding any other provisions of the Plan, the Debtors and the Reorganized Debtors, on behalf of themselves and their Estates, shall be deemed to unconditionally release the Released Parties from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, assertable on behalf of or derivative from the Debtors, based in whole or in part upon actions taken solely in their respective capacities described herein or any omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the Disclosure Statement, the Restructuring Support Agreement, the documents included in the Plan Supplement, or the Plan or related agreements, instruments, or other documents, <u>provided</u>, <u>however</u>, that (a) no individual shall be released from any act or omission that constitutes gross negligence or wilful misconduct as determined by a Final Order, (b) other than with respect to the Secured Noteholder Claims, the Reorganized Debtors shall not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of set-

off or recoupment against any Claims, and (c) the foregoing release applies to the Released Parties solely in their respective capacities described herein.

2. _**Releases by Holders of Claims.**_   On the Effective Date, and notwithstanding any other provisions of the Plan, (i) each Releasing Party will be deemed to have forever released and covenanted with the Released Parties not to sue or otherwise seek recovery from any Released Party on account of any Claim, including any Claim or Cause of Action based upon tort, breach of contract, violations of federal or state securities laws or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date in any way related to the Debtors or their businesses and affairs and (ii) each Releasing Party will be deemed to have forever released and covenanted with the Released Parties not to assert against any Released Party any Claim, obligation, right, Cause of Action or liability that any holder of a Claim may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated under the Plan, the Chapter 11 Cases, the documents included in the Plan Supplement, the Restructuring Support Agreement, the Plan, or the Disclosure Statement or related agreements, instruments or other documents, **provided**, however, the foregoing release will not (i) apply to obligations arising under the Plan, (ii) be construed to prohibit a party in interest from seeking to enforce the terms of the Plan, and (iii) apply to any act or omission that constitutes gross negligence or wilful misconduct as determined by a Final Order.  The foregoing releases apply to the Released Parties solely in their respective capacities described herein.

3. _**Exculpation and Injunction.**_   The Debtors and their officers, directors, and retained professionals shall have no liability whatsoever to any holder or purported holder of an Administrative Expense Claim, Claim, or Equity Interest for any act or omission that occurred between the Petition Date and the Effective Date in connection with the Chapter 11 Cases, including the preparation, negotiation, and filing of the Plan, the Disclosure Statement, the negotiation of the documents included in the Plan Supplement, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof except for any act or omission that constitutes willful misconduct or gross negligence as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.  Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Expense Claim, Claim or Equity Interest shall be permitted to commence or continue any Cause of Action, employment of process, or any act to collect, offset, or recover any Claim against a Released Party that accrued on or before the Effective Date.

01:15863019.6

E.      **Votes Solicited in Good Faith.**

The Debtors have, and upon entry of the Confirmation Order shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  The Debtors (and their respective affiliates, agents, directors, officers, and Professionals) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under the Plan and therefore have not been, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of the securities offered and distributed under the Plan.

F.      **Preservation of Insurance.**

The Debtors' discharge and release from all Claims as provided herein shall not, except as necessary to be consistent with this Plan, diminish or impair the enforceability of any insurance policy that may provide coverage for Claims against the Debtors, the Reorganized Debtors, their current and former directors and officers, or any other Person.

## ARTICLE X.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction:

1.      to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, in accordance with the terms of this Plan, any Executory Contracts or Unexpired Leases to the Rejection Schedule or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

2.      to determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending before the Court on the Effective Date;

3.      to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

4.      to resolve disputes as to the ownership of any Claim or Equity Interest;

5.      to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the

resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

   6. to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified or vacated;

   7. to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

   8. to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order;

   9. to hear and determine all applications, and disputes relating thereto, for compensation and reimbursement of expenses of Professionals;

   10. to hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan;

   11. to hear and determine any issue for which the Plan requires a Final Order of the Court;

   12. to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

   13. to hear and determine any Causes of Action of the Debtors, all of which have been expressly preserved under the Plan;

   14. to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge;

   15. to hear and determine any matter, case, controversy, suit, dispute, or Cause of Action (i) regarding the existence, nature, and scope of the discharge, releases, injunctions, and exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such discharge, releases, injunctions, exculpations, and other provisions;

   16. to enter a final decree closing the Chapter 11 Cases;

   17. to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

   18. to adjudicate any and all disputes arising from or relating to distributions under the Plan;

   19. to enforce all orders previously entered by the Court; and

20.     to hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XI.
## MISCELLANEOUS PROVISIONS

**A.      Immediate Binding Effect.**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with any Debtor.

**B.      Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware (without reference to the conflicts of laws provisions thereof that would require or permit the application of the law of another jurisdiction) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

**C.      Filing or Execution of Additional Documents.**

On or before the Effective Date, the Debtors or the Reorganized Debtors shall (on terms materially consistent with the Plan) file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, which shall be in form and substance acceptable to the Debtors and the Supporting Noteholders in accordance with the Restructuring Support Agreement.

**D.      Term of Injunctions of Stays.**

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**E.      Withholding and Reporting Requirements.**

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any United States federal, state, local or non-U.S. taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be

authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distribution pending receipt of information necessary or appropriate to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

**F.      Exemption From Transfer Taxes.**

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, all transfers of property pursuant hereto, including (i) the issuance, transfer or exchange under the Plan of Common Units, (ii) the making or assignment of any lease or sublease, or (iii) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan, shall not be subject to any stamp tax or similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax.

**G.      Plan Supplement.**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. The documents contained in the Plan Supplement shall be available online at www.pacer.gov and cases.primeclerk.com/windsor. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to counsel to the Debtors. The Debtors reserve the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any part of the Plan Supplement after they are filed and shall promptly make such changes available online at www.pacer.gov and cases.primeclerk.com/windsor.

**H.      Payment of Statutory Fees.**

All fees payable pursuant to section 1930 of title 28, United States Code, as determined by the Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

**I.      Amendment  or Modification of this Plan.**

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify this Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan, subject to the written consent of the Supporting Noteholders.

**J.      Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Court to be invalid, void or unenforceable, the Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void

01:15863019.6

or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation, provided, however, that, to the extent any alteration or interpretation of any term or provision of this Plan adversely affects any of the Supporting Noteholders, then the Debtors shall be required to obtain the consent of the majority of the Supporting Noteholders, with respect to such alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.    Successors and Assigns.

This Plan shall be binding upon and inure to the benefit of the Debtors and their respective successors and assigns, including, without limitation, the Reorganized Debtors.  The rights, benefits and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

## L.    Notices.

All notices, requests, and demands hereunder to be effective shall be made in writing or by e-mail, and unless otherwise expressly provided herein, shall be deemed to have been duly given when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed.  Each of such notices shall be addressed as follows:

1.    *To the Debtors*:  Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 N. King Street, Wilmington, Delaware  19801, attention:  Pauline K. Morgan; Sean T. Greecher, Robert F. Poppiti, Jr., (ii) if by e-mail to:  pmorgan@ycst.com; sgreecher@ycst.com; rpoppiti@ycst.com.

2.    *To the Supporting Noteholders*:  (i) if by mail to:  (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, attention: Andrew N. Rosenberg, Esq., Elizabeth R. McColm, Esq., Oksana Lashko, Esq. and (b) Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, DE 19801, attention:  Richard S. Cobb, Esq.; (ii) if by e-mail to:  arosenberg@paulweiss.com, emccolm@paulweiss.com, olashko@paulweiss.com, and cobb@lrclaw.com.

3.    *To the U.S. Trustee*:  (i) if by mail to: Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington De 19801, attention: Benjamin A. Hackman, Esq.; (ii) if by e-mail to:  benjamin.a.hackman@usdoj.gov.

## M.    Conflicts.

The terms of the Plan shall govern in the event of any inconsistency between the Plan and the Disclosure Statement.  In the event of any inconsistency with the Plan and the Confirmation Order, the Confirmation Order shall govern with respect to such inconsistency.

Dated:    October 8, 2014
       Wilmington, Delaware

                       Respectfully submitted,

                       **Windsor Petroleum Transport Corporation, <u>et al.</u>**

                       By:       */s/ Paul M. Leand, Jr.*
                              Paul M. Leand, Jr.
                              Chief Restructuring Officer

**<u>EXHIBIT C TO THE DISCLOSURE STATEMENT</u>**


**FINANCIAL PROJECTIONS**

## Windsor Petroleum Transport Corporation

Financial Projections                                                                                             *9/30/2014*

### Assumptions ($ in actuals)

**Operating Assumptions**

| | |
|---|---|
| Floor Min. Rate Period (BP - Purpose/Pride) | $20,000 |
| Working Capital Needs (upon return from BP) | 2,500,000 |
| Special Survey Days | 30 |
| Special Survey Expense | 3,000,000 |
| Intermediate Survey Days | 30 |
| Intermediate Survey Expense | 2,000,000 |
| Vessel Utilization | 100.0% |
| Vetting Days (upon return from BP) | 10 |

**Management Fees**

| Bareboat Rate (CF) | $ | % Share |
|---|---|---|
| $ - $100,000 | - | - |
| $10,000 - $20,000 | 10,000 | 5.0% |
| $20,000 - $30,000 | 20,000 | 10.0% |
| $30,000+ | 30,000 | 15.0% |
| Sale of Vessels Split | | 15.0% |
| Fixed Management Fee | $500,000 | |

### Operating Metrics per day (Inputs/Drivers, $ in actuals)

| | 2Q14E | 3Q14E | 4Q14E | 1Q15E | 2Q15E | 3Q15E | 4Q15E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|
| **Spot Rates** (Input Here) | $20,000 | $25,000 | $25,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 |
| **Pioneer - Buckingham** | | | | | | | | | | |
| Spot Rate per day | $20,000 | $25,000 | $25,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 |
| Operating Expense per day (Input Here) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Operating Profit per day | $10,000 | $15,000 | $15,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| **Progress - Caernarfon** | | | | | | | | | | |
| Spot Rate per day | $20,000 | $25,000 | $25,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 |
| Operating Expense per day (Input Here) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Operating Profit per day | $10,000 | $15,000 | $15,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| **Purpose - Sandringham** | | | | | | | | | | |
| Spot Rate per day | $20,000 | $25,000 | $25,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 |
| Operating Expense per day (Input Here) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Operating Profit per day | $10,000 | $15,000 | $15,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| **Pride Holyrood** | | | | | | | | | | |
| Spot Rate per day | $20,000 | $25,000 | $25,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 |
| Operating Expense per day (Input Here) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Operating Profit per day | $10,000 | $15,000 | $15,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |

### Financial Projections ($ in millions)

| | 4Q13A | 1Q14A | 2Q14E | 3Q14E | 4Q14E | 1Q15E | 2Q15E | 3Q15E | 4Q15E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pioneer - Buckingham | $1.8 | $1.8 | $1.8 | $1.6 | $2.3 | $2.7 | $2.7 | $2.8 | $2.8 | $10.1 | $11.0 | $11.0 |
| Progress - Caernarfon | 1.8 | 2.3 | 1.8 | 2.3 | 2.3 | 2.7 | 2.7 | 2.8 | 1.9 | 11.0 | 11.0 | 10.1 |
| Purpose - Sandringham | 1.8 | 1.8 | 1.8 | 2.0 | 2.3 | 2.7 | 2.7 | 2.8 | 1.9 | 11.0 | 11.0 | 10.1 |
| Pride - Holyrood | 1.8 | 1.8 | 1.8 | 2.1 | 2.3 | 2.7 | 2.4 | 2.8 | 1.9 | 11.0 | 11.0 | 10.1 |
| Net Revenue | $7.3 | $7.7 | $7.3 | $8.0 | $9.2 | $10.8 | $10.6 | $11.0 | $8.3 | $43.0 | $43.8 | $41.1 |
| Pioneer | (0.9) | (0.8) | (0.9) | (0.6) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (3.4) | (3.7) | (3.7) |
| Progress | - | (0.5) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.6) | (3.7) | (3.7) | (3.4) |
| Purpose | - | - | - | (0.7) | (0.9) | (0.9) | (0.9) | (0.9) | (0.6) | (3.7) | (3.7) | (3.4) |
| Pride | - | - | - | (0.6) | (0.9) | (0.9) | (0.8) | (0.9) | (0.6) | (3.7) | (3.7) | (3.4) |
| Opex | ($0.9) | ($1.3) | ($1.8) | ($2.8) | ($3.7) | ($3.6) | ($3.5) | ($3.7) | ($2.8) | ($14.3) | ($14.6) | ($13.7) |
| Operating Income | $6.4 | $6.3 | $5.5 | $5.2 | $5.5 | $7.2 | $7.1 | $7.4 | $5.6 | $28.7 | $29.2 | $27.4 |
| Fixed Frontline Management Fee | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.5) | (0.5) | (0.5) |
| Total Variable Management Fee | - | - | - | (0.1) | (0.1) | (0.2) | (0.2) | (0.2) | (0.1) | (0.7) | (0.7) | (0.7) |
| Total Management Fee | (0.1) | (0.1) | (0.1) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (1.2) | (1.2) | (1.2) |
| EBITDA | $6.3 | $6.3 | $5.3 | $5.0 | $5.3 | $6.9 | $6.8 | $7.1 | $5.3 | $27.5 | $28.0 | $26.2 |
| Special Survey Capex | - | - | - | (3.0) | - | - | - | - | (8.5) | - | - | - |
| Intermediate Survey Capex | - | - | - | - | - | - | - | - | - | (2.0) | - | (6.0) |
| Working Capital (upon return from BP) | - | - | - | (2.5) | - | - | (2.5) | - | - | - | - | - |
| Unlevered FCF | $6.3 | $6.3 | $5.3 | ($0.5) | $5.3 | $6.9 | $4.3 | $7.1 | ($3.2) | $25.5 | $28.0 | $20.2 |
| Cash Interest @7.84% | - | (7.7) | - | - | - | - | - | - | - | - | - | - |
| Amortization | - | (7.7) | - | - | - | - | - | - | - | - | - | - |
| Transaction/Professional Fees | - | - | - | (4.5) | - | - | - | - | - | - | - | - |
| FCF | $6.3 | ($9.1) | $5.3 | ($5.0) | $5.3 | $6.9 | $4.3 | $7.1 | ($3.2) | $25.5 | $28.0 | $20.2 |
| Other Changes in Cash | 2.4 | 0.9 | - | - | - | - | - | - | - | - | - | - |
| Ending Cash | $29.1 | $20.9 | $26.2 | $21.1 | $26.4 | $33.3 | $37.6 | $44.7 | $41.5 | $66.9 | $94.9 | $115.1 |
| Ending Debt Balance | $196.2 | $188.6 | 188.6 | - | - | - | - | - | - | - | - | - |
| Net Debt | 167.2 | 167.7 | 162.4 | (21.1) | (26.4) | (33.3) | (37.6) | (44.7) | (41.5) | (66.9) | (94.9) | (115.1) |

**EXHIBIT D TO THE DISCLOSURE STATEMENT**

**LIQUIDATION ANALYSIS**

**Windsor Holdings Limited**
**Liquidation Analysis**
**as of August 31, 2014**

|  | Chapter 11 | Chapter 7 |
|---|---|---|
| **Source of Funds** | | |
| *Assets* | | |
| Cash-Estimated Book Balance as of August 31, 2014 | $ 22,644,397 | $ 22,644,397 |
| Total Receipts from Operations | $ 7,194,523 | $ 650,000 |
| Proceeds from Avoidance Actions/Litigation | $ - | $ - |
| Vessels - Estimated Value [1] | $ 118,000,000 | $ 118,000,000 |
| | | |
| **Total Assets** | **$ 147,838,920** | **$ 141,294,397** |
| | | |
| | | |
| **Use of Funds** | | |
| *Liquidation Costs post 8/31/14* | | |
| Professional Fees--Through August 31, 2014 | $ 115,000 | $ 340,000 |
| Professional Fees-- Estimate Through 9/1/14 - Chapter 11 Effective Date | $ 200,000 | $ - |
| Professional Fees upon Effective Date (AMA/Houlihan Lokey) | $ 3,000,000 | $ - |
| Operating Expenses through Chapter 11 Effective Date | $ 12,108,979 | $ 12,108,979 |
| US Trustee Fees | $ 65,850 | $ 44,625 |
| Professional Fees-- Estimate related to Ch. 7 Scenario | $ - | $ 200,000 |
| Ch. 7 Trustee Fee | $ - | $ 4,719,582 |
| | | |
| **Total Use of Funds** | **$ 15,489,829** | **$ 17,413,186** |
| | | |
| | | |
| ***Value/Funds Available for Claims*** | **$ 132,349,091** | **$ 123,881,211** |

[1] The estimated value of the Vessels in both reorganization and liquidation scenarios is based on an estimate of the current market value of the Vessels.

**<u>EXHIBIT E TO THE DISCLOSURE STATEMENT</u>**

**ANALYSIS OF CERTAIN TAX CONSEQUENCES OF THE PLAN**

01:15870994.8

I.      **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

A summary description of certain material United States federal income tax consequences of the Plan is provided below.  This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein.  Only the principal consequences of the Plan for those Claimholders that are U.S. Holders, as defined below, and are entitled to vote to accept or reject the Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the United States Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding on the IRS or such other authorities.  As a result, there can be no assurance that the IRS will not disagree with or challenge any of the conclusions reached and described herein.  In addition, a significant amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan.  Events occurring after the date of this Disclosure Statement, including changes in law and changes in administrative positions, could affect the United States federal income tax consequences of the Plan.  No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any Claimholder or Equityholder.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

Except as otherwise specifically stated herein, this summary does not address any estate or gift tax consequences of the Plan or tax consequences of the Plan under any state, local or non-United States laws.  Furthermore, this discussion does not address all tax considerations that might be relevant to particular Claimholders in light of their personal circumstances or to persons that are subject to special tax rules.  In addition, this description of the material United States federal income tax consequences does not address the tax treatment of special classes of Claimholders, such as: banks, financial institutions, regulated investment companies, real estate investment trusts, tax-exempt entities, insurance companies, persons holding Claims as part of a hedging, integrated or conversion transaction, constructive sale or "straddle," United States expatriates, persons subject to the alternative minimum tax, dealers or traders in securities or currencies, and Claimholders that are individuals, corporations, estates or trusts that are not U.S. Holders.

For purposes of this discussion, "U.S. Holder" means a Claimholder that is: (1) a citizen or an individual resident of the United States, as determined for United States federal income tax purposes; (2) a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized under the laws of the United States or any state thereof or the District of Columbia; (3) an estate the income of which is subject to United States federal income taxation regardless of its source; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over its administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

If a pass-through entity, including a partnership or other entity or arrangement treated as a partnership for United States federal income tax purposes, is a Claimholder, the United States federal income tax treatment of an owner or partner will generally depend upon the status of such owner or partner and upon the activities of the pass-through entity.  A United States person that is an owner or partner of a pass-through entity that is a Claimholder should consult its own tax advisor regarding the tax consequences of the Plan to its particular situation.

The following discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), United States judicial decisions, administrative pronouncements and existing and proposed Treasury Regulations, all as in effect as of the date hereof.  All of the preceding authorities are subject to change, possibly with retroactive effect, so as to result in United States federal income tax consequences different from those discussed below.

**The following discussion is for general information only and is not intended to be, nor should it be construed to be, legal or tax advice to any Claimholder and no opinion or representation with respect to the United States federal income tax consequences to any such Claimholder is made.  U.S. Holders are urged to consult their own tax advisors regarding the application of United States federal, state and local tax laws, as well as any applicable non-United States tax laws, to their particular situations.**

## A.    United States Federal Income Tax Consequences for U.S. Holders Exchanging Claims under the Plan

The following discussion applies to U.S. Holders of Class 3 Claims.  The United States federal income tax consequences to a U.S. Holders (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (a) the manner in which such U.S. Holder acquired a Claim; (b) the length of time that such U.S. Holder has held the Claim; (c) whether such U.S. Holder acquired the Claim at a discount; (d) whether such U.S. Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in current or prior years; (e) whether such U.S. Holder previously included in taxable income accrued but unpaid interest with respect to the Claim; and (f) such U.S. Holder's method of accounting.  This discussion assumes that a U.S. Holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and that such Claim did not become completely or partially worthless in a prior taxable year.

### 1.    Treatment of the Exchange as a Section 351 Exchange

Although not free from doubt, the Company believes that the transaction, in which Class 3 Claimholders will contribute their Class 3 Claims to [New Holdco LLC] in exchange for Common Units (the "Exchange"), should qualify as an exchange under Section 351 of the Tax Code if, as expected, immediately after consummation of the Plan, Claimholders exchanging Claims for Common Units pursuant to the Plan, taken together, hold at least 80% of the aggregate voting power of [New Holdco LLC].  While

Section 351 of the Tax Code, when applicable, generally prevents recognition of both gains and losses, Section 367 of the Tax Code overrides the gain deferral provisions of Section 351 of the Tax Code where the corporation issuing stock is a non-United States corporation, and thus if the Exchange qualifies as an exchange under Section 351 of the Tax Code, a U.S. Holder should recognize gain, but not loss, for United States federal income tax purposes on the Exchange. The amount of such gain recognized by a U.S. Holder should equal the excess of (i) the fair market value of the Common Units received and (ii) such U.S. Holder's adjusted tax basis in the Claims surrendered in exchange for such Common Units.

In certain circumstances, a U.S. Holder may be able to avoid current recognition of gain under Section 367 of the Tax Code if such U.S. Holder owns less than 5% of the Common Units immediately after the transfer, or, if a U.S. Holder owns more than 5% of the Common Units immediately after the transfer, such U.S. Holder enters into a "gain recognition agreement" that meets the requirements set forth in the Treasury Regulations promulgated under Section 367 of the Tax Code and certain other conditions are met.  U.S. Holders are urged to consult their tax advisors regarding the availability of gain deferral under the exceptions outlined in the preceding sentence in their particular situations.

### 2.    Treatment of the Exchange as a Taxable Exchange

If Section 351 of the Tax Code does not apply to the receipt of Common Units by a U.S. Holder in connection with the discharge of Claims, the Exchange may be fully taxable and the U.S. Holder may recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (i) the fair market value of the Common Units received that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claims surrendered in the exchange therefor.  A U.S. Holder's adjusted tax basis in its Claims surrendered in the exchange would be equal to the amount paid therefor, increased by any accrued original issue discount ("OID") and any market discount and reduced by any amortizable bond premium previously taken into account.  The U.S. Holder's adjusted tax basis in the Common Units would equal the fair market value of such Common Units, and its holding period in the Common Units would begin on the day after the day of the Exchange.  Assuming a U.S. Holder holds such Claims as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claims at the time of the Exchange exceeds one year.

### 3.    Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered allowed Claim.

01:16082268.1

3

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  In addition, the Tax Code indicates that a U.S. Holder that receives Common Units in exchange for a debt acquired with market discount in a transaction that qualifies as an exchange under Section 351 of the Tax Code (as may occur here) should be treated as realizing an amount equal to the fair market value of claims transferred and should recognize the accrued market discount to the extent of any deemed gain under Treasury Regulations to be issued.  To date, specific Treasury Regulations implementing this rule have not been issued.

### 4.        Payment for Accrued but Unpaid Interest

To the extent that any amount received by a U.S. Holder of a surrendered allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income.  Conversely, a U.S. Holder of a surrendered allowed Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

The extent to which the consideration received by a U.S. Holder of a surrendered allowed Claim will be attributable to accrued interest on the debts constituting the surrendered allowed Claim is unclear.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the Plan, distributions in respect of allowed Claims shall be allocated first to the principal amount of such Claims (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

01:16082268.1

4

### B.    United States Federal Income Taxation of [New Holdco LLC]

#### 1.    United States Tax Classification of [New Holdco LLC]

[New Holdco LLC] is treated as a corporation for United States federal income tax purposes. As a result, U.S. Holders will not be directly subject to United States federal income tax on the income of [New Holdco LLC], but rather will be subject to United States federal income tax on distributions received from [New Holdco LLC] and dispositions of Common Units as described below

#### 2.    United States Federal Income Taxation of Operating Income

The Company anticipates that [New Holdco LLC] will earn substantially all of its income from the hiring or leasing of vessels for use on a voyage, time or bareboat charter basis, which is referred to as "shipping income."

Unless a non-United States corporation qualifies for an exemption from United States federal income taxation under Section 883 of the Tax Code, such corporation will be subject to United States federal income taxation on its "shipping income" that is treated as derived from sources within the United States.  For United States federal income tax purposes, 50% of shipping income that is attributable to transportation that begins or ends, but that does not both begin and end, in the United States constitutes income from sources within the United States ("United States source gross transportation income" or "USSGTI"), and, in the absence of exemption from tax under Section 883 of the Tax Code, such USSGTI generally will be subject to a 4% United States federal income tax imposed without allowance for deductions.

Shipping income of a non-United States corporation attributable to transportation that both begins and ends in the United States is considered to be derived entirely from sources within the United States.  However, United States law prohibits non-United States corporations, such as [New Holdco LLC], from engaging in transportation that produces income considered to be derived entirely from United States sources.

Shipping income of a non-United States corporation attributable to transportation exclusively between two non-United States ports will be considered to be derived entirely from sources outside the United States.  Shipping income of a non-United States corporation derived from sources outside the United States will not be subject to any United States federal income tax.

#### (a) Exemption of Operating Income from United States Federal Income Taxation

Under Section 883 of the Tax Code and the Treasury Regulations thereunder, a non-United States corporation will be exempt from United States federal income taxation of its United States source shipping income if:

(1) it is organized in a country that grants an "equivalent exemption" from tax to corporations organized in the United States in respect of each category of shipping

income, for which exemption is being claimed under Section 883 of the Tax Code (a "qualified foreign country"); and

(2) one of the following tests is met:

(A) more than 50% of the value of its stock is beneficially owned, directly or indirectly, by "qualified shareholders," which term includes persons that (i) are "residents" of qualified foreign countries and (ii) comply with certain substantiation requirements (the "50% Ownership Test");

(B) its stock is "primarily and regularly traded on an established securities market" in a qualified foreign country or in the United States (the "Publicly-Traded Test"); or

(C) it is a controlled foreign corporation (a "CFC") and it satisfies certain other requirements (collectively, the "CFC Test").

The Republic of the Marshall Islands, where [New Holdco LLC] will be created, has been officially recognized by the IRS as a qualified foreign country that grants the requisite "equivalent exemption" from tax in respect of each category of shipping income [New Holdco LLC] is expected to earn in the future.  Therefore, [New Holdco LLC] would be exempt from United States federal income taxation with respect to its United States-source shipping income if it satisfies any one of the 50% Ownership Test, the Publicly Traded Test or the CFC Test.  It is currently not anticipated that [New Holdco LLC] will satisfy the Publicly Traded Test, and it is uncertain whether [New Holdco LLC] will be able to satisfy either the 50% Ownership Test or the CFC Test.

### (b) Taxation in Absence of Section 883 Exemption

For any taxable year in which [New Holdco LLC] is not eligible for the benefits of Section 883 exemption, its USSGTI will be subject to a 4% tax imposed by Section 887 of the Tax Code without the benefit of deductions to the extent that such income is not considered to be "effectively connected" with the conduct of a United States trade or business, as described below.  Since under the sourcing rules described above, no more than 50% of [New Holdco LLC]'s shipping income would be treated as derived from sources within the United States, the maximum effective rate of United States federal income tax on the shipping income would never exceed 2% under this regime.

To the extent the shipping income of [New Holdco LLC] derived from sources within the United States is considered to be "effectively connected" with the conduct of a United States trade or business, as described below, any such "effectively connected" shipping income, net of applicable deductions, would be subject to United States federal income tax, currently imposed at rates of up to 35%.  In addition, [New Holdco LLC] would generally be subject to the 30% "branch profits" tax on earnings effectively connected with the conduct of such trade or business, as determined after allowance for certain adjustments, and on certain interest paid or deemed paid attributable to the conduct of its United States trade or business.

01:16082268.1

The shipping income of [New Holdco LLC] derived from voyage and time charters would be considered "effectively connected" with the conduct of a United States trade or business only if:

(1)      [New Holdco LLC] has, or is considered to have, a fixed place of business in the United States involved in the earning of United States source shipping income; and

(2)      substantially all of its United States source shipping income is attributable to regularly scheduled transportation, such as the operation of a vessel that follows a published schedule with repeated sailings at regular intervals between the same points for voyages that begin or end in the United States.

The shipping income of [New Holdco LLC] derived from bareboat charters would be considered "effectively connected" with the conduct of a United States trade or business only if substantially all of its United States source income from bareboat charters is attributable to a fixed place or business in the United States.

Based on the foregoing and on the expected mode of its shipping operations and other activities, it is anticipated that none of the shipping income of [New Holdco LLC] will be "effectively connected" with the conduct of a United States trade or business.

### (c) United States Taxation of Gain on Sale of Vessels

Regardless of whether [New Holdco LLC] qualifies for exemption under Section 883 of the Tax Code, [New Holdco LLC] will not be subject to United States federal income tax with respect to gain realized on a sale of a vessel, provided that (i) the sale is considered to occur outside of the United States under United States federal income tax principles and (ii) such sale is not attributable to an office or other fixed place of business in the United States.  In general, a sale of a vessel will be considered to occur outside of the United States for this purpose if title to the vessel, and risk of loss with respect to the vessel, pass to the buyer outside of the United States.  [New Holdco LLC] is expected to conduct its operations so that the gain on any sale of a vessel by [New Holdco LLC] will not be taxable in the United States.

### C.   United States Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of Common Units

### 1.   Distributions on Common Units

Subject to the discussion of passive foreign investment companies ("PFICs") below, any distributions made by [New Holdco LLC] with respect to Common Units will generally constitute dividends to the extent of [New Holdco LLC]'s current or accumulated earnings and profits, as determined under United States federal income tax principles. Distributions in excess of those earnings and profits will be treated first as a nontaxable return of capital to the extent of the U.S. Holder's tax basis in its Common

Units, and thereafter as capital gain. Because [New Holdco LLC] is not a United States corporation, U.S. Holders that are corporations will generally not be entitled to claim a dividends-received deduction with respect to distributions they receive from [New Holdco LLC].  In addition, dividends will not be eligible for a reduced rate of United States income tax for individual U.S. Holders.  Distributions taxable as dividends generally will be treated as foreign source "passive category income" for United States foreign tax credit purposes.

### 2.    Sale, Exchange or Other Taxable Disposition of Common Units

Except as discussed above with respect to market discount, and subject to the discussion of PFICs below, gain or loss recognized by a U.S. Holder on a sale, exchange or other taxable disposition of Common Units will generally equal the difference, if any, between the amount realized and the U.S. Holder's adjusted tax basis in the Common Units, as applicable, at the time of such sale, exchange or other taxable disposition.  Assuming such Common Units is held as a capital asset, any such gain or loss will be long-term capital gain or loss if the holding period for the Common Units exchanged is more than one year at that time.  The deductibility of capital losses is subject to limitations.  Gain or loss, if any, realized upon a sale, exchange or other taxable disposition of a Common Unit will be treated as having a United States source for United States foreign tax credit limitation purposes.

If a U.S. Holder receives any foreign currency on the sale of a Common Unit, such U.S. Holder may recognize ordinary income or loss as a result of currency fluctuations between the date of the sale and the date the sale proceeds are converted into United States dollars.

### 3.    Passive Foreign Investment Company Considerations

The foregoing discussion assumes that [New Holdco LLC] is not, and will not be, a PFIC.  If [New Holdco LLC] were classified as a PFIC in any year during which a U.S. Holder owns Common Units, the United States federal income tax consequences to such U.S. Holder of the ownership and disposition of Common Units could be materially different from those described above.

[New Holdco LLC] will be a PFIC if either:

- 75% or more of its gross income in a taxable year consists of "passive income" (generally including dividends, interest, gains from the sale or exchange of investment property); or

- at least 50% of its assets in a taxable year (averaged over the year and generally determined based upon either value or tax basis depending on the application of certain tests) produce or are held for the production of passive income.

For purposes of determining whether [New Holdco LLC] will be a PFIC, New Holdco will be treated as earning and owning a proportionate share of the income and assets, respectively, of its subsidiaries that are treated as pass-through entities for United States federal income tax purposes as well as of any other corporate subsidiary in which it owns at least 25% of the value of the subsidiary's stock.  For purposes of determining the PFIC status of [New Holdco LLC], income earned by [New Holdco LLC] in connection with the performance of services would not constitute passive income.  By contrast, rental income would generally constitute "passive income" unless [New Holdco LLC] were treated under specific rules as deriving its rental income in the active conduct of a trade or business.  The Company expects [New Holdco LLC] to treat any income it derives from its bareboat chartering activities as passive rental income.  The Company also expects [New Holdco LLC] to take the position that income it derives from its voyage and time chartering activities are services income, rather than rental income, and accordingly, that such income is not passive income for purposes of determining the PFIC status of [New Holdco LLC].  The Company believes that there is substantial legal authority supporting such position consisting of case law and IRS pronouncements concerning the characterization of income derived from voyage and time charters as services income for other tax purposes.

[Assuming that it is proper to characterize income from voyage and time chartering activities of [New Holdco LLC] as services income and based on the expected composition of the income and assets of [New Holdco LLC], the Company does not expect [New Holdco LLC] to be a PFIC in 2014 or to become a PFIC in any subsequent year.] [1]  However, the characterization of income from voyage and time charters as services income is not free from doubt.  Moreover, the determination of PFIC status for any year must be made only on an annual basis after the end of such taxable year and will depend on the composition of the income, assets and operations of [New Holdco LLC] during such taxable year.  Because of the above described uncertainties, there can be no assurance that the IRS will not challenge the determination made by [New Holdco LLC] concerning its PFIC status or that [New Holdco LLC] will not be a PFIC for any taxable year.

If [New Holdco LLC] were treated as a PFIC for any taxable year during which a U.S. Holder owns Common Units, the U.S. Holder would be subject to special adverse rules (described in "—Taxation of U.S. Holders Not Making a Timely QEF or Mark-to-Market Election") unless the U.S. Holder makes a timely election to treat [New Holdco LLC] as a "Qualified Electing Fund" (a "QEF election") or marks its Common Units to market, as discussed below.

***Taxation of U.S. Holders Making a Timely QEF Election.***  If a U.S. Holder makes a timely QEF election, such U.S. Holder must report for United States federal income tax purposes its pro-rata share of ordinary earnings and net capital gain of [New

---

[1] Confirm that the income derived from the bareboat charter of British Purpose will be less than 65% of the total income of New Holdco LLC and the value of British Purpose is less than 30% of the total value of the assets of New Holdco LLC.

Holdco LLC], if any, for each of [New Holdco LLC]'s taxable years during which it is a PFIC that ends with or within the taxable year of such U.S. Holder, regardless of whether distributions were received from [New Holdco LLC] by such U.S. Holder.  Net capital gain inclusions of certain non-corporate U.S. Holders might be eligible for preferential capital gains tax rates.  The U.S. Holder's adjusted tax basis in the Common Units will be increased to reflect any income included under the QEF election.  Distributions of previously taxed income will not be subject to tax upon distribution but will decrease the U.S. Holder's tax basis in the Common Units.  An electing U.S. Holder would not, however, be entitled to a deduction for its pro-rata share of any losses that [New Holdco LLC] incurs with respect to any taxable year.  An electing U.S. Holder would generally recognize capital gain or loss on the sale, exchange or other disposition of Common Units.  A U.S. Holder would make a timely QEF election for Common Units by filing IRS Form 8621 with its U.S. federal income tax return for the first year in which it held such Common Units when [New Holdco LLC] was a PFIC.  If [New Holdco LLC] determines that it is a PFIC for any taxable year, [New Holdco LLC] would provide each U.S. Holder with all necessary information in order to make the QEF election described above.

   ***Taxation of U.S. Holders Making a "Mark-to-Market" Election.***  Alternatively, if [New Holdco LLC] is treated as a PFIC for any taxable year and Common Units are treated as "marketable stock," a U.S. Holder would be allowed to make a "mark-to-market" election with respect to Common Units.  If that election is properly made, the U.S. Holder generally would include as ordinary income in each taxable year the excess, if any, of the fair market value of the Common Units at the end of the taxable year over such U.S. Holder's adjusted tax basis in the Common Units.  The U.S. Holder would also be permitted an ordinary loss in respect of the excess, if any, of the U.S. Holder's adjusted tax basis in the Common Units over its fair market value at the end of the taxable year, but only to the extent of the net amount previously included in income as a result of the mark-to-market election.  A U.S. Holder's tax basis in its Common Units would be adjusted to reflect any such income or loss amount recognized.  Any gain realized on the sale, exchange or other disposition of Common Units would be treated as ordinary income, and any loss realized on the sale, exchange or other disposition of the Common Units would be treated as ordinary loss to the extent that such loss does not exceed the net mark-to-market gains previously included by the U.S. Holder.

   ***Taxation of U.S. Holders Not Making a Timely QEF or Mark-to-Market Election***.  If [New Holdco LLC] is treated as a PFIC for any taxable year, a U.S. Holder that does not make either a QEF election or a "mark-to-market" election (a "Non-Electing Holder") would be subject to special rules with respect to (1) any excess distribution (i.e., the portion of any distributions received by the Non-Electing Holder on the Common Units in a taxable year in excess of 125% of the average annual distributions received by the Non-Electing Holder in the three preceding taxable years, or, if shorter, the Non-Electing Holder's holding period for the Common Units), and (2) any gain realized on the sale, exchange or other disposition of the Common Units.  Under these special rules:

(1)      the excess distribution or gain would be allocated ratably over the Non-Electing Holder's aggregate holding period for the Common Units; and

(2)      the amount allocated to each of the other taxable years would be subject to tax at the highest rate of tax in effect for the applicable class of taxpayer for that year, and an interest charge for the deemed tax deferral benefit would be imposed with respect to the resulting tax attributable to each such other taxable year.

Furthermore, in any year in which [New Holdco LLC] is classified as a PFIC, regardless of whether a U.S. Holder makes a QEF election or a mark-to-market election, such U.S. Holder generally will be required to file an annual report with the IRS containing such information as Treasury Regulations and/or other IRS guidance may require.

The PFIC rules are complex, and U.S. Holders are urged to consult their tax advisors concerning the U.S. federal income tax consequences of holding Common Units if [New Holdco LLC] is considered a PFIC in any taxable year, including the requirement to file an IRS Form 8621.

### 4.      <u>Controlled Foreign Corporation Status</u>

If more than 50% of the total value or total combined voting power of all Common Units is owned, directly, indirectly or constructively by U.S. Holders, each of whom own, after applying attribution rules, 10% or more of the total combined voting power of all Common Units (a "10% U.S. Holder"), [New Holdco LLC] would be treated as a CFC.  This classification would result in the application of many complex rules, including the required inclusion in income by 10% U.S. Holders of their pro rata share of any "Subpart F income" and any investments in "United States property" (each as defined by the Tax Code) of [New Holdco LLC]. Shipping income does not constitute Subpart F income provided that it is treated as services income and not as rental income (*see* the discussion above in "—Passive Foreign Investment Company Considerations" above). In addition, under Section 1248 of the Tax Code, if [New Holdco LLC] was to be considered a CFC at any time during the five-year period ending with the sale or exchange of Common Units by a 10% U.S. Holder, gain from such sale or exchange would generally be treated as dividend income to the extent of [New Holdco LLC]'s earnings and profits attributable to the Common Units sold or exchanged. If [New Holdco LLC] were to become a CFC, the PFIC rules discussed above would generally not apply with regard to any 10% U.S. Holder.  Because of the complexity of the Subpart F rules, a more detailed review of these rules is beyond the scope of this discussion.

### 5.      <u>Medicare Tax</u>

A U.S. Holder that is an individual, estate or a trust that does not fall into a special class of trusts that is exempt from such tax will be subject to a 3.8% tax on the lesser of (1) the U.S. Holder's "net investment income" for the relevant taxable year and (2) the excess of the U.S. Holder's modified adjusted gross income for the taxable year over a certain threshold (which in the case of individuals will be between $125,000 and

$250,000, depending on the individual's circumstances). A U.S. Holder's investment income will generally include the dividends and the net gains realized from the disposition of the Common Units, unless such dividend income or net gains are derived in the ordinary course of the conduct of a trade or business (other than a trade or business that consists of certain passive or trading activities). U.S. Holders that are individuals, estates or trusts are urged to consult their tax advisors regarding the applicability of the Medicare tax to their income and gains in respect of their investment in the Common Units.

### D.    Information Reporting and Backup Withholding

Certain payments, including distributions or payments in respect of Claims pursuant to the Plan, generally are subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding (currently at a rate of 28%) under certain circumstances. Under the backup withholding rules set forth in the Tax Code, a Claimholder receiving a payment or distribution of cash or other property pursuant to the Plan may be subject to backup withholding with respect to such payment or distribution unless such Claimholder (i) is an exempt recipient, such as a corporation, and when required, demonstrate this exemption, or (ii) timely provides a correct United States taxpayer identification number and makes certain certifications under penalties of perjury.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's United States federal income tax liability, and the U.S. Holder may obtain a refund of excess amounts withheld under the backup withholding tax rules by timely filing an appropriate claim for refund with the IRS.

01:16082268.1

**EXHIBIT F TO THE DISCLOSURE STATEMENT**

**CORPORATE ORGANIZATIONAL CHART**

**_WINDSOR PETROLEUM - CURRENT STRUCTURE_**



** The Companies lease the Vessels from the applicable Replacement Owner/Lessor pursuant to four separate lease agreements (the "**Lease Agreements**").